## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **ADA MORALES** | : | |
| | : | |
| **v.** | : | **C.A. NO.: 12-301-M-DLM** |
| | : | |
| **BRUCE CHADBOURNE,** | : | |
| **DAVID RICCIO, EDWARD DONAGHY,** | : | |
| **GREG MERCURIO, ICE DOES 1-5,** | : | |
| **RHODE ISLAND DOES 1-10,** | : | |
| **ASHBEL T. WALL** | : | |

## MOTION FOR SUMMARY JUDGMENT

Now comes Defendant, Ashbel T. Wall in his official and individual capacity as Director of the R.I. Department of Corrections ("Defendant," "RIDOC" or "Wall"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for Summary Judgment on the Amended Complaint in this civil action filed by Plaintiff, Ada Morales ("Plaintiff" or "Morales"). In support, Defendant submits the accompanying Memorandum of Law.

WHEREFORE, Defendant respectfully requests that this Motion for Summary Judgment be granted.

DEFENDANT

Ashbel T. Wall, individually and in his
official capacity as Director of the Rhode
Island Department of Corrections

By his Attorney,

PETER F. KILMARTIN
ATTORNEY GENERAL

/s/ Adam J. Sholes_____
Adam J. Sholes, Esq. Bar No. 7204
Thomas A. Palombo, Bar No. 4212
Assistant Attorneys General
R.I. Department of Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel.: (401) 274-4400, Extension 2219
ajsholes@riag.ri.gov


## CERTIFICATE OF SERVICE

I hereby certify that I filed the within Motion for Summary Judgment via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF system to the following attorneys on this 22nd day of September, 2015.


/s/ Adam J. Sholes_____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **ADA MORALES** | : | |
| | : | |
| **v.** | : | **C.A. NO.: 12-301-M-DLM** |
| | : | |
| **BRUCE CHADBOURNE,** | : | |
| **DAVID RICCIO, EDWARD DONAGHY,** | : | |
| **GREG MERCURIO, ICE DOES 1-5,** | : | |
| **RHODE ISLAND DOES 1-10,** | : | |
| **ASHBEL T. WALL** | : | |

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This Memorandum  of Law supports the Motion for Summary Judgment by Ashbel T.

Wall in his official and individual capacity as Director of the R.I. Department of Corrections

("Defendant," "RIDOC" or "Wall"), pursuant to Rule 56 of the Federal Rules of Civil Procedure

on the Amended Complaint filed by Plaintiff, Ada Morales ("Plaintiff" or "Morales").  For the

reasons set forth herein, Wall asserts that he is entitled to judgment on all counts in both his

official and individual capacity.

## PROCEDURAL HISTORY

On May 3, 2012, Morales filed a thirty-two page Complaint setting forth eleven counts

against various Federal[1] and State officials.  With respect to Director Wall, Morales alleges four

counts: Counts IV and V are §1983 claims (Complaint ¶¶111-120); Count VII and VIII are state

false imprisonment and negligence claims (Complaint ¶¶121-128).  In sum, Morales contends

that Director Wall violated her rights by adopting policies and procedures that honored all

Immigration Customs and Enforcement ("ICE") detainers even if the detainer is not supported by

---

[1] In addition to Wall, the Plaintiff brought this civil action against the United States under the Federal Tort Claims Act and <u>Bivens</u> claims against multiple ICE agents and supervisors in their individual capacities.  Wall will refer to them collectively as the "Federal Defendants."  Wall has filed cross-claims against all of the Federal Defendants.

probable cause.  Complaint ¶79.  Morales also asserts that Director Wall failed to provide any notice and an opportunity to be heard in violation of her constitutional due process.  Complaint ¶116.  Although the Complaint named Rhode Island Does 1-10, the Complaint was never amended to substitute a party.  The only named State defendant in this civil action is Director Wall in his official and individual capacity.

On September 4, 2012, Director Wall filed a motion to dismiss (ECF No. 21).  On February 12, 2014, this Court issued its decision denying Director Walls' motion (ECF No. 64).  See Morales v. Chadbourne, 996 F.Supp. 2d 19 (D.R.I. 2014).  Director Wall argued that RIDOC lawfully detained Morales because the detainer indicated that it was "required" to hold her for up to 48 hours.  In denying Director Walls' motion, this Court noted that "the information in the detainer itself should have led the RIDOC to believe that it was not facially valid or based on probable cause."  Id. at 39.  With respect to Director Wall's argument that it was required to honor the detainer, this Court relied on its ruling that the detainer was "not valid on its face."  Id.  This Court stated that "[t]he RIDOC was faced with a facially invalid request to detain Ms. Morales pending an investigation of her immigration status lodged solely based on her country of birth.  Therefore, the Court finds that Ms. Morales' claim that the RIDOC illegally detained her in violation of the Fourth Amendment survives the State's motion to dismiss."  Id.

With respect to the Plaintiff's procedural due process claim (Count V), this Court ruled that "ICE detainers are not mandatory."  Id. at 40.  This Court reasoned that "[t]he language of both the regulations and case law persuade the Court that detainers are not mandatory and the RIDOC should not have reasonably concluded as such."  Id.  This Court concluded that because RIDOC policy was that ICE detainers should be treated as mandatory, then it was incumbent on Director Wall to "put due process protections in place to avoid erroneous deprivations of

2

liberty." Id.  Importantly, unlike the Federal Defendants, Director Wall did not raise qualified immunity from suit in his motion to dismiss.  Wall now argues, in part, that he enjoys qualified immunity from suit for monetary damages.

A motion to dismiss addresses the plausibility of the claims in the complaint and assumes facts therein as true whereas a motion for summary judgment addresses whether genuine issues of material fact exist to support the claims.   See Fin. Res. Network, Inc. v. Brown & Brown, Inc., 754 F. Supp. 2d 128, 155 (D. Mass. 2010).  See also Conley v. U.S., 323 F.3d 7, 13 (1st Cir.2003) (en banc) (Boudin, C.J.) (law of "case is not a straitjacket but can be avoided—at the direction of the court that made the invoked ruling—on several different bases").   Since the denial of the Director's motion, the parties have engaged in extensive discovery.  A different factual record and a different standard of review govern summary judgment motions.  The facts in the Rule 12(b)(6) record, while similar, are not identical to those in the summary judgment record.   A different legal standard of review also applies when assessing the merits of defendants' summary judgment motions.

Moreover, "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." W. Reserve Life Assur. Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329 (D.R.I. 2012); Perez–Ruiz v. Crespo–Guillen, 25 F.3d 40 (1st Cir.1994); Union Mut. Life Ins. Co. v. Chrysler Corp., 793 F.2d 1 (1st Cir.1986).  Indeed, pretrial rulings are designed to be preliminary and, as such, a "[d]enial of a motion to dismiss may be followed by an order granting dismissal, or—in the very nature of the difference between a ruling on the pleadings and an examination of the record—an order granting summary judgment." 18B Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4478.1 (2nd ed.).

On July 17, 2015, the First Circuit issued a decision concerning an interlocutory appeal filed by Federal Defendants Donaghy, Riccio[2] and Chadbourne.  Morales v. Chadbourne, 793 F.3d 208 (1st Cir. 2015).  The appeal concerned the denial of qualified immunity asserted by the Federal Defendants before discovery commenced.  Director Wall did not assert qualified immunity as part of his motion to dismiss and was not a party to the appeal.  In relevant part, the First Circuit affirmed the denial of qualified immunity for the Federal Defendants.

## UNDISPUTED FACTS OF THE CASE

Wall has filed the requisite Statement of Undisputed Facts ("SUF") pursuant to Local Rule 56, which sets forth the following:

1.  On May 2, 2009, Morales was arrested by the Rhode Island State Police ("RISP") on the charge of obtaining money under false pretenses.  See Amended Complaint ¶26, Exhibit A: RISP Arrest Report.  During her deposition, Morales testified that a RISP trooper appeared at her house and took her into custody without telling her the reason.  Exhibit B: Deposition of Ada Morales, p. 19.  Morales denies that she was arrested following a traffic stop.  Id.

2.  The RISP Arrest Report states:  "On May 2, 2009 at approximately 2:50 p.m. Trooper Ruggiero while on patrol of Douglas Ave in the City of Providence" pulled over Morales' vehicle for a traffic stop.  During the encounter, Trooper Ruggiero ran her name through the NCIC database and learned that "she had an active Superior Court bench warrant for FTA-Arraignment for UMUFP over $500."  The Trooper then advised Morales of the warrant and placed her under arrest.  She was transported to the Lincoln Barracks. Exhibit A: RISP Arrest Report.

3.  Within a matter of hours, Morales was transported from the RISP Lincoln Barracks to the RIDOC in Cranston, RI.  According to RIDOC's INFACTS database, Morales was committed to RIDOC sometime around 4:42 p.m. on May 2, 2009.  Exhibit C: INFACTS printout 0018.

4.  Upon arrival at RIDOC, staff from the ID unit began the commitment process for Morales.  As part of this process, Morales would have been asked questions such as her address, emergency contact information, race, eye color, hair color, nativity (place of birth) and social security number.  In addition, her weight, height measurements and a

---

[2] Subsequently, Defendant Riccio was voluntarily dismissed from this case by stipulation of the parties.  ECF No. 150.

photograph would be taken.   Exhibit D: Deposition of Captain Kathleen Lyons, March 5, 2015, p. 21-40.

5.   Although RIDOC expected that all detainees would be asked, upon commitment, whether they claim to be a U.S. citizen, it was not required to complete the booking process. Exhibit D: Deposition of Captain Kathleen Lyons, March 5, 2015, p. 35; Exhibit E: Response for Request for Admissions Nos. 1-4.

6.   An answer for nativity (place of birth) is required to be entered into the INFACTS database by a member of RIDOC staff in order for the commitment process to move forward.   An answer to U.S. citizenship is not required for the commitment process to continue.  Exhibit D: Deposition of Captain Kathleen Lyons, March 5, 2015, pgs. 31, 35; Exhibit E: Request for Admissions Nos. 1-4.

7.   RIDOC does not verify a person's citizenship or nativity.   Exhibit D: Deposition of Captain Kathleen Lyons, March 5, 2015, pgs. 38-39.

8.   Morales testified that, upon commitment, she was asked her nativity and citizenship.  Her responses were that she was born in Guatemala and was a U.S. citizen.   Exhibit B: Deposition of Ada Morales pg. 26.

9.   The INFACTS database for Morales indicates on that, on May 2, 2009, the "field" entitled U.S. citizen was left blank or null.  Exhibit F: Deposition of Michelle Lanciaux, p. 101.

10.   Although ICE Agent Edward Donaghy ("Donaghy") has no independent recollection of what occurred on Monday May 4, 2009, it was his custom to report to work at around 6 a.m. to begin to search the daily commitment lists for newly committed persons at RIDOC.  Exhibit G: Deposition of Edward Donaghy, p. 96-97.  As a law enforcement agency, ICE had access to RIDOC's INFACTS database and was able to run reports on its own. Id. 101-102.

11.   After retrieving the daily commitment report, Donaghy reviewed the INFACTS database to determine whether each individual on the commitment list claimed to be foreign born and/or a U.S. citizen.  Exhibit G: Deposition of Donaghy, p. 125-126.  If Donaghy believed U.S. citizenship was in question after his initial search through the INFACTS database, Donaghy would run that person's name through two Federal databases, CIS and NCIC, to determine whether that person was a citizen or permanent lawful resident.  Id. at 127-128, 137-138.  Donaghy did not rely solely on INFACTS before issuing a detainer. Id. at 266.

12.   Donaghy would only issue immigration detainers when he believed he had probable cause.  Donaghy had never issued a detainer with less than probable cause.  Exhibit G: Deposition of Donaghy, p. 192.

13.     On Monday May 4, 2009, at approximately 8:32 a.m., RIDOC received an immigration detainer issued by Donaghy.  See Amended Complaint ¶31; Exhibit H: Detainer.

14.     After issuing a detainer, Donaghy expected that the RIDOC would honor the detainer. Exhibit G: Deposition of Donaghy, p. 261.

15.     Donaghy did not expect the RIDOC to conduct any further independent investigation with respect to the detainer.  Exhibit G: Deposition of Donaghy, p. 261-262.

16.     The immigration detainer "form" informed RIDOC that Federal regulations "require" RIDOC to detain Morales for a period not to exceed 48 hours.  Exhibit H: Detainer.

17.     Subsequent to receiving the immigration detainer, on May 4, 2009, Morales was brought before the Superior Court for a bail hearing.  Morales appeared shortly before noon. Exhibit B: Deposition of Ada Morales, p. 40-41.

18.     At the Court hearing, Superior Court Magistrate Patricia Harwood granted bail in the form of $10,000 personal recognizance.  Exhibit I: Transcript from May 4, 2009 hearing. Judge Harwood, however, indicated to Morales that she would not be allowed to leave because of an immigration hold.  Id.  Morales protested to the judge and claimed to be a U.S. citizen.  Exhibit B: Deposition of Ada Morales, p. 45-46.  Morales' husband was in the courtroom holding Ms. Morales' passport in plain view for all to see.  Id.  The attorney for Morales was aware that she was being held solely on an immigration detainer and told her that "there's nothing I can do." Id. at 47.

19.     At no time on May 4, 2009 did the Magistrate Judge Harwood order that Morales be unrestrained.   Exhibit B: Deposition of Ada Morales, p. 44.  Morales was eventually brought back to the holding cell within the courthouse and was there "for a while" before being transported back to the ACI.  Id. at 48.

20.     After the court hearing, Morales' husband, Hugo Morales, contacted another attorney to attempt to clear up the immigration issue.  In addition, Mr. Morales unsuccessfully attempted to contact immigration officials.  Exhibit B: Deposition of Ada Morales, p. 47-48.   At no time did Mr. Morales contact RIDOC or appear at the RIDOC with documentation indicating that Ms. Morales was a U.S. citizen. Id. at 78.

21.     Sometime during the afternoon on Monday, May 4, 2009, the Rhode Island Sheriff's Department transported Morales back to the RIDOC.  Exhibit J: Deposition of Captain Kathleen Lyons, April 8, 2015, p. 59-60; Exhibit B: Deposition of Ada Morales, p. 49.

22.     On May 4, 2009, after being transported back to RIDOC by the Sheriff's Department, RIDOC attempted to contact ICE to ascertain the status of the immigration detainer. Because ICE's office closed at 4 p.m., RIDOC did not hear back from ICE that day. Exhibit K: Fax to ICE.

23.     As a sole result of the detainer, Morales was held at the RIDOC from Monday afternoon until ICE picked her up on Tuesday morning.  See Amended Complaint ¶63.

24.   On Tuesday May 5, 2009, at approximately 10:00 a.m. ICE picked up Morales from the RIDOC.  Exhibit B: Deposition of Ada Morales, p. 55.

25.   After being questioned by ICE agents at the ICE facility, Morales was released from its custody.  Exhibit B: Deposition of Ada Morales, p. 93-95.

26.   Morales had previously been detained on an immigration detainer in 2004 when she was held by the City of Cranston.  RIDOC had no involvement with the 2004 detention. Exhibit B: Deposition of Ada Morales, p, 13-15.

27.   For at least 30 years before July 2014, RIDOC practice was to honor all immigration detainers.  RIDOC did not have a written policy with respect to this practice.  Exhibit L: Supplemental Answer to Interrogatory to No. 2.

28.   Director Wall was appointed Director of RIDOC in April 2000.  The practice to honor all ICE detainers predated his appointment.   Exhibit L: Supplemental Answer to Interrogatory No. 2.

29.   Prior to May 4, 2009, Director Wall believed that RIDOC's practice of honoring all detainers was constitutional.  Exhibit M: Deposition of Director Wall, p. 31.  Director Wall testified that as of May 4, 2009 he understood that it was his Department's obligation to honor all immigration detainers.  Id.  In addition, Director Wall believed that whether a detainer was properly issued was beyond RIDOC's control. Id. at 34.

30.   Director Wall testified that prior to May 2009, this issue of whether an immigration detainer was mandatory or voluntary had not been brought to his attention.  Exhibit M: Deposition of Director Wall, p. 94.  At some point after Governor Chafee began his term in 2011, Director Wall recalls being approached by advocates who lobbied for RIDOC not to honor detainers.  Id. at 80-81.  Director Wall responded that he thought this issue was "bigger than [RIDOC]" and that this policy would have to be set at a higher level than himself.  Id. at 92-93.  Director Wall recalls at that time he spoke with legal counsel at RIDOC and he was told that RIDOC policy was "lawful."  Id. at 96.

31.   After this Court's decision in February 2014, Director Wall contacted the Governor's Office to discuss RIDOC's practice concerning detainers.  Exhibit M: Deposition of Director Wall, p. 99.  On July 16, 2014, the Governor issued a written policy regarding immigration detainers.  In sum, per the policy, RIDOC will only honor detainers that have been ordered by a judge.  Exhibit N: Governor's Order; Exhibit M: Deposition of Director Wall, p. 100

32.   When meeting with the Governor, Director Wall agreed that the policy should be changed.  For Director Wall, "a compelling reason…was that I learned this document from the Department of Homeland Security didn't have the weight that it purported to have.  What I was told was a requirement was not enforceable, and I had not been

informed beforehand that that was the case."  Exhibit M: Deposition of Director Wall, p. 102.

33.    Director Wall explained that he believed the detainer was a Federal mandate to hold a person.  The reason for his belief was "[w]hen I see the language 'federal regulations' and there's a citation to them and then the word 'require,' that's what I conclude, that that's pretty forceful language in an official document.  We're not going to thumb our nose at it."  Exhibit M: Deposition of Director Wall, pg. 108.

34.    Bruce Chadbourne ("Chadbourne"), the Field Director Officer ("FDO") in 2009 was responsible for all ICE units within the Boston Field Office.  The Boston Field Office consisted of all six New England states.  Exhibit O: Deposition of Chadbourne, p. 11-12.

35.    Chadbourne testified that, as of May 2009, although he did not believe immigration detainers required a law enforcement agency to detain an individual, every law enforcement agency in New England that was issued a detainer honored the detainer. Exhibit O: Deposition of Chadbourne, p. 89-91.  Chadbourne believes that two agencies, namely the Chelsea Police Department and a western Massachusetts prison facility had concerns about whether detainers were enforceable.  However, as of May 2009, no law enforcement agency in New England refused to honor detainers.  Deposition of Chadbourne, pgs. 88-90.  It would be "rare" for a law enforcement agency to refuse to honor a detainer.  Id. at 40-41.

36.    Chadbourne also testified that he did not expect RIDOC to take any further action or investigation after receiving the detainer from ICE.  Exhibit O: Deposition of Chadbourne, p. 91-92.

37.    John Drane ("Drane"), the Supervisory Detention and Deportation Officer ("SDDO") for the Providence sub-office of ICE, testified that he believed in May 2009 that RIDOC was expected to honor immigration detainers.  Exhibit P: Deposition of Drane, p. 49-50, 179.

38.    According to Drane, as 2009, no law enforcement agency had refused to honor immigration detainers or asked for additional information from ICE regarding detainers. Exhibit P: Deposition of Drane, p. 49.  Drane would be "surprised" if a local law enforcement agency asked for additional information about an individual.  Id.

39.    Drane also testified that it was not part of RIDOC's job to ask a person about their immigration status.  Exhibit P: Deposition of Drane, p. 104.

40.    Although individuals often claim to be U.S. citizens when they are not, it was rare for a detainer to be issued on a U.S. citizen.  Exhibit P: Deposition of Drane, p. 121-122; Exhibit O: Deposition of Chadbourne, p. 49-52.

41.    The detainer issued for Plaintiff Morales was a standard form used nationwide.  Exhibit O: Deposition of Chadbourne, p. 87-88; Exhibit P: Deposition of Drane, p. 180.

## LEGAL STANDARD

In order to grant summary judgment, the Court must find that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009). The initial burden is on the moving party to show the absence of genuine issues of material fact, after which "the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingram v. Brink's, Inc., 414 F.3d 222, 228–29 (1st Cir. 2005).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Thompson v. Coca–Cola Co., 522 F.3d 168, 175 (1st Cir. 2008).  A material fact "has the potential of determining the outcome of the litigation."  Maymi v. Puerto Rico Ports Authority, 515 F.3d 20, 25 (1st Cir. 2008).

## ARGUMENT

1.  **Director Wall cannot be personally liable for RIDOC's policy to honor all ICE detainers.**

Director Wall is being sued in his individual capacity in two counts:[3]

- Count IV: Unreasonable seizure – Fourth and Fourteenth Amendments (42 U.S.C. §1983)

- Count V:  Due Process - Fourteenth Amendment (42 U.S.C. §1983)[4]

In Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009), the Supreme Court stated:  "In a § 1983 suit or a Bivens action – where masters do not answer for the torts of their servants – the term "supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  This continues the long

---

[3] Plaintiff withdrew Count VI:  Equal Protection - Fourteenth Amendment under §1983.
[4] The RIDOC is also being sued for false imprisonment and inadequate medical care.

line of precedent prohibiting *respondeat superior* liability.  See Monell v. Department of Social Services, 436 U.S. 658, 690-92 (1978) and Gutierrez-Rodriguez v. Cartagena, 882 F.2d 533, 562 (1st Cir. 1989).

The First Circuit has ruled that "supervisory liability lies only where an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation."  Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) (Internal citations and quotation marks omitted.) The affirmative link requirement "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995).  Deliberate indifference "will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights."  Id. (citation and quotations omitted).

"Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference."  Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (citations and quotations omitted).  Further, "the plaintiff must show that the official had actual or constructive notice of the constitutional violation."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (Citations omitted.)  A supervisor's act or omission may be in "formulating a policy, or engaging in a custom, that leads to the challenged occurrence…he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and

authority to alleviate it." <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 582 (1st Cir. 1994) (Citations omitted.)  Lastly, "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." <u>Id</u>. (citations omitted).

As an example from the First Circuit, in <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 266 (1st Cir. 2009), the mayor of Barceloneta, Puerto Rico established a policy to dispose of pets in public housing complexes.  After residents refused to follow the policy, a private contractor was hired who killed many of the pets by throwing them against a van or off a nearby cliff.  568 F.3d at 267.  Applying the deliberate indifference standard, the court held that the mayor could not be held liable under 42 U.S.C. §1983, despite establishing the policy to dispose of the pets and his presence at one of the raids.  <u>Id</u>. at 275.  The First Circuit said that, to support a claim of supervisory liability, a plaintiff must plead facts indicating "<u>an affirmative link between the behavior of the subordinate and the action or inaction of his supervisor…such that the supervisor's conduct led inexorably to the constitutional violation</u>."  <u>Id</u>. at 275 (citations and internal quotations omitted, with emphasis supplied).  Simply creating a policy, which was silent to the manner of how to dispose of the pets, was "insufficient to create the affirmative link necessary for a finding of supervisory liability, even under a theory of deliberate indifference." <u>Id</u>.

Thus, to be actionable as constitutional violations, acts or omissions must constitute more than mere negligence; instead, they must amount to a reckless or callous indifference to the constitutional rights of others.  <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344 (1986).  <u>See also</u> <u>Germany v. Vance</u>, 868 F.2d 9, 17-18 (1st Cir. 1989).

Here, the Plaintiff claims that Director Wall should be held individually liable under section 1983 because he "was personally and directly responsible for approving, implementing, and overseeing all ACI/RIDOC policies, procedures and customs relating to the treatment of individuals subject to the immigration detainer, including but not limited to Standard Operating Procedure ("SOP"), No. 2.08." Exhibit Q: Plaintiff's Supplemental Answer to Interrogatory No. 11. In sum, Plaintiff claims that Director Wall "failed to adopt minimally adequate policies and to provide adequate supervision and training for his subordinates…." Id.

Although Director Wall is responsible for approving all RIDOC policy, the practice of honoring all ICE detainers predates Director Wall's appointment to his position. SUF ¶28. To be clear, RIDOC practice was not to detain naturalized (or natural born) U.S. citizens on immigration detainers. Instead, it was to honor or accept all detainers issued by ICE. There is no evidence of another situation at the RIDOC of a U.S. citizen being held solely on an immigration detainer. Indeed, the previous time an immigration detainer had been lodged against the Plaintiff, Morales was being held by another law enforcement agency. SUF ¶25. Also, ICE officials have testified that this type of occurrence was rare. SUF ¶40.

The United States' position supports the Director's position. The United States filed a Memorandum in response to RIDOC's Motion to Dismiss (ECF No. 29). In the response, the United States admitted "that under 8 C.F.R. 287.7, the Department of Homeland Security expects state entities to cooperate and detain aliens upon receipt of the detainer." Id. at 3. The United States further affirmatively made clear that "when a state reasonably relies on section 287.7(d) and acts in accord with the terms of the detainer, it need not independently evaluate the propriety of the detainer." Id. Importantly, every ICE official deposed during discovery supports this position. SUF ¶¶ 14, 36, 37.

Moreover, Director Wall testified that as of May 2009, he had no reason to question the validity of whether immigration detainers were mandatory or voluntary.  He testified that although he may not have personally reviewed an immigration detainer prior to the instant lawsuit, he was satisfied that RIDOC policy/practice in May 2009 was lawful.  SUF ¶ 29.  Key to his determination was his belief that an official document sent by a Federal law enforcement agency and that contained language that indicated RIDOC was "required" to detain a person, was a Federal mandate to honor.  SUF ¶ 33.

Perhaps most importantly, recently our Court of Appeals issued a decision in the interlocutory appeal filed by the Federal Defendants.  See Morales v. Chadbourne, 793 F.3d 208 (1st Cir. 2015).  The First Circuit reasoned that "the sole purpose of a detainer is to request continued detention of an alien so that ICE officials may assume custody of that alien and investigate whether to initiate removal proceedings against her."  Id. at 214-15.  (Emphases added).  The First Circuit held, however, that detainers can only be issued with probable cause and it was clearly established in 2009 that an ICE agent would understand that a detainer could only be issued with probable cause.  Id. at 215.  Perhaps because a detainer is presumed to have the requisite probable cause to hold a person, the First Circuit went on to hold that "[t]he natural consequences of Donaghy issuing the detainer was that Morales would be detained for up to 48 hours.  Donaghy cannot argue otherwise.  The detainer he issued, on its face, instructed ACI officials to [detain Morales] for a period not to exceed 48 hours."  Id. at 218.

Based on the above undisputed facts, Walls' actions fail to meet the "affirmative link" standard or the "reckless or callous indifference" requirement necessary to establish his liability for the alleged Fourth and Fourteenth Amendments violation.  Similar to Maldonado, Defendant Wall, as RIDOC Director, is responsible for establishing the policies RIDOC personnel are

required to follow.  This alone cannot supply the affirmative link necessary to establish supervisory liability; especially, when the same policy was followed by all other law enforcement agencies in New England.  Furthermore, Wall's acts or omissions do not exhibit "reckless or callous indifference" toward Morales.  Especially when our Court of Appeals stated that the RIDOC was instructed to follow a detainer that was presumably issued with probable cause.

It is clear that Director Wall acted like a reasonable government official when he continued RIDOC practice to honor all immigration detainers and did not have to conduct an independent investigation to verify that probable cause existed; again a practice and policy that was followed by every other law enforcement agency in New England in May 2009.  In May 2009, RIDOC, a prison facility, simply complied with an official document issued by the Federal government and which stated, on its face, that RIDOC was <u>required</u> to honor the detainer. RIDOC played no part in the investigation by ICE and had no information as for the reasons why the detainer was issued.[5]  RIDOC presumed, as did the Superior Court and Sheriff's Department which also complied with the detainer, that the immigration detainer required Morales to be held until ICE took physical custody.

**2.      <u>To The Extent Director Wall Can Be Held Personally Liable, Qualified Immunity Shields Director Wall.</u>**

i.      Standard for Qualified Immunity.

---

[5] By statute, RIDOC is responsible "for the custody, care, discipline, training, treatment, and study of persons committed to state correctional institutions or on probation or parole, so that those persons may be prepared for release, aftercare, and supervision in the community."  R.I. Gen. Laws § 42-56-1(b).  RIDOC does not investigate the underlying grounds for any of the inmates detained at the ACI; regardless of whether that person is detained with or without a warrant.  RIDOC leaves that to the arresting law enforcement agency.  RIDOC is simply the "state prison."

The doctrine of qualified immunity precludes suits for money damages against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability [which]…is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial – of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S. at 816. Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000) (citing Malley v. Briggs, 475 U.S. 335, 341, 343 (1986)). Without proper immunity for reasonable *mis*interpretation, governmental actors would be placed in the untenable position of facing the burdens of litigation and the risk of liability for guessing incorrectly when the constitutional provision itself provides little guidance.[6]

Qualified immunity seeks to ensure that governmental defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right. Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014). To be clearly established, the contours of this right must have been "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 134 S.Ct. 2012, 2023 (2014). "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.'" Carroll v. Carman, 135 S.Ct. 348, 350 (2014). For

---

[6] In this case, the Fourth Amendment prohibits only "unreasonable" searches.

15

qualified immunity to be surrendered, pre-existing law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994)(en banc) (*citing* Anderson v. Creighton, 483 U.S. 635, 640 (1987).   It is not enough for the constitutional right to be "clearly established" at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law.  Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998).

In DeAbadia v. Izquierdo Mova, 792 F.2d 1187 (1st Cir. 1986), the First Circuit stated:

> … we are presently concerned not with the correctness of defendants' determination, on the one hand, nor their subjective state of mind, but of the 'objective reasonableness' of their conduct… Harlow demands not prescience, but subjective good faith.

792 F.2d at 1193.  The objective reasonableness determination is for the Court to make, and not for the jury. Id.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly' established' at the time of the challenged action."  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (citations and quotations omitted).   Courts may skip the first prong, i.e., whether there was a constitutional violation and proceed directly to the "clearly established" inquiry.  See Pearson v. Callahan, 555 U.S. 223 (2009).  A Government official's conduct violates "clearly established law when at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable officer would have understood that what he is doing violates the right."  al-Kidd, 131 S. Ct. at 2083 (citations and quotations omitted).

The Supreme Court has further defined a right as "clearly established" when there exists "cases of controlling authority in their jurisdiction at the time of the incident" or when there exists "a *consensus* of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Id. at 2086 (emphasis added); see generally, Plumhoff, 134 S. Ct. at 2023-24 ("[R]espondent has not pointed us to any case – let along a controlling case or a robust consensus of cases – decided between 1999 and 2004 that could be said to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase."). This standard ensures that law enforcement officers have "fair and clear warning of what the Constitution requires." al-Kidd, at 2086-87 (internal marks and citations omitted); see also Estrada, 594 F.3d at 63 ("[I]f a reasonable officer would not have understood that his conduct violated Plaintiffs' constitutional rights, we must grant him qualified immunity.").

In determining whether the legal question at issue is "beyond debate[,]" courts are not to define the constitutional question at a "high level of generality." al-Kidd, 131 S. Ct. at 2083-84 ("The general proposition, for example, that an unreasonable search and seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established"). This holding is consistent with the principle that qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." Id. at 2085. Moreover, an official's claim of qualified immunity will be defeated if, "in light of pre-existing law" the unlawfulness of his conduct was "apparent." Anderson v. Creighton, 483 U.S. at 640. This Court should be mindful, in determining what law is "clearly established" for qualified immunity purposes, that the vast majority of state officers are not lawyers, and rely on the relevant guidance of others in the conduct of their duties. They cannot be expected to be "seers in the crystal ball of constitutional

doctrine" any more than "high state officials."  <u>Westberry v. Fisher</u>, 309 F.Supp. 12,17 (D. Me. 1970).

    ii.    It was not clearly established in May 2009 that RIDOC was not required to honor immigration detainers and that the subsequent detention of an individual violated a constitutional right.

At the time of Morales' detention in May 2009, no judicial opinion had held that it was unconstitutional for a state prison to honor ICE detainers or that a prison needed due process safeguards for when a person claimed to be a U.S. citizen.  Literally, there was not even a single case.  Moreover, it is undisputed that, in May 2009, every law enforcement agency in New England honored immigration detainers.  SUF ¶¶ 35, 38.  In order for a State official to be liable, there must be "clearly established" law that would allow an official to have knowledge of conduct that would violate a "clearly established" constitutional right.

Morales would like to frame the issue quite broadly, and argue that it was clearly established in May 2009 that a law enforcement agency needed to have probable cause to detain a person.  Respectfully, that is the incorrect analysis.  <u>See</u> <u>Anderson v. Creighton</u>, *supra*.  There, an FBI agent named Anderson participated in a warrantless search of the Creighton family's home in hopes of finding a wanted armed robber.  <u>Id</u>. at 637.  The robber was not located at the home and the family later sued the FBI agent.  The 8th Circuit reversed the grant of summary judgment with respect to qualified immunity, holding: "since the right Anderson was alleged to have violated—the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances—was clearly established." <u>Id</u>. at 638.  The Supreme Court reversed.  In pertinent part, the Supreme Court held "the operation of [the clearly established standard], however, depends substantially

upon the level of generality at which the relevant "legal rule" is to be identified." Id. at 639. The Court went on to further state:

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Id. at 640.  (Emphasis added).  Consistent with the holding in Anderson, the issues in the case at hand are: 1) whether it was clearly established in May 2009 that honoring ICE detainers was not mandatory on the RIDOC and; 2) whether it was clearly established in May 2009 that the RIDOC was required to conduct an independent investigation into the citizenship of individuals if they claimed to be U.S. citizens.  Wall submits that neither issue was "clearly established" at the time of Morales' detention in May 2009.

As to the issue of whether a detainer is mandatory or voluntary, it was not clearly established in May 2009 that having a policy in place which honored all immigration detainers violated the Fourth or Fourteenth Amendments.  Indeed, prior to May 2009, decisions from district courts indicate that immigration detainers permitted law enforcement officials to legally hold persons for up to 48 hours.  See e.g. Royer v. I.N.S., 730 F. Supp 588, 591 (1990) (section 287.7(a)(4) requires only that the official upon whom the INS has served a detainer to hold the person who could otherwise be lawfully detained); Mulato-Gonzalez v. Sheriff, 2007 WL 858759  (E.D. Tex. Mar. 15, 2007) (permissible to hold a person pursuant to a immigration detainer for up to 48 hours).

Even after May 2009, multiple district courts ruled that a local prison was required to honor immigration detainers.  In Galarza v. Szalczyk et al., No. 10-CV-06815, 2012 WL 1080020, at 20 (E.D. Pa. Mar. 30, 2012), the plaintiff, a United States citizen born in New Jersey, was held solely on an immigration detainer for three days.  Id. at 1.  The district court in

<u>Galarza</u> addressed whether a prison is required to hold an individual after ICE issues an immigration detainer.  With respect to whether a prison was required to honor a detainer, the district court in <u>Galarza</u> held:

> …although an immigration detainer 'serves to advise another law enforcement agency that [ICE] seeks custody' and 'is a request' to the federal, state, or local law enforcement agency presently holding the individual named in the detainer that it 'advise [ICE], prior to release' of that individual, id. § 287.7(a), <u>once the immigration detainer is issued, the local, state or federal agency then holding the individual 'shall' maintain custody</u>.  *citing* § 287.7(a) and (d)).  Moreover, although the period of time that the agency with custody when the immigration detainer is issued <u>is required to hold the individual</u> is 48 hours, those 48 hours excludes Saturdays, Sundays, and holidays.  (Emphases added).

In granting the prison's motion to dismiss, the court held that "because ICE issued a detainer for plaintiff, the [prison] was required to maintain custody of him after he was 'not otherwise detained by a criminal justice agency' for a period not to exceed 48 hours…."  <u>Id</u>.  This decision was later reversed by the Third Circuit in <u>Galarza v. Szalczyk</u>, 745 F.3d 634 (3rd Cir. 2014).  Nonetheless, in May 2009, there was no controlling authority or consensus of persuasive authority.

In September 2012, the court in <u>Rios-Quiroz v. Williamson County</u>, TN, No. 11-1168, 2012 WL 3945354 (M.D. Tenn. Sept. 10, 2012) agreed with the district court <u>Galarza</u> decision.  The <u>Rios-Quiroz</u> court was faced with "whether a county or municipal law enforcement agency may honor an ICE detainer issued for an individual who was reported to the law enforcement agency solely for the purpose of completing the booking process related to a misdemeanor citation issued in lieu of custody."  <u>Id</u>. at 2.  The <u>Rios-Quiroz</u> court recognized that 8 C.F.R. § 287.7(d) provides that the local law enforcement agency "shall" maintain custody of the individual.  <u>Id</u>. at 4.  The court reasoned that subsection (d) "says 'shall maintain,' which

indicates an obligation to maintain custody." Id.   The court, therefore, ruled that the law enforcement agency was required to detain individuals after an immigration detainer is issued.

In Rivas v. Martin, 781 F.Supp.2d 775 (N.D.Ind. 2011) the plaintiff was arrested on a felony charge.  While in state custody, ICE issued an immigration detainer.  The immigration detainer contained identical language to the one at issue, stating: "Federal regulations (8 C.F.R. 287.7) require that you detain the alien for a period not to exceed 48 hours (excluding Saturdays, Sunday's [sic] and Federal holidays) to provide adequate time for DHS to assume custody of the alien." Id. at 776.  After posting her bail, Rivas was held in prison for approximately five (5) days based solely on the immigration detainer.  Id. at 777.  Rivas subsequently brought a Section 1983 action against the prison alleging that she was unlawfully detained.  Id.

Although the court in Rivas denied the defendant's motion to dismiss because the plaintiff was held beyond the 48 hour time period, it observed "[w]hen someone is arrested and detained without a warrant, it is presumptively reasonable for that person to be detained up to 48 hours pending a determination of probable cause.  Id. at 780.  (Emphasis added) (citing County of Riverside v. McLaughlin, 500 U.S. 44 (1991)).  The Rivas court continued that "the language of the detainer and of 8 C.F.R. § 287.7 made it clear that defendants could only hold Rivas for an additional 48 hours under the detainer."  781 F.Supp.2d. at 782.  And that "[c]ourts have determined that 8 C.F.R. § 287.7 requires only that the official upon whom the INS has served a detainer hold the alien, who could otherwise no longer be lawfully detained, for up to 48 hours in order to permit the INS to assume custody of him."  Id.  (citing Royer v. INS, 730 F.Supp. 588, 591 (S.D.N.Y.1990); Moreno Escobar v. U.S. Dep't of Justice, No. Misc. 05–0048, 2005 WL 1060635, at *1 (E.D.Pa. 2005)) (unpublished) (citing to 8 C.F.R. § 287.7(d) and stating

21

"[p]ursuant to a detainer request, state or federal officials may hold an alien for forty-eight hours after his release date")).

In <u>Ortega v. U.S. Immigration and Customs Enforcement et al.</u>, 737 F.3d 435 (6th Cir. 2012), ICE mistakenly issued a detainer for a U.S. citizen and sent the detainer to the local prison.  <u>Id</u>. at 437.  Just as RIDOC in May 2009, the local prison had a policy to honor all immigration detainers.   <u>Id</u>.  As a result of receiving the detainer, the local prison officials removed the plaintiff from a home confinement program and placed him back in the prison.  <u>Id</u>. On appeal, the Sixth Circuit affirmed the grant of dismissal based on qualified immunity for all parties.  With respect to the due process claim, the Sixth Circuit held "no controlling authority or consensus of persuasive authority established that Ortega had a liberty interest in remaining on home confinement."  <u>Id</u>. at 439.  Further, as to the Fourth Amendment seizure claim, the Sixth Circuit held "…no appellate court holdings had addressed this issue at the time of the detainer…."  <u>Id</u>. at 441.[6]

As detailed *infra*, even subsequent to May 2009, district courts from various parts of the country issued rulings that were consistent with RIDOC practice in May 2009 to honor all ICE detainers.  However, not all district courts were in agreement.  In <u>Buquer v. City of Indianapolis</u>, 797 F.Supp.2d 905 (S.D. Ind. 2011), a number of aliens brought an action challenging the constitutionality of a state statute that, in pertinent part, allowed law enforcement officers to make warrantless arrests when the officer had a removal order or detainer from ICE.  <u>Id</u>. at 909.

---

[6] Here, ICE mistakenly issued an immigration detainer for Morales - a U.S. citizen.  In addition, RIDOC had a practice in place where it would honor all detainers issued by ICE.  <u>Ortega</u> differs from the instant case with respect to the specific issue in dispute.  In <u>Ortega</u>, the primary issue was whether a person had a liberty interest in home confinement and whether ICE and the local prison violated this interest by ending the inmate's home confinement after the detainer was issued.

22

The issue before the court was not whether a prison is required to detain an individual after an immigration detainer is issued.  Instead, while giving context to Federal immigration-based terms used in the state statute, the court simply provided its brief understanding of detainers.  Within a twenty two page opinion, the court stated in one paragraph that:

> If federal or local law enforcement informs ICE that an alien is in custody on non-immigration related charges, ICE may issue a detainer requesting that the law enforcement agency hold the individual for up to 48 hours beyond the time that the detainee would otherwise be released in order to allow ICE to assume custody, if it chooses to do so.  8 C.F.R. § 287.7(d).  A detainer is not a criminal warrant, but rather a voluntary request that the law enforcement agency 'advise [ICE], prior to release of the alien, in order for [ICE] to arrange to assume custody.'  Id. § 287.7(a).  The detainer automatically expires at the end of the 48-hour period. Id. at 911.  (Emphases added).

Buquer not only supports Director Wall's position that the law was unsettled in May 2009, but demonstrates that the law remained unsettled for years.  Indeed, while some district courts such as in Royer, Galarza (at least in the district court), Rivas and Rios-Quiroz stand for the proposition that ICE detainers must be honored, Buquer appears to state otherwise.  It was not until this Court's decision on February 12, 2014, that the District of Rhode Island issued a ruling that squarely addressed this issue for this jurisdiction.  This clearly evinces unsettled law regarding the whether detainers were mandatory on local prisons at the time of Morales' detention in May 2009.

In opposition to the Director's motion to dismiss, Morales argued that the First Circuit previously ruled in United States v. Female Juvenile, A.F.S., 377 F.3d 27 (1st Cir. 2004) that immigration detainers were requests and not mandatory.  With respect to immigration detainers, the issue before the First Circuit was whether an immigration detainer acts to hold a person in "administrative custody" under the authority of INS.  In Female Juvenile, a juvenile defendant was not released from federal authorities even though the district court ordered her released.  Id.

23

at 34.  The federal officials argued that the juvenile was in "administrative custody" following the dismissal of the criminal charges based on an immigration detainer.  Id. at 35.  The First Circuit stated that "an INS detainer is not, standing alone, an order of custody.  Rather it serves as a request that another law enforcement agency notify the INS before releasing an alien…."  Id. at 35.  The First Circuit continued that the government "has not shown that [the juvenile] was held in administrative custody under the authority of the INS following the dismissal of the information on April 10."  Id.  Respectfully, the First Circuit did not recognize that a local prison had the option to enforce a detainer.  That issue was simply not before our Court of Appeals. Indeed, it appears that the juvenile was in Federal custody at a Federal facility at all times. Moreover, the INS eventually did assume custody of the juvenile and successfully deported her. Id. at n. 14.  This Court must follow the holding in Anderson and look to see whether the very action in question was previously held to be unlawful.  Clearly, the same issue was not before the First Circuit in Female Juvenile as is presently before this Court.

To the extent the First Circuit has opined on the issues of detainers, it did so recently in Morales v. Chadbourne, 793 F.3d 208 (1st Cir. 2015) when it stated that a detainer "instructs the agency" and "instructed ACI officials" to detain Morales for up to 48 hours.  Id. at 214, 218. Indeed, this decision supports Wall's qualified immunity argument.  Wall was instructed by a Federal document to hold Morales for up to 48 hours.  A document issued by an ICE Agent who thought that he had probable cause to issue the detainer.  SUF ¶11.  And regardless of whether Agent Donaghy actually had probable cause or not, it was "clearly established" that probable cause was needed before the detainer could be issued.  See Morales, 793 F.3d at 215.  Thus, it was reasonable for Wall (and RIDOC) to honor detainers.

In 2014, the Third Circuit became the first and only circuit to address the precise issue regarding whether a detainer was a mandatory requirement for the local prison to follow. See Galarza v. Szalczyk, 745 F.3d 634 (3d Cir. 2014). The Third Circuit reversed the district court's holding that immigration detainers were mandatory. In doing so, the Third Circuit noted that a number of jurisdictions, beginning in 2010 but more commonly in 2012, began to refuse to honor detainers. Id. n. 14. (citing Santa Clara County, Cal., Board of Supervisors' Policy Manual § 3.54, Civil Immigration Detainer Requests (resolution adopting § 3.54) (2010); Chicago Municipal Code §§ 2–173–05, 2–173–042 (first adopted 2012); N.Y.C., N.Y., Administrative Code § 9–131 (first adopted 2012); City of Berkeley, California Council, Regular Meeting Annotated Agenda (Oct. 30, 2012); D.C. Acts 19–442, Immigration Detainer Compliance Amendment Act of 2012, 59 D.C.Reg. 10153–55 (same); Cal Gov't Code § 7282 et seq. (effective Jan. 1, 2014)). Respectfully, this evinces that as of May 2009, it was not clearly established that RIDOC's policy was unconstitutional.

Based on a lack of clearly established case law in May 2009, Director Wall did not know, nor should he have known, that his conduct was unlawful. Wall did not have any reason to believe that RIDOC's policy was unconstitutional. The RIDOC simply received an immigration detainer from ICE and followed previously established practice, without any knowledge that the Department's conduct may be unlawful. Here, because the unlawfulness of honoring immigration detainers was not clearly established in May 2009, Director Wall should not personally be subject to monetary damages. See Pearson, 555 U.S. at 244 ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law"). RIDOC received an immigration detainer from ICE. The immigration detainer informed RIDOC that federal regulations "require" RIDOC to

detain Plaintiff Morales for a period not to exceed 48 hours. Defendant Wall believed in good faith that RIDOC was required to detain Morales; regardless of whether he made a mistake of law or fact, Wall still is protected by qualified immunity.

> iii.    Qualified Immunity Applies to the Due Process claim.

Morales alleges in Count V of her Complaint that the Director Wall failed to afford her notice and an opportunity to be heard before she was detained in violation of her due process rights under the Fourteenth Amendment to the United States Constitution.   She alleges Director Wall and RIDOC honored the detainer without notifying her or affording her a pre-deprivation hearing in violation of her Fourteenth Amendment due process rights.   Director Wall, however, and the RIDOC did not violate Morales' due process rights, because she was not constitutionally entitled to notice and an opportunity to be heard on a one-day detention order.   Morales, 996 F. Supp. 2d at 34.   See also Devenpeck v. Alford, 543 U.S. 146 (2004)("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required").

Moreover, to extent Morales was entitled to notice and an opportunity to be heard, Director Wall is entitled to qualified immunity on Morales' due process claim because the right to notice and an opportunity to be heard before the issuance of an ICE detainer was not a clearly established right at the time of her detention.   Id.   The Federal Defendants have conceded that although they expected the RIDOC to honor detainers, they did not expect RIDOC to investigate the propriety of the detainer.   SUF ¶¶ 13-14, 35-38; ECF No. 29.

This Court previously granted Chadbourne and Riccio's motion to dismiss a similar allegation, Count II, based on qualified immunity.   The Court reasoned:

> [a]fter a review of the law and regulations applicable in this case, the Court cannot say that the right to notice and an opportunity to be heard before an ICE detainer is issued was a clearly established right. Significantly, the federal

26

regulation establishing the issuance of temporary detainers provides that a person can be held for up to 48 hours based on a detainer. 8 C.F.R. § 287.7(d). There is no provision in the regulation for notice and an opportunity to be heard before the issuance of a detainer. Id. at 34.

This Court concluded that it would not "find that a reasonable ICE agent would have understood that this conduct in not affording her an opportunity to be heard would violate her rights. Id. (*citing* Galarza, 2012 WL 1080020, at 17–18). Likewise, it was not clearly established that a local prison enforcing an immigration detainer was required to provide an opportunity for a detainee to be heard. In addition, as the First Circuit held in Morales, a detainer was presumably issued with probable cause**.** Id. at 215. Because Director Wall did not violate a clearly established right in this regard, he enjoys qualified immunity on the procedural due process claim.

**3.** **Although this Court ruled that the RIDOC was not required to honor immigration detainers, Federal regulation permitted the RIDOC to legally hold Morales for up to 48 hours.**

Damages for false arrest or false imprisonment in Rhode Island are available only when the imprisonment is improper or unjustified. Dyson v. City of Pawtucket, 670 A.2d 233, 238-39 (R.I. 1996) (*citing* Moody v. McElroy, 513 A.2d 5 (R.I.1986)). "The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement." Id. "Whenever a person unlawfully obstructs or deprives another of his freedom to choose his location, for however brief a period, that person will be liable for that interference." Id. "To establish this cause of action, a plaintiff must show more than that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Id. The plaintiff must also show that he or she was detained without legal justification. Id. (*citing* Johnson v. Palange, 406 A.2d 360, 362 (1979)).

Here, although this Court has previously ruled that the detainer for Morales was not "facially valid or based on probable cause," RIDOC was still legally justified to detain her for up to 48 hours. First, it is presumptively reasonable for a person to be detained up to 48 hours pending a determination of probable cause. See County of Riverside v. McLaughlin, 500 U.S. 44 (1991); United States v. Vilches–Navarrete, 523 F.3d 1, 15 (1st Cir. 2008); United States v. Ayala, 289 F.3d 16, 19 (1st Cir. 2002) ("courts have construed the Fourth Amendment as imposing a presumptive 48–hour time limit on detentions in the absence of a probable cause determination"). Second, although this Court has ruled that it is not required that the RIDOC honor all immigration detainers, the RIDOC was still legally justified pursuant to the detainer to hold Morales for up to 48 hours. See Royer, Mulato-Gonzalez, Rivas, supra. Lastly, as the First Circuit held in Morales, a detainer "instructs the agency" and "instructed ACI officials" to detain Morales for up to 48 hours. Morales, 793 F.3d at 214, 218. And that it was clearly established in 2009 that probable cause was needed to issue a detainer. Id. at 215. Because the RIDOC was legally justified to hold Morales, Judgment must be entered in favor of Director Wall with respect to Count VII False Imprisonment.

**4.      RIDOC policy in May 2009 did not breach any duty of care to Morales.**

Morales broadly claims that the RIDOC committed negligence. See Count VIII, ¶¶126-128. Although a portion of this Count references the withdrawn equal protection claim (i.e., discriminatory treatment based on race, ethnicity, etc…), Morales does claim that she suffered "personal injury" while in RIDOC custody and Director Wall had a duty to "establish and enforce policies and practices to prevent the occurrence of constitutional and tortious actions by their subordinates." Cpt. ¶127.

At Morales' deposition, her counsel made clear that she was "not seeking extraordinary damages in terms of medical bills or cost of treatment afterwards. We're seeking garden variety

emotional distress of the type people normally seek.  And as a result of that, we're not going to

subject her to subsequent medical treatment to discovery."  Exhibit B: Deposition of Morales,

pgs. 62-63.  Counsel further clarified that "her medical treatment isn't relevant….It's the pain

and suffering that a person would suffer having experienced what she experienced."  Id. at 63.

When an attorney for Defendant Donaghy sought further information with respect to her medical

treatment, counsel for Morales indicated "given the damages we're seeking, we're not allowing

to probe into her medical treatment prior to 2009 or after 2009.  We don't think it's relevant."

Id. at 99.  Indeed, Morales' counsel instructed her not to answer these questions.  See id. 99-102.

Because Morales has made clear that she is not seeking damages from a specific incident that

occurred while in RIDOC custody (i.e., specific physical harm requiring medical treatment),

Count VIII (Negligence) is essentially a blanket claim that Director Wall breached a duty to

Morales by enforcing a policy to honor detainers.  As detailed infra, even without probable

cause, the RIDOC was legally justified in holding Morales for up to 48 hours pursuant to an

immigration detainer.  It was not "clearly established" in May 2009 that RIDOC regarding

detainers were unconstitutional.  Moreover, the detainer was presumably issued with probable

cause.  Therefore, Judgment must be entered in favor of Director Wall in both his individual and

official capacity with respect to Count VIII.

**5.**     **RIDOC's practice of honoring detainers for up to 48 hours, even if no probable cause existed, was reasonable and constitutional.**

In this case, Agent Donaghy testified he would only issue detainers if he had probable

cause.  SUF ¶ 11.  Even assuming arguendo that no probable cause existed, when someone is

detained without a warrant, it is presumptively reasonable for that person to be detained up to 48

hours pending a determination of probable cause.  See County of Riverside v. McLaughlin, infra;

United States v. Ayala, 289 F.3d 16, 19 (1st Cir. 2002) ("courts have construed the Fourth

Amendment as imposing a presumptive 48–hour time limit on detentions in the absence of a probable cause determination"). Therefore, RIDOC's policy of honoring all detainers, which would never exceed the 48 hours threshold, was both reasonable and constitutional.

Recently in <u>Heien v. N. Carolina</u>, 135 S. Ct. 530 (U.S. 2014), the Supreme Court held that a police officer's reasonable mistake of law can give rise to the reasonable suspicion necessary to justify a traffic stop. In <u>Heien</u>, a police officer stopped a car after noticing that only one of its brake lights was working. <u>Id</u>. at 534. The officer gave the driver a warning and asked whether he could search the car. <u>Id</u>. The passenger, petitioner Nicholas Heien, owned the car and gave the officer permission. <u>Id</u>. The officer found drugs in the car and arrested both men. <u>Id</u>. The state later charged Heien, the owner, with attempted trafficking in cocaine. <u>Id</u>. at 535. Heien moved to suppress the evidence seized from the car. <u>Id</u>. The trial court denied the motion, finding that the faulty brake light gave the police officer reasonable suspicion to initiate the stop. <u>Id</u>. Heien pleaded guilty but reserved his right to appeal the suppression decision. The North Carolina Court of Appeals reversed. <u>Id</u>. It held that the initial stop was not valid because driving with only one working brake light did not actually violate North Carolina law. <u>Id</u>. It held that the justification for the stop was therefore "objectively unreasonable" and that the stop violated the Fourth Amendment. <u>Id</u>. The North Carolina Supreme Court reversed. <u>Id</u>. Noting that the state had not appealed that interpretation of the vehicle code, the court assumed for purposes of its decision that Heien's faulty brake light did not violate state law. <u>Id</u>. The court held, however, that the North Carolina vehicle code was unclear on that point and that police officer's mistaken interpretation of it was reasonable. <u>Id</u>. The court further held that an officer does not violate the Fourth Amendment when he acts reasonably, including when he acts upon a

reasonable mistake of law.  Id.  In an opinion by Chief Justice Roberts, the Supreme Court affirmed.

The Supreme Court reaffirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'" Id. at 536.  Because "[t]o be reasonable is not to be perfect," the Court has "recognized that searches and seizures based on mistakes of fact can be reasonable."  Id.  "But reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground."  Id.  In support, the Court pointed to cases from the early 19th century "treating legal and factual errors alike in this context;" that is, in "explaining the concept of probable cause."  Id. at 537.  The Court acknowledged that, as Heien argued, many of its cases "have looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all."  Id. at 539.

The Court rejected Heien's contention that its approach will "discourage officers from learning the law."  Id. at 539.  The Court noted that the "Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable."  Id. (Emphases added).  The Court next rejected Heien's reliance on the maxim that "ignorance of the law is no excuse."  Id. at 540.  "Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law."  Id.  Finally, the Court reviewed the relevant North Carolina provisions and found them sufficiently unclear to make it

objectively reasonable for police officer to believe having one faulty brake light violated North Carolina law. Because of the confusion in the provisions, the mistake of law was reasonable. Id.

Likewise, RIDOC's practice or policy in May 2009 was reasonable and constitutional. As stated, RIDOC practice, at the time, was to honor all ICE detainers. Indeed, Morales has withdrawn the Equal Protection claim against Director Wall. Although this Court has previously ruled in denying the various motions to dismiss that the detainer was "facially invalid," Morales, 996 F.Supp. 2d at 38, RIDOC's policy to honor an official Federal document which states "Federal regulations (8 CFR 287.7) require that you detain the alien for a period not to exceed 48 hours[…]" was at the very least, a reasonable mistake of law. Especially, considering that the First Circuit ruled that the detainer "on its face, instructed ACI officials" to detain Morales. Morales, 2015 WL 4385945 at 7.

Here, RIDOC policy to honor all detainers based on the belief that they were mandatory was objectively reasonable. First, it was constitutional to hold Morales for less than 24 hours without probable cause. See infra. Second, as of May 2009, all prison and law enforcement agencies within New England honored detainers. Indeed, even another Rhode Island law enforcement agency, the Cranston Police Department, honored a detainer for Morales in 2004. Third, the detainer form used to detain Morales in 2009 was the same form utilized nationwide by ICE. ICE did not use a separate form for Rhode Island or the New England region. Fourth, as evidenced in this case, in May 2009, Rhode Island state courts recognized the validity of immigration detainers. If it was commonly understood that detainers were not mandatory in May 2009, Magistrate Harwood could have unrestrained Morales on May 4, 2009 after being informed that Morales claimed to be a U.S. citizen and had documentation in the courtroom. Instead, Magistrate Harwood informed Morales that it was outside her jurisdiction, even though

her husband was in the courtroom holding her passport.[7]   Based on the foregoing, Judgment should be entered in favor of Director Wall in his official and individual capacity as to all claims.

## <u>CONCLUSION</u>

This Honorable Court should grant summary judgment in favor of Defendant Wall based on qualified immunity and hold that he is not liable for unlawful detainment. Wall is an employee of the State, who performed a discretionary function, and thus fits into the category of qualified immunity. It was not clearly established in May 2009 such that it would give Wall any reason to believe that RIDOC policy was unlawful in any way.  Finally, Wall was not personally involved in Plaintiff's detainment. Plaintiff attacks Wall's policy, which was implemented prior to his employment as director of RIDOC, and simply promulgating a policy is not sufficient to find a supervisor liable.  Therefore, Defendant Wall in his capacity as RIDOC Director and in his individual capacity, respectfully requests that his Motion for Summary Judgment be granted and that this civil action, as against him, be dismissed.

---

[7] Morales' testimony concerning her court appearance goes beyond what is in the transcript from the court proceeding that day.  Nonetheless, even assuming Morales' recollection is entirely accurate, it further supports Walls' position that RIDOC policy was reasonable.

DEFENDANT

Ashbel T. Wall, individually and in his official capacity as Director of the Rhode Island Department of Corrections

By his Attorney,

PETER F. KILMARTIN
ATTORNEY GENERAL

/s/ Adam J. Sholes_____
Adam J. Sholes, Esq. Bar No. 7204
Thomas A. Palombo, Bar No. 4212
Assistant Attorneys General
R.I. Department of Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel.: (401) 274-4400, Extension 2219
ajsholes@riag.ri.gov

## CERTIFICATE OF SERVICE

I hereby certify that I filed the within Memorandum in Support of Summary Judgment via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF system to the following attorneys on this 22nd day of September, 2015.

/s/ Adam J. Sholes_____