# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ADA MORALES,             :

               Plaintiff,      :

               v.            :       CIVIL ACTION

BRUCE CHADBOURNE,    :       No. 12-cv-00301-M-DLM
et al.,                :

              Defendants.    :

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S COMBINED MOTION FOR SUMMARY JUDGMENT
## AGAINST THE FEDERAL DEFENDANTS
## AND OPPOSITION TO THE FEDERAL DEFENDANTS'
## SUMMARY JUDGMENT MOTION

Katherine Desormeau (*pro hac vice*)
ACLU FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0778
Fax: (415) 395-0950
KDesormeau@aclu.org

Mark A. Ford (*pro hac vice*)
Margaret E. O'Grady (*pro hac vice*)
Mi Hyun Yoon (*pro hac vice*)
Laura A. Donovan (R.I. Bar No. 8333)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Tel.:  (617) 526-6000
Fax:  (617) 526-5000
Mark.Ford@wilmerhale.com
Margaret.O'Grady@wilmerhale.com
Angela.Yoon@wilmerhale.com
Laura.Donovan@wilmerhale.com

*Attorneys for Plaintiff*
*Ada Morales*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY........................................... 3

   A.  FACTS ....................................................................................................................... 3

     1.  Ms. Morales's Imprisonment on the ICE Detainer ............................................. 3

     2.  Agent Donaghy's Actions.................................................................................... 5

     3.  Field Office Director Chadbourne and the ICE's Detainer Issuance Practices in Rhode
       Island....................................................................................................................... 8

   B.  PROCEDURAL HISTORY .................................................................................... 13

ARGUMENT ..................................................................................................................... 14

   A.  MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FOURTH
      AMENDMENT CLAIM AGAINST AGENT DONAGHY ............................... 14

     1.  The Record Establishes that Agent Donaghy Caused Ms. Morales To Be Imprisoned
       Without Probable Cause. ..................................................................................... 15

       a.  *Ms. Morales's Guatemalan place of birth did not constitute probable cause to
         belive she was a removable non-citizen* ....................................................... 16

       b.  *Agent Donaghy's failure to find Ms. Morales's CIS record adds nothing to the
         probable cause analysis* ................................................................................ 16

       c.  *The blank "citizenship" field in RIDOC's INFACTS database, even assuming
         Agent Donaghy looked at it, adds nothing to the probable cause analysis.* ................ 20

2. Agent Donaghy Is Not Entitled to Qualified Immunity.................................................. 22

3. At a Minimum, Agent Donaghy's Motion for Summary Judgment Should
Be Denied............................................................................................................. 27

B. MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FOURTH
AMENDMENT CLAIM AGAINST DIRECTOR CHADBOURNE ................................ 30

1. The Record Establishes that Director Chadbourne Is Liable for Ms. Morales's Unlawful
Detention Because of His Deliberately Indifferent Failure to Supervise or Train His
Subordinates.......................................................................................................... 31

2. Director Chadbourne Is Not Entitled to Qualified Immunity ........................................ 36

3. At a Minimum, Director Chadbourne's Motion for Summary Judgment Should Be
Denied ................................................................................................................... 36

C. MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FTCA
CLAIMS AGAINST THE UNITED STATES.................................................................... 38

1. The Federal Officers' Actions Caused Ms. Morales's Detention.................................... 38

2. Ms. Morales Is Entitled to Summary Judgment as to Her False Imprisonment Claim,
or, at a Minimum, the United States' Motion Should Be Denied.................................... 41

3. Ms. Morales Is Entitled to Summary Judgment as to Her Negligence Claim, or, at a
Minimum, the United States' Motion Should Be Denied................................................ 43

D. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PUNITIVE
DAMAGES SHOULD BE DENIED.................................................................................. 46

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Afroyim v. Rusk*, 387 U.S. 253 (1967) ...................................................................... 19

*Almeida v. Town of N. Providence*, 468 A.2d 915 (R.I. 1983) .................................... 39

*Arizona v. Evans*, 514 U.S. 1 (1995)................................................................. 23, 24, 27

*Beck v. Ohio*, 379 U.S. 89 (1964) ...................................................................... passim

*Berberian v. Mitchell*, 321 A.2d 431 (R.I. 1974), *adhered to*, 341 A.2d 56 (R.I. 1975).............. 43

*Butler v. Elle*, 281 F.3d 1014 (9th Cir. 2002) .............................................................. 26

*Camilo-Robles v. Hoyos*, 151 F.3d 1 (1st Cir. 1998)................................................... 37

*Cannon v. Macon Cnty.*, 1 F.3d 1558 (11th Cir. 1993) *opinion modified on denial of reh'g*, 15 F.3d 1022 (11th Cir. 1994) .......................................................................... 30

*Castro v. Cnty. of Los Angeles*, 797 F.3d 654 (9th Cir. 2015)....................................... 47

*Castro v. United States*, 34 F.3d 106 (2d Cir. 1994) ..................................................... 43

*Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994)........................ 20

*Corvello v. New England Gas Co.*, 460 F. Supp. 2d 314 (D.R.I. 2006)....................... 44

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010)................................................. 37

*Dominguez v. United States*, 799 F.3d 151 (1st Cir. 2015) ......................................... 38

*Dunaway v. New York*, 442 U.S. 200 (1979) ................................................................ 1

*Fed. Exp. Corp. v. State of R.I., Dep't of Transp., Airports Div.*, 664 F.2d 830 (1st Cir. 1981) .. 44

*Ford v. City of Boston*, 154 F. Supp. 2d 131 (D. Mass. 2001) .................................... 35

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989)................................ 37

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................ 36

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................................... 27

*I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51 (1st Cir. 1999).......................... 7

*Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999). ........................................................................ 46

*In re Perkins*, 204 F. 350 (S.D.N.Y. 1913) ................................................................................... 19

*Johnson v. Scotts Bluff Cnty. Sheriff's Dep't,* 245 F. Supp. 2d 1056 (D. Neb. 2003).................. 23

*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) .............................................................................. 30

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ..................................................................... 25, 27

*Lyttle v. United States*, 867 F. Supp. 2d 1256 (M.D. Ga. 2012) ............................................ 44, 45

*Maresca v. Bernalillo Cnty.*, -- F.3d ----, No. 14-2163, 2015 WL 6384984 (10th Cir. Oct. 22, 2015) (slip op.).......................................................................................................... 26, 29

*McAllister v. Desoto Cnty.*, 470 F. App'x 313 (5th Cir. 2012) (unpub.)....................................... 23

*Medeiros v. Sitrin*, 984 A.2d 620 (R.I. 2009) .............................................................................. 43

*Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014) ....................................................................... 40

*Moody v. McElroy*, 513 A.2d 5 (R.I. 1986) ............................................................................ 41, 42

*Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015)......................................................... passim

*Morales v. Chadbourne*, 996 F.Supp.2d 19 (D.R.I. 2014) ................................................... passim

*Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994).......................................................................... 18

*Parks v. Town of Leicester*, No. 10-30120, 2012 WL 2088926 (D. Mass. June 7, 2012) (unpub.).......................................................................................................................... 23

*Petro v. Town of W. Warwick ex rel. Moore*, 889 F. Supp. 2d 292 (D.R.I. 2012)....................... 40

*Phelan v. Vill. of Lyons*, 531 F.3d 484 (7th Cir. 2008)................................................................. 30

*Pierce v. Providence Ret. Bd.*, 15 A.3d 957 (R.I. 2011).............................................................. 39

*Pittman v. City of New York*, No. 14-4140, 2014 WL 7399308 (E.D.N.Y. Dec. 30, 2014) (unpub.).......................................................................................................................... 23

*Prokey v. Watkins*, 942 F.2d 67 (1st Cir. 1991)........................................................................... 29

*Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) ..................................................................... 37

*Rivera v. Murphy*, 979 F.2d 259 (1st Cir. 1992)..................................................................... 15, 18

*Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61 (1st Cir. 2014) ..................................... 14

*Smith v. Wade*, 461 U.S. 30 (1983) ................................................................................................. 46

*Testa v. Winquist*, 451 F. Supp. 388 (D.R.I. 1978) .................................................................. 40, 45

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ........................................................................................ 29

*Torres Ramirez v. Bermudez Garcia*, 898 F.2d 224 (1st Cir. 1990) ....................................... 22, 29

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ................................................................. 16

*United States v. Fuccillo*, 808 F.2d 173 (1st Cir. 1987) ................................................................ 26

*United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010) ................................................................... 18

*United States v. Walker*, 719 F. Supp. 2d 586 (W.D. Pa. 2010) .................................................... 25

*Uroza v. Salt Lake Cnty.*, No. 11-713, 2013 WL 653968 (D. Utah Feb. 21, 2013) (unpub.) ....... 40

*Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486 (1st Cir. 1991) ......................................... 42

*Vargas Ramirez v. United States*, 93 F.Supp.3d 1207 (W.D. Wash. 2015) .................................. 30

*Volpe v. Gallagher*, 821 A.2d 699 (R.I. 2003) .............................................................................. 44

*Walden v. City of Providence*, 495 F. Supp. 2d 245 (D.R.I. 2007) ............................................... 15

*Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968) ................................................................................. 42

*Wong Sun v. United States*, 371 U.S. 471 (1963) .......................................................................... 18

## Federal Regulations

6 C.F.R. pt. 5 Appx. C ..................................................................................................................... 24

8 C.F.R. § 287.7(d) ............................................................................................................................ 9

## Federal Statutes

28 U.S.C. § 1346(b)(1) ............................................................................................................. 11, 38

8 U.S.C. § 1357 ................................................................................................................................ 44

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a) ............................................................................................................ 14

**Treatises**

Restatement (Second) of Torts § 45A (1965) ................................................................... 41

## INTRODUCTION

Plaintiff Ada Morales is a U.S. citizen and long-time resident of Rhode Island who has been wrongly detained on two separate occasions, at federal officials' request, for the purpose of investigating her immigration status.  Since becoming a U.S. citizen in 1995, she has twice been subjected to immigration "detainers" issued by U.S. Immigration and Customs Enforcement ("ICE") to Rhode Island law enforcement authorities requesting that she be held in jail pending ICE's investigation into her immigration status.

This lawsuit concerns the second incident, which happened in 2009.  Defendants' actions caused Ms. Morales to be imprisoned in the Rhode Island Department of Corrections ("RIDOC") for approximately 24 hours after a state judge ordered her released.  She was held in state prison without a warrant, probable cause, or even a chance to contest her detention, based on nothing more than ICE Agent Edward Donaghy's assertion that he had "initiated" an "investigation" into whether she might be a removable non-citizen.  Discovery has definitively established that this was the sole basis for Ms. Morales's detention, and, as this Court has already held, the mere initiation of investigation is an insufficient basis to hold someone in jail.  *Morales v. Chadbourne*, 996 F.Supp.2d 19, 29 (D.R.I. 2014) (Dkt. No. 64); *see also Dunaway v. New York*, 442 U.S. 200, 215-16 (1979).  Summary judgment is therefore warranted.

As described below, the undisputed facts show that Agent Donaghy requested Ms. Morales's detention based on her Guatemalan place of birth and *no other affirmative information*.  His cursory, name-based computer searches returned no records, one way or the other, about Ms. Morales's citizenship.  Agent Donaghy nevertheless issued a detainer based solely on investigatory interest, and then proceeded to do nothing more on Ms. Morales's case. He never attempted to speak to her or anyone else at RIDOC.  And even though he had Ms.

1

Morales's Social Security Number, he never bothered to enter it into the various databases available to him.  Simply picking up the phone or typing nine digits into his computer would have quickly established that Ms. Morales is a U.S. citizen who is not subject to immigration detention, saving her a frightening and unwarranted night in jail.  Instead, Agent Donaghy let Ms. Morales sit in prison until she was brought in handcuffs to ICE's office the following day.

The record further establishes that this was business as usual for ICE in Rhode Island. Field Office Director Bruce Chadbourne and Supervisory Detention and Deportation Officer John Drane were deliberately indifferent to their subordinates' use of ICE detainers to cause unlawful imprisonment.  Chadbourne and Drane did not bother training their agents in how to use ICE detainers, did not keep track of cancelled detainers, and did not even know that the Fourth Amendment requires ICE detainers to be supported by probable cause—even though, as the First Circuit has held, that "law was clearly established" in 2009.  *Morales v. Chadbourne*, 793 F.3d 208, 218 (1st Cir. 2015).  As a result, ICE agents in Rhode Island were permitted to issue detainers "willy-nilly," without an adequate evidentiary basis and without making even minimal efforts to determine whether the targets were U.S. citizens.  Plaintiff's Statement of Undisputed Facts (hereinafter "Pl. Facts") ¶108.  In fact, the first time Ms. Morales could talk to "somebody that . . . care[d]" about her erroneous detainer was only *after* the detainer had been executed, when she was finally hauled into ICE's office.  Pl. Facts ¶64.  Chadbourne and Drane's utter failure to supervise their agents or promulgate any policies to guide their detainer issuance evinces a complete disregard for the liberty rights of Ms. Morales and hundreds of other people detained in Rhode Island each year.

# STATEMENT OF FACTS AND PROCEDURAL HISTORY

## A.  FACTS

### 1.  Ms. Morales's Imprisonment on the ICE Detainer

Plaintiff Ada Morales, born in Guatemala, immigrated to the United States in 1985.  Pl. Facts ¶1.  She became a Lawful Permanent Resident ("LPR") in 1989, and she became a naturalized U.S. citizen in 1995.  *Id*.  The federal government maintains an "Alien file" ("A file") on Ms. Morales, as it does for all naturalized citizens and immigrants who come into contact with the federal immigration authorities, and this A file includes Ms. Morales's naturalization certificate.  Pl. Facts ¶¶6, 7.  Ms. Morales also has a Social Security Number and a U.S. passport issued by the federal government.  Pl. Facts ¶2.

Ms. Morales was the subject of an immigration detainer for the first time in 2004.  Pl. Facts ¶8.  She was arrested by the Cranston Police Department for suspected shoplifting (a charge that was later dismissed for insufficient evidence), and during her court appearance, she learned that ICE had lodged a detainer against her.  Pl. Facts ¶¶8, 9.  ICE agents were waiting for her at the court.  Pl. Facts ¶10.  They took her into custody, transported her to an ICE office, fingerprinted her, and—once they confirmed that she was a U.S. citizen—released her.  *Id*.  ICE kept no record of this 2004 detainer.  Pl. Facts ¶11.  Indeed, ICE's Rhode Island sub-office "didn't keep any records of prior detainers" as of 2009, so an agent in 2009 would have "no way of determining" that Ms. Morales had been previously subject to a detainer.  *Id*.

In May 2009, Ms. Morales was the target of an ICE detainer for a second time.  Rhode Island officials arrested her on state charges and transported her to RIDOC.  Pl. Facts ¶27.  At booking on Saturday, May 2, 2009, a RIDOC official asked her where she was from; she

answered that she was born in Guatemala, and that she is a U.S. citizen.  Pl. Facts ¶31.  She spent the weekend in RIDOC's custody, awaiting her initial appearance in state court.  Pl. Facts ¶35.

On Monday morning, May 4, 2009, Defendant Edward Donaghy, an agent in ICE's Rhode Island sub-office, learned of Ms. Morales's arrest by logging into RIDOC's computer system and reviewing its daily commitment report.  Pl. Facts ¶¶17, 47.  At 8:32 a.m., Agent Donaghy faxed RIDOC an immigration "detainer" form stating that an "[i]nvestigation ha[d] been initiated" into Ms. Morales's immigration status.  Pl. Facts ¶¶44, 55.  The detainer incorrectly identified Ms. Morales as an "alien," alleging that her "[s]ex" was "M[ale]" and her "[n]ationality" was "Guatemala[n]."  Pl. Facts ¶55.  The detainer requested that RIDOC "detain the alien" for up to 48 hours, plus weekends and holidays, after she would otherwise be released to give ICE extra time to take her into federal custody.  *Id.*  The detainer was not accompanied by a warrant or even an assertion of probable cause to believe Ms. Morales was a removable non-citizen.  Pl. Facts ¶56.  Yet Agent Donaghy fully "expect[ed]" RIDOC to hold Ms. Morales on the detainer, as, in his experience, RIDOC had always done.  Pl. Facts ¶57.

Later on May 4, Ms. Morales appeared in state court.  Pl. Facts ¶130.  She pleaded not guilty, and the magistrate judge ordered her released from criminal custody on personal recognizance.  *Id.*  Upon being ordered released, she would normally have been free to "walk right out of the courthouse doors."  Pl. Facts ¶131.  Instead, because of the ICE detainer, state officials transported Ms. Morales in handcuffs back to RIDOC, where she was strip searched and re-committed into prison custody.  Pl. Facts ¶¶133, 134.  This time, she was sent to a different part of the facility in which convicted criminals were housed.  Pl. Facts ¶136.  The experience of being strip-searched was "very shameful and very hard" for her, Pl. Facts ¶135, and the additional night spent in RIDOC custody on May 4 was "the worst night of [her] life."  Pl. Facts

¶139.  She was afraid that other inmates would hurt her, and she feared that, despite her citizenship, they were right when they told her she would be deported and separated from her husband and children.  *Id.*  Even though Ms. Morales told multiple RIDOC officials that she is a U.S. citizen, she was nonetheless kept in prison for approximately 24 more hours.  Pl. Facts ¶142.  As Agent Donaghy's supervisor John Drane testified, there was no opportunity for Ms. Morales to assert her U.S. citizenship to ICE during this time.  Pl. Facts ¶64.

On Tuesday, May 5, 2009, ICE agents arrived at the jail to take Ms. Morales into federal custody.  Pl. Facts ¶161.  They handcuffed her, drove her to ICE's office, interviewed her, confirmed that she is a U.S. citizen, and finally released her.  Pl. Facts ¶162.  Before she left, Ms. Morales protested to one ICE agent that this was the second time she had been targeted by an ICE detainer, and she asked for an assurance that it would not happen a third time.  The agent apologized for her detention, but told her "there's nothing I can do" to ensure that she would not be detained again in the future.  Pl. Facts ¶163.

### 2.  Agent Donaghy's Actions

It is undisputed that Agent Donaghy never met or even talked to Ms. Morales before issuing her ICE detainer.  Pl. Facts ¶58.  Nor did he speak to anyone at RIDOC about her.  *Id.*  He reviewed RIDOC's daily commitment report and its inmate database, saw Ms. Morales's name and Guatemalan place of birth, and decided to "initiate[]" an "[i]nvestigation" into her citizenship and immigration status.  Pl. Facts ¶¶47, 55.  Yet the only "investigation" Agent Donaghy actually performed before issuing Ms. Morales's detainer was a cursory name-based computer search while sitting at his desk in ICE's Rhode Island office.

Agent Donaghy testified that he does not recall which computer databases he searched on May 4, and defendants were unable to produce any record of such searches.  Pl. Facts ¶¶48, 50.

Agent Donaghy believes, however, that he would have queried (1) RIDOC's "INFACTS" system, which contains booking information about RIDOC inmates; (2) the federal government's Central Index System ("CIS"), which ICE agents can use to identify a person's "Alien number" or "A number"; (3) and the FBI's National Crime Information Center ("NCIC"), which contains criminal history information.  Pl. Facts ¶¶30, 43, 53, 73, 92.  Assuming that is true—as Plaintiff does for purposes of her summary judgment motion—it is undisputed that those searches on May 4 would have shown (1) that Ms. Morales was born in Guatemala on XXXX XX, 1963, (2) that Ms. Morales was "married" and that her husband's surname was also "Morales," and (3) that Ms. Morales had a Social Security Number, XXX-XX-6916.  Pl. Facts ¶¶66, 67, 68.

It is also undisputed that Agent Donaghy's computer searches would have yielded no records one way or another about Ms. Morales's citizenship or immigration status.  Pl. Facts ¶69, 84, 93.  The federal immigration authorities did, of course, have conclusive evidence in their possession in 2009 that Ms. Morales is a U.S. citizen.  Pl. Facts ¶6.  They had interacted with her on multiple occasions before, including when they granted her LPR status in 1989 and when she became a naturalized citizen in 1995.  Pl. Facts ¶1.  These interactions are reflected in Ms. Morales's physical A file and a corresponding electronic record in CIS, both of which showed unequivocally that she was a U.S. citizen on May 4, 2009.  Pl. Facts ¶¶6, 89.  But Agent Donaghy searched CIS using only her current married name (Ada Morales)—not her maiden name (Ada Cabrera), under which she had naturalized over a decade previously.  Pl. Facts ¶¶7, 82.  As a result, Agent Donaghy's CIS search turned up no results.  Pl. Facts ¶83.

Ms. Morales's name was not the only piece of information Agent Donaghy could have used in his database search.  He also knew Ms. Morales's Social Security Number, which was listed in RIDOC's daily commitment report, in INFACTS, and in the NCIC—all records that

Donaghy says he would have viewed on May 4.  Pl. Facts ¶¶41, 43, 88.  ICE's 30(b)(6) deponent Supervisory Detention and Deportation Officer Daniel Monico confirmed that it was "[a]bsolutely" "common for ICE agents to search [CIS] by different [identifying] numbers" in 2009, and that an ICE agent presented with the information available to Agent Donaghy "should check" the Social Security Number and "would . . . be expected" to do so.  Pl. Facts ¶87.  Yet the record shows that Agent Donaghy did not attempt to search CIS using Ms. Morales's Social Security Number on May 4.  Pl. Facts ¶89.[1]  If he *had* entered Ms. Morales's Social Security Number into CIS, he would instantly have found her CIS record, which clearly identified her as a U.S. citizen.  *Id.*  Indeed, Agent Donaghy eventually located Ms. Morales's CIS record in 2011, after this litigation began, *by searching with her Social Security Number.*  Pl. Facts ¶90.

Agent Donaghy also never spoke with Ms. Morales or anyone else at RIDOC, either in person or by phone, before issuing her detainer.  Pl. Facts ¶58.  He admitted that he had no reason to think RIDOC would refuse a request to interview Ms. Morales in person or by phone. Pl. Facts ¶59.  He made no effort to contact anyone at RIDOC because, in his view, "I had no reason to."  Pl. Facts ¶58.  Instead, Agent Donaghy summarily concluded that Ms. Morales "made no claim of being a U.S. citizen"—even though he gave her no opportunity whatsoever to do so, and even though she had, in fact, made that (truthful) claim when she was booked.  Pl. Facts ¶62.

---

[1] Defendants suggest there may be a factual question whether Agent Donaghy ran a search using Ms. Morales's Social Security Number, *see* Fed. Br. at 17, but the only record citation they provide to support their speculation is Agent Donaghy's interrogatory response, stating: "I *do not recall* whether I also conducted a search based on Ms. Morales's social security number as well."  Pl. Facts ¶48 (emphasis added).  Agent Donaghy's lack of memory is not enough to create a genuine factual dispute for trial.  *See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999).  In any event, it is undisputed that if Agent Donaghy had entered Ms. Morales's Social Security Number into CIS on May 4, 2009, he would have seen her CIS record, which showed she was a U.S. citizen.  Pl. Facts ¶89.  If Agent Donaghy had run this search, seen Ms. Morales's U.S. citizenship, and issued a detainer anyway, his action would be obviously unlawful.  Either way, Plaintiff is entitled to summary judgment.

Agent Donaghy estimates that his review of RIDOC's daily commitment report (which included approximately 100 inmates) and his resulting computer searches took between 60 and 90 minutes total—less than a minute per inmate on average.  Pl. Facts ¶¶45, 46.  At 8:32 a.m., having found no evidence one way or the other of Ms. Morales's citizenship or immigration status, Agent Donaghy issued a detainer asserting that he had "initiated" an "[i]nvestigation" into her status.  Pl. Facts ¶¶44, 55.  He does not recall doing any further investigation into Ms. Morales's status for the rest of the day.  Pl. Facts ¶63.  In fact, he testified, even after receiving notification from RIDOC that the detainer was the only remaining basis for a person's detention, "we would really take no action until the following day."  *Id.*  Knowing that the detainer would cause Ms. Morales's extended detention, Agent Donaghy faxed it to RIDOC, took no further steps to ascertain Ms. Morales's status, and went home for the day between 4:00 and 7:00 p.m.  Pl. Facts ¶¶57, 65.  Ms. Morales, meanwhile, spent the night in prison.

### 3. Field Office Director Chadbourne and the ICE's Detainer Issuance Practices in Rhode Island

Agent Donaghy's decision to issue the detainer against Ms. Morales took place in a vacuum of oversight within ICE's Boston Field Office and the Rhode Island sub-office.  The testimony of both Field Office Director Bruce Chadbourne and Supervisory Detention and Deportation Officer John Drane demonstrates that ICE agents in Rhode Island routinely issued detainers "willy-nilly," Pl. Facts ¶108, without probable cause, solely for the purpose of investigatory convenience.  Supervisors Chadbourne and Drane failed to provide their subordinates with a bare minimum of supervision and guidance regarding detainer issuance; they failed to train Donaghy and other agents in the applicable constitutional limits on ICE detainers; and they did nothing to remedy—or even keep track of—unlawful detentions like Ms. Morales's.

From 2003 until 2011, Bruce Chadbourne was the Field Office Director for ICE's Boston

Field Office.  Pl. Facts ¶19.  As Field Office Director, Chadbourne was responsible for

"overs[eeing] [e]nforcement and [r]emoval [o]perations" in ICE's New England offices,

including the Rhode Island sub-office where Agent Donaghy worked; "communicating national

policy to the sub-offices," including by holding trainings and staff meetings; and ensuring that

agents in the sub-offices were following national policy and "provid[ing] . . . clarification" if

they were not.  Pl. Facts ¶¶20, 22.

Director Chadbourne knew that his subordinates were routinely issuing ICE detainers.

Pl. Facts ¶23.  Yet, even as of the date of his deposition testimony, he exhibited a striking

ignorance about the way ICE detainers work and the legal limits on their use.  Despite the clear

language of the detainer form itself—*see* Pl. Facts ¶55 (asking the receiving agency to "*detain*

the alien") (emphasis added), and the equally clear language of the federal detainer regulation,

*see* 8 C.F.R. § 287.7(d) (2009) (describing a detainer as a "request" to "maintain custody of the

alien" who is "not otherwise detained")—Director Chadbourne took the surprising position that

issuing an ICE detainer does not cause detention at all, but "just notif[ies] the facility that [ICE]

ha[s] an interest in the[] [person]. . . . I don't believe there's any expectation for them to hold the

individual at all."  Pl. Facts ¶101.  Thus, he opined, "an ICE agent does not have to make a

determination that a person is in the country illegally before issuing a detainer."  Pl. Facts ¶102.

He testified that agents needed only "reasonable suspicion," not "probable cause," to issue a

detainer.  *Id.*

The reality, of course, is that Ms. Morales's detainer—like thousands of others issued on

Director Chadbourne's watch—resulted in her extended imprisonment after she would otherwise

have been released from RIDOC's custody.  Keeping Ms. Morales in prison after her criminal

custody ended was the detainer's express purpose.  Thus, as the First Circuit held, ICE "required probable cause to detain [her] pursuant to an immigration detainer"—and this basic Fourth Amendment requirement was clearly established in 2009.  *Morales*, 793 F.3d at 218.  Director Chadbourne's testimony to the contrary exposes his complete indifference to the constitutional limits on his agents' use of detainers, and the impacts those detainers had on people's liberty.

Director Chadbourne made no effort to oversee his subordinates' use of detainers, implement policy, or ensure that his subordinates understood the applicable legal standards— which, his testimony shows, he did not know himself—despite the obvious risk that agents would improperly issue detainers as a result.  Pl. Facts ¶¶103, 104, 110.  Indeed, Director Chadbourne testified that a 2009 memorandum, identified by the United States and ICE 30(b)(6) deponent Officer Monico as national detainer policy, had "nothing to do with issuing detainers." Pl. Facts ¶¶96, 97, 103.  Agent Donaghy, accordingly, could not "recall anything" Director Chadbourne did to ensure that policy was implemented.  Pl. Facts ¶¶98, 103.  Director Chadbourne also testified that he never discussed the detainer form with anyone or conducted any training on how to use detainers.  Pl. Facts ¶110.  He could not recall whether the agents under his supervision were ever given detainer-related training.  *Id.*

Director Chadbourne also did nothing to monitor or review his subordinates' detainer-issuance decisions.  In 2004—the year after Chadbourne became Field Office Director, and the year when Ms. Morales was first held on an ICE detainer—ICE's Rhode Island office had no system for tracking detainers issued or cancelled.  Pl. Facts ¶125.  Even after ICE began collecting detainer data, Chadbourne did not recall ever seeing statistics regarding his subordinates' cancelled detainers; he never asked to see such statistics because he "didn't think it was an issue."  Pl. Facts ¶127.

Had Director Chadbourne taken the time to look at his subordinates' detainer statistics, he would have found them abysmal.  In 2009, the year Ms. Morales was detained, roughly two detainers were cancelled for every three that led to an individual being booked into ICE custody.  Pl. Facts ¶119.  Such cancelled detainers may be an indication that the subject was actually a U.S. citizen or LPR not subject to removal.  Pl. Facts ¶120.  In fact, RIDOC's own data show that, between 2003 and 2014, ICE issued 462 detainers against individuals *identified in RIDOC's system as U.S. citizens*.  Pl. Facts ¶122.  Yet Director Chadbourne did not even try to determine how many detainers his agents were issuing and then cancelling, much less to determine the reason for those high cancellation rates.  Pl. Facts ¶127.  In all, while Director Chadbourne was aware that his agents were issuing detainers on a daily basis, he did nothing at all to ensure that they did so in a lawful manner.

Similarly, Supervisory Detention and Deportation Officer Drane was both misinformed and inexcusably careless when it came to the issuance of detainers.[2]  Officer Drane was Agent Donaghy's direct supervisor, Pl. Facts ¶24, and his job responsibilities included supervising immigration enforcement agents like Agent Donaghy, "[e]stablish[ing] guidelines and performance expectations for the staff members, . . . [o]bserv[ing] workers' performance, . . . [and] [i]nterpret[ing] and recommend[ing] administrative procedures and policies."  Pl. Facts ¶25.  Drane, like Chadbourne, was well aware that the agents under his supervision were routinely issuing detainers to Rhode Island law enforcement agencies.  Pl. Facts ¶26.  Yet he did nothing to ensure that these detainers were issued lawfully, or that his subordinates understood the legal limits on detainer issuance.

---

[2] Officer Drane is not a *Bivens* defendant.  His actions are relevant to the United States' liability under the FTCA, however, because the FTCA authorizes suit against the United States for damages "caused by the negligent or wrongful act or omission of *any employee* of the government."  28 U.S.C. § 1346(b)(1) (emphasis added).

Despite having responsibility for supervising Agent Donaghy's enforcement actions, Officer Drane testified that "[t]here's no supervision that really goes along with" the issuance of detainers, which he described as "an independent process" that "doesn't take any oversight."  Pl. Facts ¶111.  He did not believe oversight was necessary because he viewed detainer issuance as "a routine part of [the agents'] job," like "a police officer issuing a ticket."  *Id.*

Like Director Chadbourne, Officer Drane believed that agents needed only "reasonable suspicion"—not probable cause—to issue a detainer.  Pl. Facts ¶106.  He testified that in 2009, the purpose of a detainer was merely to "get[] us started with the process to be able to . . . get [the individual] to our office to talk [to] her more about what's going on."  Pl. Facts ¶106; *see also id.* ("So we have to issue the detainer so they come to us so that we can find out more information.").  Notably, Drane believed the information available to Agent Donaghy on May 4—Ms. Morales's foreign place of birth and his failure to find her record in CIS—did *not* give rise to probable cause, but he nevertheless believed Donaghy could "issue the detainer *so that we can get the probable cause*":

> Q. And how then would you get the probable cause?
> A. By the person coming in to us after and talking to us and then—like more of a broader interview; where were you born; where your parents born; what are you doing here, type questions.
> Q. And the answers to those questions would then get the probable cause in order to—
> A. For us to issue an A file or to issue a charging document. Yes.

Pl. Facts ¶107.  Drane further explained that "[f]or us to issue a charging document, we have to have certain information. We just can't willy-nilly issue charging documents."  Pl. Facts ¶108. But he evidently saw no problem with "willy-nilly" issuing detainers, testifying that "the process for issuing a detainer is different."  *Id.*

Officer Drane testified that he did not "consider it serious at all" when a detainer is issued against a U.S. citizen. Pl. Facts ¶112. He casually dismissed the extra day Ms. Morales spent in prison: "[W]hen she came in[to] [the ICE office] and said, I'm a U.S. citizen, she went home. It wasn't an issue." *Id.* The incident was not something he felt was worth discussing in an agent's performance review because, he testified, it is "kind of a normal part of our job"; "that's what happens sometimes" and "if this situation happened again tomorrow, it happens." *Id.* In fact, it was not until April 2012—nearly three years after Ms. Morales's detention, and only after this lawsuit was filed—that Officer Drane instructed Agent Donaghy to update ICE's internal records to indicate that Ms. Morales is a U.S. citizen. Pl. Facts ¶117.

## B. PROCEDURAL HISTORY

Ms. Morales filed her complaint in 2012. The federal defendants filed motions to dismiss, which this Court denied in large part. *See Morales*, 996 F. Supp. 2d at 28-38. As relevant here, the Court concluded that Ms. Morales stated plausible claims for relief against both Agent Donaghy and Director Chadbourne for violating her Fourth Amendment right to be free from an unreasonable seizure, and against the United States for false imprisonment and negligence by its employees. *Id.* at 28-34, 36-37. Director Wall also filed his own motion to dismiss, which this Court denied. *Id.* at 38-41.

The individual federal defendants filed an interlocutory appeal of the Court's ruling, asserting qualified immunity as to Ms. Morales's constitutional claims. In 2015, the First Circuit Court of Appeals rejected the defendants' appeal. *Morales*, 793 F.3d 208. In particular, the First Circuit rejected Agent Donaghy's claim to qualified immunity, holding that "it is beyond debate that an immigration officer in 2009 would need probable cause to arrest and detain individuals for the purpose of investigating their immigration status." *Id.* at 216-18. The Court also denied

13

qualified immunity to Director Chadbourne, holding that "it is beyond debate that a supervisor who either authorized or was deliberately indifferent to his subordinate's issuance of a detainer without probable cause could be held liable for violating the Fourth Amendment." *Id.* at 222 n.5.

Discovery is now complete, and all parties have moved for summary judgment.

## ARGUMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where multiple parties file cross-motions for summary judgment, as here, the Court must "determine whether either of the parties deserves judgment as a matter of law on [the] facts that are not disputed," and "[i]n so doing . . . consider each motion separately, drawing inferences against each movant in turn." *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 69-70 (1st Cir. 2014) (first alteration in original; internal quotation marks omitted).

As argued below, there are no material facts in dispute here, and the law is clear. Given the undisputed facts adduced in discovery, Ms. Morales is entitled to summary judgment on her constitutional and Federal Tort Claims Act ("FTCA") claims. At a minimum, the Court should deny the defendants' summary judgment motion, which relies on misstatements of the law and improperly asks the Court to draw unsupported factual inferences in defendants' favor.

## A.  MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FOURTH AMENDMENT CLAIM AGAINST AGENT DONAGHY.

Defendants appear to concede that Agent Donaghy did not have probable cause to believe Ms. Morales was a removable non-citizen when he issued her detainer. They make no attempt anywhere in their summary judgment brief to argue that Ms. Morales's detention was supported by probable cause. Instead, they argue only that Agent Donaghy should be shielded by qualified immunity. *See* Federal Defendants' Summary Judgment Brief (Dkt. No. 157-1) (hereinafter

"Fed. Br.") at 9-17 (arguing that "Agent Donaghy is *entitled to qualified immunity* because, at a minimum, he *arguably* had probable cause") (emphases added); *id.* at 13 (arguing that "a reasonable officer in Agent Donaghy's position could have concluded that there was probable cause"), *id. at* 17 (arguing that "[i]n sum . . . Donaghy is entitled to qualified immunity because it was not 'clearly established' that the circumstances with which he was confronted . . . did not constitute probable cause").[3]  Even setting defendants' waiver aside, the record establishes beyond question that Agent Donaghy did not have probable cause to issue Ms. Morales's detainer.  *See infra* at Section A(1).  The record also makes clear that Agent Donaghy is not entitled to qualified immunity.  *See infra* at Section A(2).  Finally, at a minimum, the Court should deny Agent Donaghy's summary judgment motion, which relies on misstatements of the law and unsupported factual inferences.  *See infra* at Section A(3).

### 1.   The Record Establishes that Agent Donaghy Caused Ms. Morales To Be Imprisoned Without Probable Cause.

Discovery has established that Agent Donaghy did not have probable cause to believe Ms. Morales was a removable non-citizen when he issued her detainer.  Probable cause exists when "the facts and circumstances within the[] [agent's] knowledge and of which [he] ha[s] reasonably trustworthy information [a]re sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense."  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  This inquiry depends on the "totality of [the] circumstances."  *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992) (internal quotation marks omitted).  Here, the facts and circumstances known

---

[3] Elsewhere in their brief, Defendants reference a probable cause argument that they have not in fact made. *See* Fed. Br. at 19 ("The undisputed facts . . . show that Agent Donaghy had probable cause . . . . *See supra*, Arg. Section A"), *id.* at 22 ("The United States . . . adopts the arguments, *supra*, that Agent Donaghy had probable cause . . ."). The section to which they cite contains only their qualified immunity argument—not an argument that there was actually probable cause to detain Ms. Morales. Naturally, to preserve an argument, it is not enough to say "as argued above" if one does not actually make any such argument above. *See Walden v. City of Providence*, 495 F. Supp. 2d 245, 268 (D.R.I. 2007) (finding argument waived where defendants "utterly fail[ed] to support the argument that no constitutional rights were violated" beyond making a few conclusory statements in their brief).

to Agent Donaghy and of which he had reasonably trustworthy information fell far short of probable cause.

### a.  Ms. Morales's Guatemalan place of birth did not constitute probable cause to believe she was a removable non-citizen.

On May 4, the only fact that suggested alienage and of which Agent Donaghy "had reasonably trustworthy information," *Beck*, 379 U.S. at 91, was Ms. Morales's Guatemalan place of birth.  The Court has already correctly held that foreign birth alone is not a sufficient basis for immigration detention.  *See Morales*, 996 F. Supp. 2d at 35 (the Constitution does not permit "the approximately 17 million foreign-born United States citizens . . . [to be] automatically . . . subject to detention . . . based solely on their national origin."); *id.* at 39 ("that single factor is insufficient to warrant a prudent person to believe that she was in this country illegally"); *see also* Pl. Facts ¶95 (U.S. Census Bureau data showing over 17 million foreign-born U.S. citizens in the United States as of 2010); *United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) (the fact that vehicle occupants appeared to be "of Mexican descent" was not enough to supply the reasonable suspicion of alienage needed to justify a temporary stop—let alone the probable cause needed for an arrest—because "[l]arge numbers of native-born and naturalized citizens" share those same characteristics).  Agent Donaghy conceded as much in his deposition, agreeing that "it would be constitutionally improper . . . to issue an immigration detainer simply because the inmate was born outside the U.S."  Pl. Facts ¶94.

### b.  Agent Donaghy's failure to find Ms. Morales's CIS record adds nothing to the probable cause analysis.

Recognizing that Ms. Morales's Guatemalan place of birth is not reason enough to detain her, Agent Donaghy argues that he had probable cause based on the *absence* of information: his failure to find any evidence of her citizenship or immigration status when he ran a name-based

search in CIS.  Fed Br. at 7, 15.  His failure to find Ms. Morales's CIS record carries no weight

in the probable cause analysis for three reasons.

First, Agent Donaghy admitted at his deposition that he knew nothing about how

complete or incomplete CIS was.  Therefore, his testimony reveals, he had no basis whatsoever

for concluding that his failure to find a CIS record under Ms. Morales's name meant anything at

all about her immigration status:

> Q. So how far does the CIS data go back in time?
> A. I don't know.
> . . . Q. So it's possible someone applied for benefits in the 1980s and just isn't in the CIS?
> A. It's possible. I don't know.
> Q. But you don't know one way or the other how complete the CIS database is for people who applied for benefits in the 1980s?
> A. No.
> Q. You've never asked anyone?
> A. No.
> Q. To your knowledge, it could be more or less than 50 percent complete[]?
> A. I don't know.
> Q. No idea one way or the other?
> A. No.
> Q. How about the 1990s?
> A. I don't know.
> Q. You have no idea how complete the CIS database is for people who applied for benefits in the 1990s?
> A. I don't know.
> Q. Never asked anyone?
> A. No.
> Q. Did anyone ever tell you?
> A. No.
> Q. To the best of your knowledge, you couldn't say whether it's more than 50 percent complete?
> A. I do not know.
> . . . Q. The fact that someone is born in another country [and] not located in the CIS, therefore, does not necessarily mean they're not a U.S. citizen. Correct?
> A. It's possible.
> Q. You don't know one way or the other how likely it is?
> A. No, I don't.

Pl. Facts ¶91.  Given Agent Donaghy's admitted lack of knowledge about CIS, he had no basis

for assuming that his *failure* to turn up any search results gave him probable cause to detain Ms.

Morales as a removable non-citizen.

The First Circuit has long recognized that "[t]he experience and training of a police

officer are . . . factors to be considered in the determination of probable cause."  *Rivera*, 979 F.2d

at 264.  Here, because Agent Donaghy had "no idea" one way or the other how complete CIS

was, Pl. Facts ¶91, the fact his search turned up no records adds nothing to the probable cause

analysis.  *See Wong Sun v. United States*, 371 U.S. 471, 480 (1963) (narcotics agents had no

probable cause for arrest where they "had no basis in experience for confidence in the reliability

of [an informant's] information"); *United States v. Lall*, 607 F.3d 1277, 1291 (11th Cir. 2010)

("The record clearly shows that [the officer] did not have probable cause to seize the physical

evidence because he had no idea what this equipment was and could not have recognized it as

incriminating evidence . . . ."); *see also Orhorhaghe v. INS*, 38 F.3d 488, 497, 497-99 (9th Cir.

1994) (INS agent's testimony that petitioner's "name did not appear in INS computer records of

lawful entries into the United States" did not carry any weight in the Fourth Amendment

analysis).

<u>Second</u>, the record establishes that CIS is not, in fact, a complete record of all foreign-

born people's interactions with federal immigration authorities.  Rather, CIS "serves as an *initial*

*screening* process to provide a *quick look* at a person's basic information . . . to determine if

there is a need to request the physical [A] file."  Pl. Facts ¶74 (emphasis added).  An ICE training

document from January 2009 warns ICE agents to "[k]eep in mind that not all aliens"—nor,

presumably, all U.S. citizens—"will be found in CIS."  *Id*.  Indeed, in Ms. Morales's own case,

ICE's Rhode Island office had detained her, interviewed her, and verified her U.S. citizenship

just five years earlier—in 2004—yet CIS shows no record of this interaction.  *See* Pl. Facts ¶¶10,

11.  Thus, a simple no-match in CIS is not a reasonably trustworthy indication that a person has

had no prior contacts with immigration.[4]

Third, Agent Donaghy searched CIS in a way that rendered his search results—or rather,

his lack of search results—predictably under-inclusive.  He searched CIS using Ms. Morales's

name alone, even though he knew from INFACTS that Ms. Morales was "married" and that her

spouse's surname was also "Morales," and even though he knew that women "common[ly] . . .

change their last name as a result of marriage."  Pl. Facts ¶¶ 67, 80.  Thus, Donaghy was on

notice that "Morales" was Plaintiff's married name, and that a name-based search would exclude

any records associated with her maiden name.[5]  This systemic shortcoming of name-based

searches is one reason why, as discussed further below, ICE agents were "expected" to search

using Social Security Number.  Pl. Facts ¶87 (ICE 30(b)(6) deponent testified that an ICE agent

presented with the information available to Agent Donaghy "should check" the Social Security

Number and "would . . . be expected" to do so); ¶85 (ICE 30(b)(6) deponent testified that

"numbers are the best search mechanisms inside of CIS").  *See infra* at Section A(2).  Critically,

Agent Donaghy knew Ms. Morales's Social Security Number—which not only suggested that

---

[4] To be clear, if Agent Donaghy had conducted a name-based search and *found* a record in CIS—e.g., a record showing affirmatively that the person had violated the immigration laws—that result might well be "reasonably trustworthy information" with some probative value, notwithstanding the general unreliability of name-based searches described *infra*. *Beck*, 379 U.S. at 91. A "no-match," however, is different. The absence of evidence cannot be considered evidence of absence where, as here, the database searched is incomplete and the method used to search it is unsound.

[5] A U.S. citizen who gets married after naturalizing and decides to change her surname is under no obligation to report her new name to the immigration authorities. As ICE's 30(b)(6) deponent Special Agent Rodger Werner testified, "[o]nce you become a citizen, your interactions with the Department of Homeland Security are at your leisure. There's no requirement [of a] U.S. citizen to go back and tell us anything." Pl. Facts ¶81. *See also Afroyim v. Rusk*, 387 U.S. 253, 261 (1967) ("[A] naturalized citizen . . . possess[es] all the rights of a native citizen, and stand[s], in view of the constitution, on the footing of a native.") (internal quotation marks and brackets omitted). Further, because a naturalization certificate is a record of a historical event—like a birth certificate or a diploma—there is no need to update it to reflect subsequent changes in the individual's name. *Cf. In re Perkins*, 204 F. 350, 351 (S.D.N.Y. 1913) (denying a petition to amend a naturalization certificate where the petitioner changed his name after naturalizing; explaining that the court would not "change the record, which speaks correctly, so as to make it speak incorrectly as of its date").

she had lawful status, but also provided a better search term than her name.  Pl. Facts ¶¶85, 88.

Given the limits of name-based searches generally, and given that Agent Donaghy was

specifically on notice that "Ada Morales" was a married name, his failure to find her CIS record

after a single named-based search carries no evidentiary weight.

> ### c. The blank "citizenship" field in RIDOC's INFACTS database, even assuming Agent Donaghy looked at it, adds nothing to the probable cause analysis.

Agent Donaghy argues in his brief that he may also have relied on the blank "citizenship"

field in Ms. Morales's INFACTS record when issuing her detainer.  Fed Br. at 6, 14.  But

critically, Agent Donaghy never mentioned that field as playing any role in his probable cause

assessment in either of his two declarations (which he signed under oath) or in his "summary of

events."  Pl. Facts ¶72.  Nor did he mention it in his response to Plaintiff's interrogatory seeking

"any and all . . . databases or records systems [he] queried . . . and what results [he] received" on

May 4; Agent Donaghy responded that "the biographical information [he viewed in INFACTS]

typically included the inmate's name, the place where they were born and any aliases," but he

said nothing about citizenship.  *Id.*  Given this record evidence, Agent Donaghy cannot

manufacture a question of fact by pointing solely to his own post-hoc deposition testimony that

he *presumes* he would have viewed that information and relied on it—particularly as it is

undisputed that, as of the date of his deposition, he did not "recall" what he saw in INFACTS on

May 4.  Pl. Facts ¶48.  *See also Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st

Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he

cannot create a conflict and resist summary judgment with an affidavit that is clearly

contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

In any event, even assuming Agent Donaghy did view the "citizenship" field in INFACTS before issuing Ms. Morales's detainer, it adds nothing to the probable cause analysis. On May 4, 2009, that field was *blank*—neither "no" nor "yes."  Pl. Facts ¶69.  A blank field says nothing about what the answer might be; it merely suggests that the relevant question was not asked or answered or that the answer was not recorded, and Agent Donaghy had no information about which of these possibilities was the case.[6]  Agent Donaghy admitted that he did not "know if anyone at [RIDOC] asked [Ms. Morales] if she was a citizen," and that he had no "evidence that she was asked if she was a U.S. citizen."  Pl. Facts ¶70.  As ICE's witnesses acknowledged, it is not RIDOC's job to make assessments of inmates' citizenship.  Indeed, Officer Drane testified that the first time a person held on a detainer could assert a claim to U.S. citizenship to "somebody that . . . cares" would be *after* she is taken into ICE custody, because local law enforcement agencies "don't understand immigration laws" and "[i]t's not part of their job" to make citizenship determinations.  Pl. Facts ¶¶64, 71; *see also* Pl. Facts ¶71 (Director Chadbourne testified that he "didn't really expect . . . anything from RIDOC" in terms of assessing claims of citizenship); *Id.* ("Defendant United States . . . did not expect [RIDOC] to verify the citizenship of Ms. Morales.").  Thus, the fact that RIDOC had not recorded any information one way or the other regarding Ms. Morales's citizenship in its internal system was not "reasonably trustworthy" evidence that would lead a "prudent" agent to believe she was a non-citizen.  *Beck*, 379 U.S. at 91.

In sum, the record establishes that Agent Donaghy issued a detainer against Ms. Morales based on her place of birth and *no other reliable information*, one way or the other, about her citizenship or immigration status.  He did so despite knowing her Social Security Number and

---

[6] As the record establishes, RIDOC officers can complete the booking process without recording anything in the citizenship field.  Pl. Facts ¶33.  Indeed, when Ms. Morales was booked into RIDOC custody, she told the booking officer that she was a U.S. citizen; that information was not recorded in INFACTS. Pl. Facts ¶¶32, 34.

declining to search by it, and without ever speaking to her or anyone else at RIDOC.  *See infra* at

Section A(2).  Without probable cause—without even asserting that he had probable cause—

Agent Donaghy faxed RIDOC a document he knew would cause Ms. Morales's extended

imprisonment and left work for the day.  In so doing, he violated Ms. Morales's Fourth

Amendment rights.

### 2.   Agent Donaghy Is Not Entitled to Qualified Immunity.

The record makes equally clear that Agent Donaghy is not entitled to qualified immunity.

Qualified immunity applies only if the officer's "conduct is objectively reasonable based on the

information available at the time and in light of clearly established law."  *Torres Ramirez v.*

*Bermudez Garcia*, 898 F.2d 224, 228 (1st Cir. 1990).  Here, this Court and the First Circuit have

already resolved half of that inquiry, holding that "the law was clearly established in 2009 that,

under the Fourth Amendment, an ICE agent required probable cause to issue an immigration

detainer."  *Morales*, 793 F.3d at 211; *accord Morales*, 996 F. Supp. 2d at 33-34.

The only remaining question for summary judgment, then, is whether it was "objectively

reasonable" for Agent Donaghy to issue a detainer "based on the information available" to him

on the morning of May 4.  *Torres Ramirez*, 898 F.2d at 228.  For all the reasons explained above,

*see supra* at Section A(1), it was not.  Given the information available to him, it was not

objectively reasonable for him to assume, without further inquiry, that his failure to find a match

in CIS using a single name-based search meant that Ms. Morales was a removable non-citizen.

Agent Donaghy protests that officers can reasonably "rel[y] on a name search of an

electronic database" in determining whether probable cause exists.  Fed. Br. at 13.  But the

question here is not whether an officer can *ever* reasonably rely on information in a computer

database; certainly, in some circumstances, they can.  Rather, the question is whether the specific

information Agent Donaghy found (or did not find) on May 4 constituted "reasonably

trustworthy information" that would warrant a "prudent" officer to conclude that Ms. Morales

was a non-citizen subject to detention and removal.  *Beck*, 379 U.S. at 91.  Agent Donaghy relies

on a handful of unpublished or out-of-circuit cases granting qualified immunity to officers who

acted on *affirmative*, apparently trustworthy information that they found in a database.[7]  But

critically, none of those cases suggest that an officer who finds *no* information in a database and

draws his *own* unsupported inference of probable cause therefrom, as Donaghy did, is entitled to

qualified immunity.  In effect, Donaghy asks the Court to hold that any arrest is *per se*

reasonable as long as the agent runs a computer search first—even if the search turns up no

results, even if the agent has no idea whether the database contains the information he is looking

for, and even if the method used to search is predictably under-inclusive.  That is not the law.

The primary case on which Agent Donaghy relies is *Arizona v. Evans*, 514 U.S. 1 (1995),

in which police officers arrested and searched an individual when a records check revealed an

"outstanding arrest warrant" in his name.  *Id.* at 4.  It later came to light that the warrant had

already been quashed.  *Id.*  *Evans* held that, if the warrant remained in the database because of a

"clerical error[] of [a] court employee[]," then suppression of evidence would not be required

because the officers "acted in objectively reasonable reliance on a search warrant, issued by a

neutral and detached Magistrate."  *Id.* at 11, 16.  *Evans* does not remotely suggest that the mere

act of looking at a database will insulate an officer from liability where he makes his *own*

---

[7] *See Johnson v. Scotts Bluff Cnty. Sheriff's Dep't*, 245 F. Supp. 2d 1056, 1057 (D. Neb. 2003) (dismissing claim against officers who arrested plaintiff based "on an outstanding warrant" they found in NCIC); *McAllister v. Desoto Cnty.*, 470 F. App'x 313, 319-20 (5th Cir. 2012) (unpub.) (affirming grant of qualified immunity to officers who ran a suspect's license plate number, found the vehicle registered to "Connie McAllister," and found "only one 'Connie McAllister'" in their computer system—the plaintiff, and "not the actual drug dealer" who shared her name); *Pittman v. City of New York*, No. 14-4140, 2014 WL 7399308, at *3, *7 (E.D.N.Y. Dec. 30, 2014) (unpub.) (granting qualified immunity to officers who relied on "a computer record that mistakenly identified [plaintiff's] vehicle as stolen"); *Parks v. Town of Leicester*, No. 10-30120, 2012 WL 2088926, *1, *10 (D. Mass. June 7, 2012) (unpub.) (granting qualified immunity to an officer who "searched a computerized criminal-history database for 'Dawn Spencer' and found a record associated with plaintiff Dawn Parks.").

determination of probable cause—and certainly not when the officer's search returns no results, as here.

Just as importantly, three Justices whose votes were necessary to the *Evans* majority concurred to emphasize that when an officer relies on information found in a database—even *affirmative* information, like an outstanding arrest warrant—that reliance is not necessarily always reasonable:

> While the police [here] were innocent of the court employee's mistake, they may or may not have acted reasonably in their reliance *on the recordkeeping system itself.* Surely it would *not* be reasonable for the police to rely, say, on a recordkeeping system, their own or some other agency's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests . . . .

514 U.S. at 16-17 (O'Connor, J., joined by Souter, and Breyer, J.J., concurring) (see also *id.* at 17 (officers "may not . . . rely on [technology] blindly"). By the same logic, surely it is not reasonable to assume that the *absence* of results gives rise to probable cause when the agent is using an obviously under-inclusive search method, and has "no idea" how complete or incomplete the database is. Pl. Facts ¶91.[8]

Moreover, as discussed above, name-based searches of CIS routinely produce false negatives. *See supra* at A(1)(b). ICE's 30(b)(6) deponent Officer Monico testified that name-based searches of the federal government's immigration databases are prone to false negatives because of, among other things, "input" errors and cultural variations in naming conventions. Pl. Facts ¶77. These dangers are particularly acute for women, who, as Agent Donaghy acknowledged, "common[ly] . . . change their last name as a result of marriage." Pl. Facts ¶80; *see also id.* ¶79 (Officer Drane acknowledged it was "common" for agents checking daily

---

[8] In addition, far from having "mechanism[s] to ensure its accuracy over time," *Evans*, 514 U.S. at 17 (O'Connor, J., concurring), CIS is specifically excluded from federal law requiring agencies to maintain accurate records because, in the government's own words, "[i]t is impossible to determine in advance what information [in CIS] is accurate, relevant, timely, and complete." 6 C.F.R. pt. 5 Appx. C at 42.

commitment reports to "encounter women who have changed their names after marriage").[9]

Agent Donaghy was specifically on notice that this was true in Ms. Morales's case: INFACTS clearly showed that Ms. Morales was "married" and that her spouse's surname was also "Morales."  Pl. Facts ¶67.

Because of the limitations inherent in name-based searches, both of ICE's 30(b)(6) witnesses recognized the importance of searching CIS by identification numbers when available. Special Agent Werner testified that identifying "*numbers* are the best search mechanisms inside of CIS."  Pl. Facts ¶85 (emphasis added).  And Officer Monico testified that "[a]n ICE agent is *expected* to run a check based on the information he or she has available," including Social Security Number:

> Q. So if a daily commitment report has a name, a date of birth, and a Social Security number, you would search on those fields?
> A. Correct.
> Q. And what circumstances would you not search on those fields?
> A. There's none that I can think of.

Pl. Facts ¶86 (emphasis added).  *See also* Pl. Facts ¶¶87 (an ICE agent "should check" the Social Security Number and "would . . . be expected" to do so; "it was a check you'd want to perform").  Yet Agent Donaghy did not bother to run such a search.

As the First Circuit has recognized, "an inquiry into the reasonableness of an officer's conduct must focus . . . on what the officer did . . . *[and] failed to do[]*."  *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004) (emphasis added).  Here, Agent Donaghy easily could have run a CIS search using Ms. Morales's Social Security Number.  Pl. Facts ¶84.  If he had typed those nine digits into his computer, he would have found Ms. Morales's CIS record—showing that she was

---

[9] *See also United States v. Walker*, 719 F. Supp. 2d 586, 601 & n.14 (W.D. Pa. 2010) (noting that  "93% of American-born married women in this country had the same surname as their husbands") (citing Gooding and Kreider, U.S. Census Bureau, *Working Paper: With This Name I Thee Wed: Women's Marital Naming Choices* at 7 (2007), available at http://paa2007.princeton.edu/papers/70879 (analyzing 2004 Census Bureau data)).

naturalized 14 years previously—and spared her a traumatic night in jail.  Pl. Facts ¶89.

Alternatively, Agent Donaghy could have picked up the phone and asked to interview Ms.

Morales.  Pl. Facts ¶59.  Either step would have taken only a few moments.  This was not a "hot

pursuit" situation; as the First Circuit noted, "immigration officers . . . have *easier* access to

interview . . . an individual detained in criminal custody" than when they encounter an individual

in the field.  *Morales*, 793 F.3d at 218 (emphasis added).  Agent Donaghy knew exactly where to

find Ms. Morales.  By logging into INFACTS, he could see where Ms. Morales was housed at

RIDOC and what her case status was.  Pl. Facts ¶60.

   Under these circumstances, Agent Donaghy's decision to detain Ms. Morales for

"[i]nvestigation," Pl. Facts ¶55—based solely on a cursory, name-based CIS search that returned

no results at all, when he admittedly had "no idea" whether CIS was complete, Pl. Facts ¶91, and

closed his eyes to other readily available sources of information—is not objectively reasonable.

*See United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987) (holding that agents acted

recklessly, warranting suppression of evidence, where "the cartons of stolen clothing could have

been identified easily through mailing labels attached to the cartons; yet the agents took no steps

to obtain the information disclosed on those labels" before seeking a warrant to search them);

*Maresca v. Bernalillo Cnty.*, -- F.3d ----, No. 14-2163, 2015 WL 6384984, at *7-*8 (10th Cir.

Oct. 22, 2015) (slip op.) (granting summary judgment to plaintiffs where officer "mistyped

[their] license plate number into her computer, thereby triggering the stolen vehicle report,"

failed to verify that the plaintiffs' vehicle matched the report's description, failed to "confirm

with dispatch that the stolen vehicle report was accurate and up-to-date," and chose not to

"interview[] the [plaintiffs]" before arresting them); *Butler v. Elle*, 281 F.3d 1014, 1025-26 (9th

Cir. 2002) (reversing grant of qualified immunity to investigator who ran a name-based computer

search, found no record of title or tax payments for the plaintiff's vehicle, and inferred that the plaintiff was evading vehicular taxes; noting that investigator "did not search under [plaintiff's] full name" and "failed to investigate" the possibility that he paid his taxes in a manner not covered by the database).[10]

Defendants protest that Agent Donaghy cannot be held liable because, in 2009, there were no cases holding that the *particular* set of facts Donaghy encountered here were insufficient for probable cause. Fed. Br. at 13, 17. It is well settled, however, that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Limone*, 372 F.3d at 48 ("There is no requirement that the facts of previous cases be materially similar . . . in order to trump a qualified immunity defense.") (internal citation omitted). Having failed to find any information one way or the other about Ms. Morales by searching her married name, a reasonable ICE agent would not have preemptively imprisoned her for his own investigatory convenience without at least searching her Social Security Number, picking up the phone to interview her or speak to someone at RIDOC, or giving her some opportunity to make a claim of U.S. citizenship.

### 3. At a Minimum, Agent Donaghy's Motion for Summary Judgment Should Be Denied.

As explained above, the undisputed facts establish that Agent Donaghy caused Ms. Morales to be detained without probable cause and that he is not entitled to qualified immunity. It is therefore unsurprising that Agent Donaghy's summary judgment motion relies on several factual assertions that are not supported by the record and are, in any event, immaterial.

---

[10] To be clear, Plaintiff's position is not that officers have an ongoing duty to continue investigating *after* they have acquired probable cause for an arrest. But when an officer is deciding whether he has probable cause in the first place—especially where his assessment is based in such part on his *failure* to find any records in a database—then the adequacy of his search is obviously relevant, both to the merits and to qualified immunity. *See Evans*, 514 U.S. at 17 (O'Connor, J., concurring); *Beck*, 379 U.S. at 91 (probable cause must be based on "reasonably trustworthy" information).

For example, Agent Donaghy's summary judgment motion asks the Court to assume that he viewed the blank "citizenship" field in INFACTS before issuing Ms. Morales's detainer. *See* Fed. Br. at 14. As explained above, the record does not establish that he viewed that field in INFACTS, and anyway, the question whether he did is immaterial to Plaintiff's summary judgment motion. *See supra* at Section A(1)(c). If the Court views this as a material fact, however, it is certainly not undisputed as Donaghy claims. Given that Agent Donaghy's two sworn declarations, his "summary of events," and his interrogatory responses *all* failed to mention what he now argues was a pivotal fact in his probable cause analysis, and given Donaghy's conceded inability to remember what searches he ran on May 4, a reasonable jury could easily conclude that he did not view this field at all. *See supra* at Section A(1)(c).

Agent Donaghy also asks the Court to assume that he conducted name-based searches of CIS and NCIC despite the fact that he concededly has no memory of doing so, and even though no "[c]opies of negative checks" were "printed and included in the [A] file," as ICE policy would have required, had those searches been run. Pl. Facts ¶¶51, 52. All Donaghy's statements about what searches he likely conducted and what information he would have viewed—including his deposition testimony, both of his declarations, and the "summary of events" that he wrote for his supervisors—were based on his general practice and on searches he or someone else conducted *after this litigation began*, not on his recollection of the events of May 4. Pl. Facts ¶49. And in any case, as explained above, he is liable whether or not he conducted such searches. *See supra* at Section A(1)-(2).

Agent Donaghy further asks the Court to deem his failure to search CIS using Ms. Morales's Social Security Number reasonable as a matter of law because, he claims, the record shows "it was not standard practice" to conduct such searches "because of the high percentage of

fraud [agents] experienced with Social Security numbers."  Fed. Br. at 6.  That statement directly conflicts with the testimony of ICE's 30(b)(6) deponent, Officer Monico, who explained that agents in 2009 were "expected" to run searches based on Social Security Number if that information was available, Pl. Facts ¶¶86, 87, and with common sense.  But any question about ICE's "standard practice" is immaterial, as it was *constitutionally* unreasonable, under the circumstances of this case, for Agent Donaghy to issue a detainer knowing Ms. Morales's Social Security Number but without bothering to enter it into CIS.  *See supra* at Section A(1)-(2).

In other words, none of these factual assertions on which Agent Donaghy's summary judgment motion relies are material.  However, if the Court determines that any of these questions about what he did or failed to do on May 4 are material to his liability, the proper course is to deny his summary judgment motion and permit the matter to proceed to trial.  *See Prokey v. Watkins*, 942 F.2d 67, 73-74 (1st Cir. 1991) (denying summary judgment to officers where there were genuine questions of material fact concerning what information was available to them at the time of arrest).  To adopt Agent Donaghy's version of the facts would require the Court to draw unsupported inferences *in his favor*, which of course the Court may not do in deciding his motion for summary judgment.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

Thus, if the Court does not grant summary judgment to Ms. Morales, it should still deny Agent Donaghy's summary judgment motion.  *See, e.g., Torres Ramirez*, 898 F.2d at 227-28 (holding that officer "was not entitled to qualified immunity as a matter of law" where he circulated "an arrest warrant he knew or should have known had been vacated"; "the jury could have believed that he was reckless by not checking his own records before recirculating a warrant that was five months old."); *Maresca*, 2015 WL 6384984, at *7-*8 (officer was not

entitled to summary judgment where she failed to verify that plaintiffs' vehicle matched the description in a stolen vehicle report, failed to "confirm with dispatch that the stolen vehicle report was accurate and up-to-date," and chose not to "interview[] the [plaintiffs]" before arresting them); *Phelan v. Vill. of Lyons*, 531 F.3d 484, 488, 490 (7th Cir. 2008) (officer was not entitled to summary judgment for arresting plaintiff based on inconclusive information in a stolen vehicle database because, if he had read the full record, "he would have realized . . . that further investigation was warranted"); *Kuehl v. Burtis*, 173 F.3d 646, 650-51 (8th Cir. 1999) (affirming judgment that officer was not entitled to summary judgment where he "refused to interview" an available witness); *see also Cannon v. Macon Cnty.*, 1 F.3d 1558, 1565 (11th Cir. 1993) *opinion modified on denial of reh'g*, 15 F.3d 1022 (11th Cir. 1994) (officer was not entitled to summary judgment because "[a] reasonably well trained officer would have at least attempted to obtain information from [plaintiff] for purposes of filling out [plaintiff's] arrest report, rather than copying data from an NCIC computer printout").[11]

## B.  MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FOURTH AMENDMENT CLAIM AGAINST DIRECTOR CHADBOURNE.

The record establishes that Director Chadbourne, too, is liable for Ms. Morales's unlawful detention.  As the First Circuit held, "it is beyond debate that a supervisor who either authorized or was deliberately indifferent to his subordinate's issuance of a detainer without probable cause could be held liable for violating the Fourth Amendment."  *Morales*, 793 F.3d at 222 n.5.  Discovery has now established exactly that.  Director Chadbourne's deliberate indifference to his agents' practice of issuing ICE detainers without probable cause led

---

[11] *See also Vargas Ramirez v. United States*, 93 F.Supp.3d 1207, 1226-27, 1229 (W.D. Wash. 2015) (granting summary judgment to plaintiff on an FTCA false imprisonment claim because, inter alia, "the fact that no record of Mr. Vargas existed in the Border Patrol databases . . . was not necessarily indicative of unlawful presence. . . . These databases . . . did not include information on all individuals who were born in the United States, on all foreign-born individuals in the United States, or on all individuals who are United States citizens by virtue of deriving or acquiring their citizenship through a parent or grandparent who was born in the United States.").

foreseeably to Ms. Morales's unconstitutional detention. *See infra* at Section B(1). The record

also makes clear that Director Chadbourne is not entitled to qualified immunity. *See infra* at

Section B(2). Finally, even if the Court does not grant summary judgment to Ms. Morales, it

should deny Director Chadbourne's summary judgment motion. *See infra* at Section B(3).

### 1. The Record Establishes that Director Chadbourne Is Liable for Ms. Morales's Unlawful Detention Because of His Deliberately Indifferent Failure to Supervise or Train His Subordinates.

This Court and the First Circuit have already laid out the legal contours of Director

Chadbourne's liability. As the First Circuit explained, it is well settled that "[a] supervisor may

be held liable for the constitutional violations committed by his subordinates" where there is "an

affirmative link between the behavior of a subordinate and the action *or inaction* of his

supervisor." *Morales*, 793 F.3d at 221 (internal quotation marks omitted; emphasis added).

Among other things, a plaintiff may establish an affirmative link by showing that the defendant

"supervise[d] [or] train[ed]. . . a subordinate with deliberate indifference toward the possibility

that deficient performance of the task eventually may contribute to a civil rights deprivation," or

"engag[ed] in a custom[] that le[d] to the challenged occurrence." *Id.* at 222 n.5 (internal

quotation marks omitted). Applying these principles to Ms. Morales's allegations against

Director Chadbourne, this Court and the First Circuit found them sufficient to state a claim for

relief. *Id.* at 222.

Those allegations have now been confirmed by the record. It is undisputed that Director

Chadbourne had supervisory authority for ICE's Boston Field Office, including the Rhode Island

sub-office where Agent Donaghy worked. As he acknowledged, it was his duty as Field Office

Director to "overs[ee] [e]nforcement and [r]emoval [o]perations" in the Rhode Island sub-office,

Pl. Facts ¶20, to "communicat[e] national policy to the sub-offices" and make sure it was

correctly implemented, Pl. Facts ¶22, and to "provid[e] . . . clarification" as needed.  *Id.*  Yet

Director Chadbourne could not recall a single thing he did to fulfill those duties with respect to

ICE detainers.  Even though he knew his agents were routinely issuing detainers, Pl. Facts ¶23,

he made no effort to ensure that his agents understood ICE policy or the basic legal limits on

their detainer issuance authority.  He could not recall ever discussing the detainer form with

anyone, reviewing his agents' detainer issuance statistics, or providing any sort of detainer-

related training or guidance to his subordinates.  Pl. Facts ¶¶110, 127.

　　For example, defendants identified a 2008 Memorandum from then-ICE Director James

Hayes as one of the ICE national policies governing detainer issuance in 2009.  Pl. Facts ¶¶96,

97.  The Hayes Memorandum, which is addressed to "Field Office Directors," sets forth

procedures for ICE agents "exercising authority under . . . 8 U.S.C. § 1357," Pl. Facts ¶98, the

statute that governs "warrantless enforcement actions, including the issuance of detainers."

*Morales*, 793 F.3d at 216.  The Memorandum provides that an ICE agent "must ensure that s/he

has reason to believe[12] that the individual to be arrested is in the United States in violation of

[federal immigration law]."  Pl. Facts ¶98.  It also instructs that agents "must fully investigate all

claims to U.S. citizenship immediately upon learning of the assertion of citizenship," including

by notifying the Field Office Director.  *Id.*  ICE's 30(b)(6) deponent Officer Monico confirmed

that the Hayes Memorandum was binding ICE policy in 2009, and that it should have been

"communicated to ICE agents . . . [t]hrough field office directors."  Pl. Facts ¶97.

　　Yet Director Chadbourne could not recall doing anything to ensure that his agents

followed the Hayes Memorandum when issuing detainers.  Pl. Facts ¶103.  On the contrary, he

---

[12] The Hayes Memorandum notes that courts have interpreted "reason to believe" as the equivalent of "probable cause."  Pl. Facts ¶98.  *See also Morales*, 793 F.3d at 216 ("Courts have consistently held that the 'reason to believe' phrase in § 1357 must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause.") (internal citations omitted).

opined that the Hayes Memorandum "has nothing to do with issuing detainers . . . . It's apples and oranges." *Id.* In fact, in his deposition, Chadbourne took the sweeping position that "an ICE agent *does not have to make a determination* that a person is in the country illegally before issuing a detainer." Pl. Facts ¶102 (emphasis added); *see also* Pl. Facts ¶99. In Chadbourne's view, ICE agents could issue detainers based on mere "reasonable suspicion," not probable cause, Pl. Facts ¶102—even though both ICE policy and well settled Fourth Amendment law made clear that probable cause was required. *See* Pl. Facts ¶¶98, 99 (Hayes Memorandum and ICE training materials); *Morales*, 793 F.3d at 215-16 (as a matter of constitutional law, "there could be no question in 2009" that an ICE detainer "require[d] *more* than just reasonable suspicion," it required "probable cause") (emphasis added).[13]

Director Chadbourne also made no effort to ensure that his agents screened people for U.S. citizenship before subjecting them to ICE detainers. He did not require agents to provide notice to people who were subject to detainers, to interview them, or to communicate with them in any way—thus allowing agents to cause detention remotely without ever giving the subjects a chance to assert U.S. citizenship. Pl. Facts ¶104. When asked how a detainee could possibly make a claim of citizenship that would trigger ICE's review, Chadbourne answered that the burden was on the detainee to "br[ing] it to our attention"—either "in writing," "in person" when the detainee was brought into ICE's custody, or by "writ[ing] their congressman." Pl. Facts ¶105.

_____

[13] The federal defendants try to muddy this distinction in their brief, arguing that "the terms 'reason to believe,' 'reasonable suspicion,' and 'probable cause'" *all* describe the same standard—apparently trying to generate confusion out of the phonetic similarity between the phrases "reason to believe" and "reasonable suspicion." Fed. Br. at 19 n.5. They are not the same, and the First Circuit did not so hold. The phrase "reason to believe," as used in 8 U.S.C. § 1357, has long been understood to mean "probable cause." Morales, 793 F.3d at 21. In contrast, Director Chadbourne used the phrase "reasonable suspicion," which describes a *lower* evidentiary standard usually associated with brief *Terry* stops. *See id.* at 215. It is clear from his deposition testimony that Chadbourne understood "reasonable suspicion" to be a lower standard than "probable cause." Pl. Facts ¶102 (opining that "reasonable suspicion," "[n]ot probable cause," was the evidentiary standard for both detainer issuance and warrantless arrests).

Further, Director Chadbourne made no effort to track his subordinates' detainer issuances and cancellations.  Despite a 2007 ICE national policy memorandum requiring Field Office Directors to collect and submit weekly statistics to ICE headquarters about their agents' enforcement actions, including detainers, Pl. Facts ¶126, the record shows that the Boston Field Office and Rhode Island sub-office did not collect detainer data until October 2009.  Pl. Facts ¶125.  Even when they began maintaining data, Director Chadbourne could not recall ever seeing statistics regarding detainer cancellation; he never asked to see such statistics because he "didn't think it was an issue."  Pl. Facts ¶127.

Even a cursory glance at his subordinates' detainer cancellation numbers would have told Director Chadbourne that things were seriously amiss.  In 2009, agents in ICE's Boston Field Office cancelled roughly two detainers for every three that led to an individual being booked into ICE custody.  Pl. Facts ¶119.[14]  When confronted with these statistics at his deposition, Chadbourne admitted that he found the high cancellation rate "surprising."  Pl. Facts ¶128.  Such cancelled detainers may be an indication that the subject was actually a U.S. citizen or LPR not subject to removal.  Pl. Facts ¶120 (the only reason for cancelling a detainer that Chadbourne could "think of" was if the subject "is here legally").  Indeed, RIDOC's own data show that between 2003 and 2014, ICE issued 462 detainers against individuals who are identified in RIDOC's system as U.S. citizens—an average of 42 per year.  Pl. Facts ¶122.  Thus, the record shows that ICE was routinely issuing detainers against U.S. citizens, *see* Pl. Facts ¶112 (Officer Drane testifying that it was "kind of a normal part of our job"), which is just what one would

---

[14] These statistics are likely under-inclusive because, as Agent Donaghy confirmed, not all detainers issued against U.S. citizens or other non-removable people were logged as "cancelled" in ICE's system.  Pl. Facts ¶123 ("Q. So there may be situations where you issue a detainer, you later determine that it's a citizen, but no cancellation is ever given. Right? . . . A. Yes.").

expect when the Field Office Director did nothing to ensure that his subordinates "make a determination that a person is in the country illegally before issuing a detainer."  Pl. Facts ¶102.

In sum, under Director Chadbourne's watch, ICE agents were allowed to cause individuals' incarceration without probable cause to believe that they were subject to removal. Director Chadbourne's indifference to the most basic legal limitations on ICE's detention authority and his failure to provide any supervision or guidance created an obvious risk that unlawful detentions like Ms. Morales's would result.  Not only was Ms. Morales's imprisonment a predictable result of Director Chadbourne's failure to supervise and train his agents; it also appears to be just one of many wrongful detainers issued on his watch.

These facts amply demonstrate what the complaint alleged: that Director Chadbourne failed to supervise or train his subordinates in the issuance of ICE detainers with deliberate indifference to the risk that unconstitutional detentions like Ms. Morales's would result.  He had the power and the duty to ensure that his subordinates' detainer practices conformed to the law, yet he took no action, tacitly condoning the routine issuance of ICE detainers without probable cause.  As this Court and the First Circuit have already recognized, that is a sufficient basis to hold Director Chadbourne responsible.  *See Morales,* 793 F.3d at 222 n.5; *Morales*, 996 F. Supp. 2d at 31-32; *see also Ford v. City of Boston*, 154 F. Supp. 2d 131, 146-47, 148 (D. Mass. 2001) (granting summary judgment against sheriff who presided over an unconstitutional strip-search policy, and noting that his "hands-off approach to his job does not absolve him of responsibility").  Given this record, there are no genuine issues of fact in dispute for which trial is needed; Director Chadbourne is liable for the violation of Ms. Morales's Fourth Amendment rights.

### 2.   Director Chadbourne Is Not Entitled to Qualified Immunity.

The same undisputed facts that demonstrate Director Chadbourne's deliberate

indifference, described above, also show why qualified immunity does not shield him from

liability.  His complete inattention to his subordinates' detainer issuance practices, despite the

obvious risk of unconstitutional imprisonment, was not an objectively reasonable choice for an

ICE Field Office Director to make.

As this Court and the First Circuit have already held, Ms. Morales's right to be free from

imprisonment on an ICE detainer without probable cause was clearly established in 2009.

*Morales*, 793 F.3d at 211; *Morales,* 996 F. Supp. 2d at 33-34.  Director Chadbourne's professed

ignorance of this clearly established constitutional law does not absolve him of responsibility, for

"a reasonably competent public official should know the law governing his conduct."  *See*

*Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).  Given the state of the law in 2009, the First

Circuit held, "it is beyond debate that a supervisor who either authorized or was deliberately

indifferent to his subordinate's issuance of a detainer without probable cause could be held liable

for violating the Fourth Amendment."  *Morales*, 793 F.3d at 222 n.5.  Director Chadbourne is

not entitled to qualified immunity.

### 3.   At a Minimum, Director Chadbourne's Motion for Summary Judgment Should Be Denied.

Director Chadbourne's sole argument for summary judgment is that he cannot be held

responsible for failing to train and supervise his agents because "ICE training and policy

regarding detainers came directly from Washington, DC," and not from him.  Fed. Br. at 7; *see*

*also id.* at 18-19.  His argument is circular.  The fact that he made no effort to provide policy

guidance or supervision, tacitly allowing his agents to continue issuing detainers without

probable cause, is the very basis for his liability—not his defense.  *See Camilo-Robles v. Hoyos*,

151 F.3d 1, 7 (1st Cir. 1998) (supervisor's "connection [to the constitutional violation] need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct").  To the extent Director Chadbourne asks the Court to infer that he lacked either the power or the responsibility to supervise his agents' detainer issuance practices, the record shows otherwise, as argued above.  *See supra* at Section B(1).

 If the Court determines there is any genuine question about Chadbourne's obligation as Field Office Director to ensure that his agents understood the limits of their authority under the Constitution and agency policy, however, the proper course is to deny his summary judgment motion and permit the matter to go to trial.  *See* Pl. Stmt. of Disputed Facts ¶18.  *See also Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 581-82 (1st Cir. 1989) (affirming jury's imposition of punitive damages against police superintendent based on his "reckless or callous indifference" where he "utilized a disciplinary system that was grossly deficient to fulfill its purpose" and failed to identify a pattern of officer violence); *Dodds v. Richardson*, 614 F.3d 1185, 1202-03 (10th Cir. 2010) (affirming the denial of qualified immunity where the defendant sheriff "admits to the existence and operation of the policies of not allowing felony arrestees to post lawfully set bail," and "[r]egardless of who first drafted the policies, Oklahoma law charged Defendant as sheriff with the responsibilities of running the county jail . . . ."); *Rivas v. Freeman*, 940 F.2d 1491, 1495-96 (11th Cir. 1991) (affirming damages award against sheriff who failed to promulgate policies that would prevent mistaken detention of individuals).  At the very least, Director Chadbourne's summary judgment motion should be denied.

## C.  MS. MORALES IS ENTITLED TO SUMMARY JUDGMENT ON HER FTCA CLAIMS AGAINST THE UNITED STATES.

Ms. Morales is entitled to summary judgment on her claims against the United States under the FTCA, which "permits suits against the government for torts caused by the wrongful acts of any government employee while acting within the scope of his office or employment." *Dominguez v. United States*, 799 F.3d 151, 153 (1st Cir. 2015); *see also* 28 U.S.C. § 1346(b)(1). There is no dispute that Agent Donaghy, Officer Drane, and Director Chadbourne were all acting within the scope of their federal employment at all relevant times.  Thus, Ms. Morales's FTCA claims for false imprisonment and negligence fall within the FTCA's waiver of sovereign immunity.  As explained below, the undisputed facts establish that these federal employees committed torts against Ms. Morales for which the United States is liable.  At a minimum, the United States' motion for summary judgment, which relies almost entirely on a misstatement of the law of proximate cause, should be denied.

### 1.  The Federal Officers' Actions Caused Ms. Morales's Detention.

As an initial matter, there is no serious question that the acts and omissions of the federal officers were proximate causes of the harm Ms. Morales suffered.  The United States makes the preposterous argument that its agents "did not 'cause' Plaintiff's detention," Fed. Br. at 22, and they strive to point the finger at RIDOC instead.  *See, e.g.*, Fed. Br. at  25 (arguing that "the link between the United States and Plaintiff's post-discharge detention" is "tenuous," and that "RIDOC's intervening actions . . . absolve the United States of liability").  The United States' argument is based on a fundamental misunderstanding of the nature of tort causation.

It is well established that multiple tortfeasors may be held responsible where their various actions contribute to causing a single injury.  As the Rhode Island Supreme Court has repeatedly explained, "proximate cause need not be the sole and only cause.  It need not be the last or latter

cause.  It's a proximate cause if it concurs and unites with some other cause which, acting at the same time, produces the injury of which complaint is made."  *Pierce v. Providence Ret. Bd.*, 15 A.3d 957, 966 (R.I. 2011) (internal quotation marks omitted).  That is the case here.  Had it not been for ICE's issuance of a detainer, the record is clear that Ms. Morales would have "walk[ed] right out of the courthouse doors" as soon as the magistrate judge ordered her released on May 4. Pl. Facts ¶¶130-33.  Chadbourne and Drane's negligence, combined with Agent Donaghy's misconduct in issuing the detainer, combined with RIDOC's decision under Director Wall's supervision to comply with the detainer, together resulted in Ms. Morales's unlawful detention. Each one of those tortfeasors shares in the responsibility for Ms. Morales's injury.

The fact that RIDOC was free to decide whether or not to hold Ms. Morales on the detainer does not break the chain of causation.  As the Rhode Island Supreme Court has recognized, "there may be concurrent proximate causes that contribute to an individual's injuries," and as long as the "independent or intervening cause is reasonably foreseeable, the causal connection remains unbroken."  *Almeida v. Town of N. Providence*, 468 A.2d 915, 917 (R.I. 1983) (internal quotation marks and emphasis omitted).  It is certainly not unforeseeable or surprising that RIDOC did what ICE asked it to do, particularly when RIDOC had always enforced ICE's detainers in the past.  Pl. Facts ¶57, 144.[15]  Nor does it matter that RIDOC's decision to detain Ms. Morales was itself unlawful and tortious, as Ms. Morales argues in her separately filed brief regarding Director Wall's liability.  As this Court has recognized, "[l]iability lies even if the intervening cause involved negligence or an intentional tort, provided

---

[15] Defendants also suggest that RIDOC's conduct *before* Agent Donaghy issued the detainer—i.e., RIDOC officers' collection of her booking information—means that Donaghy's act was not the proximate cause of Ms. Morales's detention.  Fed. Br. at 24-25.  That argument is meritless.  Agent Donaghy chose to issue a detainer based on his own "initiat[ion]" of an "[i]nvestigation," Pl. Facts ¶55, and that detainer, naturally enough, led directly to Ms. Morales's detention.  RIDOC's earlier acts and omissions could not have broken that direct causal link.

the intervening act was foreseeable." *Testa v. Winquist*, 451 F. Supp. 388, 392 (D.R.I. 1978); *see also Petro v. Town of W. Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 343 (D.R.I. 2012).

Essentially, the federal defendants are rehashing a new version of the same old causation argument that they advanced (and lost) before the First Circuit on their interlocutory appeal.  As the First Circuit held, "[t]he natural consequence of Donaghy issuing the detainer was that Morales would be detained for up to 48 hours," and that is all that proximate causation requires. *Morales*, 793 F.3d at 217.  In *Bivens* cases, as in common-law tort cases, a "law enforcement officer is 'responsible for the natural consequences of his actions'"—including when he requests or circulates a warrant that another officer independently decides to execute. *See id.* at 217-18 (quoting *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986), and citing *Torres Ramirez*, 898 F.2d at 228).  *See also Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (plaintiff plausibly alleged that ICE's detainer issuance caused his inability to post bond, even though the bail bondsman's independent acts also contributed to his detention); *Uroza v. Salt Lake Cnty.*, No. 11-713, 2013 WL 653968, at *8 (D. Utah Feb. 21, 2013) (unpub.) ("Because [the detainer] and other actions by federal defendants are alleged to be the directing causes of Uroza's detention, the United States can be held liable for Uroza's allegedly false and unlawful imprisonment.").

In short, the law is quite clear that, having requested and purported to authorize Ms. Morales's extended detention, the federal officials proximately caused that detention.  The United States and its officials cannot induce state agencies to act and then disclaim their shared responsibility for the desired results.

**2. Ms. Morales Is Entitled to Summary Judgment as to Her False Imprisonment Claim, or, at a Minimum, the United States' Motion Should Be Denied.**

The undisputed facts establish that Agent Donaghy falsely imprisoned Ms. Morales. Under Rhode Island tort law, "[w]henever a person unlawfully obstructs or deprives another of his freedom to choose his location, for however brief a period, that person will be liable for that interference." *Moody v. McElroy*, 513 A.2d 5, 7 (R.I. 1986). The elements of false imprisonment are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* at 7. The plaintiff must also show (5) that "she was detained without legal justification or under a void process." *Id.* (internal citations omitted). Ms. Morales has established each one of these elements.

<u>First</u>, there is no dispute that Agent Donaghy intended to confine Ms. Morales. He faxed a detainer to RIDOC specifically naming Ms. Morales and requesting that RIDOC "detain the alien" for up to 48 hours, plus weekends and holidays, after she would otherwise be released. Pl. Facts ¶¶44, 55. *See also Morales*, 793 F.3d at 214-15 ("[T]he sole purpose of a detainer is to request the continued detention of an alien . . . ."). Agent Donaghy testified that he fully expected RIDOC to comply with his request and extend Ms. Morales's detention. Pl. Facts ¶57. Thus, Agent Donaghy clearly issued with the detainer with the specific and express intent to confine Ms. Morales. *See* Restatement (Second) of Torts § 45A (1965) ("One who instigates . . . the unlawful confinement of another is subject to liability to the other for false imprisonment."); *id.* § 45A comment (c) ("Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself.").

41

The United States argues—without citing any authority—that Ms. Morales must show that Agent Donaghy "intended to confine *a U.S. citizen*" in particular.  Fed. Br. at 26 (emphasis added; internal quotation marks omitted).  There is no such requirement under Rhode Island law. A plaintiff need only show that "the defendant intended to confine [the plaintiff]," *Moody*, 513 A.2d at 7, not that the defendant intended to confine someone of the plaintiff's particular immigration status or nationality.  *See Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486, 492 (1st Cir. 1991) (under general common law principles, "the requisite intent is . . . merely the intent to confine" rather than the intent to do so wrongfully); *Whirl v. Kern*, 407 F.2d 781, 797 n.18 (5th Cir. 1968) ("The harm intended by a tortfeasor in committing an act of false imprisonment is not the intent to wrongfully confine, but simply the intent to cause the confinement.") (citing Restatement (Second) of Torts § 44 (1965)).  There is no dispute here: Agent Donaghy intended to confine Ms. Morales when he issued her detainer.

Second and third, Ms. Morales certainly was "conscious of [her] confinement" and "did not consent" to it.  *Moody*, 513 A.2d at 7.  She remembers the night that she spent in RIDOC's custody after she should have been released as "the worst night of [her] life."  Pl. Facts ¶139. She protested repeatedly to multiple RIDOC officials that she was a U.S. citizen and that the ICE detainer was erroneous, but she was nevertheless imprisoned until the following day against her will.  Pl. Facts ¶¶137, 142.

Fourth and fifth, Ms. Morales's detention was not "privileged" and was "without legal justification," *Moody*, 513 A.2d at 7, for all the reasons discussed above.  *See supra* at Section A(1).  Because Agent Donaghy lacked probable cause to issue the detainer, Ms. Morales's detention was without legal justification, and the United States is therefore liable for the imprisonment she suffered.  *See Berberian v. Mitchell*, 321 A.2d 431, 433 (R.I. 1974), *adhered*

*to*, 341 A.2d 56 (R.I. 1975) (directing entry of judgment for plaintiff on false arrest claim where arresting officer lacked probable cause).[16]

In sum, there are no disputed facts here.  The record unequivocally establishes that Agent Donaghy falsely imprisoned Ms. Morales, and the United States is liable for his tortious actions under the FTCA.  At a minimum, however, if the Court determines that there are disputes of fact regarding what Agent Donaghy did or failed to do on May 4, *see supra* at Section A(3), the United States' motion for summary judgment should be denied.

### 3.   Ms. Morales Is Entitled to Summary Judgment as to Her Negligence Claim, or, at a Minimum, the United States' Motion Should Be Denied.

Ms. Morales is also entitled to summary judgment against the United States as to her negligence claim.  Under Rhode Island law, "[t]o maintain a cause of action for negligence, the plaintiff must establish four elements: (1) a legally cognizable duty owed by defendant to plaintiff; (2) breach of that duty; (3) that the conduct proximately caused the injury; and (4) actual loss or damage."  *Medeiros v. Sitrin*, 984 A.2d 620, 625 (R.I. 2009) (internal citation omitted).  The record here establishes all four elements.  Agent Donaghy acted negligently in issuing Ms. Morales's detainer without doing a minimally adequate investigation into her citizenship and immigration status, and Officer Drane and Director Chadbourne acted negligently in failing to provide any training or policy safeguards to ensure that their subordinates issued detainers lawfully.

Specifically, for all the reasons discussed above, Agent Donaghy's decision to issue a detainer without running Ms. Morales's Social Security Number through CIS, speaking to her or anyone else at RIDOC, or taking any other steps to inquire into her citizenship and immigration

---

[16] Notably, "qualified immunity will not immunize the United States from liability" in an FTCA suit. *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994).  Thus, the question for false imprisonment purposes is only whether Agent Donaghy had probable cause to detain Ms. Morales—not whether a reasonable agent could have believed he had probable cause.

status beyond a cursory name-based search was plainly negligent.  *See supra* at Section A(1)-(2).

Agent Donaghy had a duty—one that arose under clearly established Fourth Amendment law,

the governing statute (8 U.S.C. § 1357), and agency policy (the Hayes Memorandum)—not to

cause Ms. Morales's detention without probable cause to believe she was in fact a removable

non-citizen.[17]  Agent Donaghy breached that duty by issuing Ms. Morales's detainer anyway,

and his breach led directly and proximately to Ms. Morales's extended detention.  *See Lyttle v.*

*United States*, 867 F. Supp. 2d 1256, 1301 (M.D. Ga. 2012) (holding that plaintiff stated a claim

for negligence under the FTCA where he alleged that immigration officials "fail[ed] to review

available documentation of Lyttle's citizenship [and] fail[ed] to investigate Lyttle's claims of

being born in the United States").

Likewise, Director Chadbourne and Officer Drane each had a duty to train and supervise

the agents under their command to ensure that they understood the constitutional, statutory, and

policy limits on their enforcement authority, including the issuance of ICE detainers.  Both

supervisors breached their duty.  Indeed, Director Chadbourne and Officer Drane lacked even a

basic understanding of the legal limits on ICE detainers—even though, as the First Circuit has

held, any reasonable officer in 2009 would have understood that ICE detainers must be

supported by probable cause.  *Morales*, 793 F.3d at 216-17.  Their negligence allowed their

subordinates to continue issuing detainers "willy-nilly," Pl. Facts ¶108, without probable cause

and without doing an adequate investigation into the subjects' citizenship or immigration status.

---

[17] The existence of a duty is "a question of law" that Rhode Island courts assess based on "all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of fairness."  *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I. 2003) (internal citations omitted).  A violation of a statute or agency regulation may be evidence that a duty has been breached.  *See, e.g.*, *Fed. Exp. Corp. v. State of R.I., Dep't of Transp., Airports Div.*, 664 F.2d 830, 835 (1st Cir. 1981) ("The standards of conduct to which the defendants are held in the present case are defined largely by operations manuals promulgated by the government.") (applying Rhode Island law); *Corvello v. New England Gas Co.*, 460 F. Supp. 2d 314, 321 (D.R.I. 2006) ("Under Rhode Island law, violation of a statute is evidence of negligence.").

*See Lyttle*, 867 F. Supp. 2d at 1301 (holding that plaintiff stated a claim for negligence under the FTCA where he alleged that supervisory immigration officials "fail[ed] to adequately train and supervise ICE officers" to avoid wrongful detentions of U.S. citizens).

Moreover, Director Chadbourne and Officer Drane negligently failed to track their subordinates' detainer decisions or maintain accurate records to prevent repeated wrongful detentions, as Ms. Morales's case illustrates.  Even though ICE's Rhode Island office had subjected Ms. Morales to an erroneous detainer once before, in 2004, it kept no record of the encounter.  Likewise, after Ms. Morales was detained the second time, in 2009, ICE still did not bother to update its records to reflect her U.S. citizenship until three years later, after this litigation had begun.  Pl. Facts ¶117.  Even when ICE began collecting detainer issuance and cancellation statistics in 2009, Director Chadbourne could not recall ever having looked at them.  This inexcusably lax approach to record-keeping virtually ensured that problems would go unaddressed and could easily be repeated.  *See* Pl. Facts ¶112 (Drane testified that "if this situation happened again tomorrow, it happens").  *See also Testa*, 451 F. Supp. at 394 (holding that administrator of law enforcement records "had a duty to maintain reasonably accurate and current record systems" under Rhode Island law).

Officer Drane's and Director Chadbourne's breaches were proximate causes of Ms. Morales's unlawful detention.  Because they abdicated their duty to provide training and supervision to agents in the field, Agent Donaghy was "not aware of any formal policies as of May 2009 regarding immigration detainers."  Pl. Facts ¶113.  In this vacuum of supervisory guidance, it is entirely foreseeable that Donaghy and other Rhode Island ICE agents would continue issuing detainers without an adequate legal basis.

45

Finally, it is undisputed that Ms. Morales suffered actual injury in the form of emotional distress.  Because of the negligent actions of the ICE officials, she spent "the worst night of [her] life" in RIDOC custody.  Pl. Facts ¶139.  She was subjected to a humiliating strip search.  Pl. Facts ¶¶134, 135.  Other inmates harassed her, and at least one RIDOC officer called her a liar and told her she would be deported.  Pl. Facts ¶¶138, 139.  She spent the night fearing that she would, indeed, be separated from her children and husband.  Pl. Facts ¶139.  Ms. Morales also missed work and lost wages as a result of her extended detention.  Pl. Facts ¶141.

Given these undisputed facts, Ms. Morales is entitled to summary judgment on her negligence claim.  At a minimum, however, if the Court determines that there are disputes of fact regarding what Agent Donaghy did or failed to do on May 4, or the nature of the supervisory agents' duty, the United States' motion for summary judgment should be denied.

### D. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PUNITIVE DAMAGES SHOULD BE DENIED.

Finally, the Court should deny the federal defendants' motion for summary judgment as to punitive damages.  There is record evidence from which a jury could conclude that the federal defendants were recklessly indifferent to the risk that their actions would lead to Ms. Morales's unconstitutional detention.

The question of punitive damages should be presented to the jury in a *Bivens* action when the evidence could support a finding that the defendant acted "in the face of a perceived risk that doing so would violate [the plaintiff's] federally assured rights."  *Iacobucci v. Boulter*, 193 F.3d 14, 26 (1st Cir. 1999).[18]  Here, a jury could conclude that Agent Donaghy, in issuing a detainer based on such flimsy grounds for suspicion, acted "with conscious indifference to the possibility that he lacked probable cause."  *Iacobucci*, 193 F.3d at 25.  Likewise, a jury could conclude that

---

[18] Punitive damages are available in a *Bivens* action.  *See Smith v. Wade*, 461 U.S. 30, 36 n.5 (1983).

Director Chadbourne abdicated his responsibilities in the face of a perceived risk that his subordinates would issue detainers without probable cause. *See Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 669-70 (9th Cir. 2015). Therefore, defendants' motion for summary judgment as to punitive damages should be denied.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Ms. Morales. At a minimum, it should deny the federal defendants' motion for summary judgment, which relies on mischaracterizations of the law and the record.

Dated: November 13, 2015                                  Respectfully submitted,

By:  /s/ Katherine Desormeau
Laura Donovan (No. 8333)
Mark A. Ford (*pro hac vice*)
Margaret E. O'Grady (*pro hac vice*)
Mi Hyun Yoon (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
Mark.Ford@wilmerhale.com
Margaret.O'Grady@wilmerhale.com
Angela.Yoon@wilmerhale.com

Katherine Desormeau (*pro hac vice*)
ACLU FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0778
Fax: (415) 395-0950
KDesormeau@aclu.org

*Attorneys for Plaintiff*
*Ada Morales*