UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ADA MORALES, <br>       Plaintiff, <br><br>   v. <br><br> BRUCE CHADBOURNE, EDWARD <br> DONAGHY, ASHBEL T. WALL, <br> UNITED STATES OF AMERICA, <br>       Defendants. | C.A. No. 12-301-M-LDA |

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

Ada Morales was born in Guatemala, and became a naturalized United States citizen on September 11, 1995 under her maiden name, Ada Amavilia Cabrera. She has a social security number and a United States passport. Despite this, Ms. Morales was held at the state prison on an Immigration and Customs Enforcement ("ICE") detainer that was issued solely based on her Hispanic last name and her Guatemalan birthplace. This twenty-four hour illegal detention revealed dysfunction of a constitutional proportion at both the state and federal levels and a unilateral refusal to take responsibility for the fact that a United States citizen lost her liberty due to a baseless immigration detainer through no fault of her own. There is plenty of blame to go around amongst the Defendants in this case. This opinion will attempt to sort it out, guided by the principle that: "[t]o allow ICE to issue a detainer against an American citizen, with unlimited discretion

and without any accountability, sets a dangerous precedent and offends any and all notions of due process." *Ortega v. U.S. Immigration & Customs Enf't*, 737 F.3d 435, 444 (6th Cir. 2013) (Keith, J., dissenting).

## I.    FACTS AND BACKGROUND

ICE is charged with enforcing immigration laws.  Its agents issue detainers[1] based on information about potential undocumented individuals gathered by its own officers and, when available, from information from state and local police[2] and corrections institutions collected upon intake.  ICE rightly acknowledges its sole responsibility and ownership over the process of investigating potential immigration law violators.[3]  State and local law enforcement have no investigatory responsibilities, but receive the detainers from ICE because potential immigration

---

[1] A detainer is a tool used by ICE to hold individuals who are taken into state custody.  It is a written request that the state law enforcement officers detain an individual for no more than 48 hours after his or her release on state charges so that ICE can investigate that person's immigration status.  8 C.F.R. § 287.7.

[2] The Mayor of Providence has said that he would uphold a longstanding policy in the City to refuse "to hold people charged with civil infractions for federal immigration officials."  Matt O'Brien, *Immigration Bill Could Thwart Providence Mayor's Stance on Enforcement*, Providence Journal (Jan. 20, 2017), http://www.providencejournal.com/news/20170120/immigrations-bill-could-thwart-providence-mayors-stance-on-enforcement.  Other state and local governments have also recently begun to "resist cooperating with federal immigration authorities."  Vivian Lee, *Cities in New York Advised How to Back a Trump Deportation Push*, New York Times (Jan, 18, 2017).

[3] Although he is not a named defendant in this case, Ms. Morales relies heavily on the testimony of Supervisory Detention and Deportation Officer, John Drane, who worked in ICE's Rhode Island office.  He was Agent Donaghy's direct supervisor at the time of her illegal detention.  Officer Drane testified that it was not part of RIDOC's job to ask a person about their immigration status.  Indeed, all federal employees involved in this case testified that local law enforcement had no obligation to investigate the propriety of any ICE detainer nor did ICE expect RIDOC to undertake its own investigation about a particular individual's citizenship after receiving the detainer.

violators are being held by them on state or local charges.  Upon recipient of an ICE detainer, the Rhode Island Department of Corrections' ("RIDOC") Adult Corrections Institution ("ACI"), consistent with its decades-long practice, blindly honored the immigration detainer.[4]  At the time, no law enforcement agency in New England refused to honor an ICE detainer.

Thus, the prism through which the Court must filter undisputed facts is that ICE was in sole charge of investigating and issuing detainers on those believed to be in violation of immigration laws and ICE expected state and local law enforcement to perform the "dirty work" of holding the individuals in their custody until ICE can retrieve them.  Ms. Morales' case resulted from what happens when this federal-state balance of power fails.  Now the Court must determine who bears responsibility in the face of both state and federal defendants pointing fingers at each other.

The Rhode Island State Police arrested Ms. Morales on state criminal charges on May 2, 2009 and transported her to the ACI for booking.  As part of the typical commitment process, staff from the RIDOC ID Unit asked Ms. Morales to provide her address, emergency contact information, race, eye color, hair color, nativity, date of birth, and social security number.  They also took her height and

---

[4] In July 2014, after the filing and progression of this case, the Governor of the State of Rhode Island issued a written policy about state enforcement of federal immigration detainers. *See* http://www.ri.gov/press/view/22691.  Now, RIDOC will only honor immigration detainers if they are backed by a judicial order of deportation or removal.

weight measurements and a photograph. This information was entered into RIDOC's inmate database, INFACTS.

While it is expected that RIDOC ID Unit officers would ask about an individual's citizenship and there is a field in INFACTS to indicate as much, that information is not required to complete the commitment process. Ms. Morales testified that RIDOC officials asked her about her citizenship and she answered that she was a citizen. The citizenship field in INFACTS, however, was left blank in Ms. Morales' case, not indicating affirmatively or negatively about her citizenship. The RIDOC held Ms. Morales for the weekend at the ACI on the state charge until she could appear before a state court magistrate judge on Monday, May 4, 2009.

As was his practice, Agent Edward Donaghy arrived at the Rhode Island ICE Field Office on Monday morning, logged on to INFACTS and downloaded the RIDOC commitment report for the weekend's activities.[5] Ms. Morales' name appeared on that report, along with approximately 100 other individuals. Agent Donaghy testified that if he believed an individual's citizenship was in question after his initial INFACTS search, he would check two additional federal databases, Central Index System ("CIS")[6] and National Crime Information Center ("NCIC"),[7]

---

[5] ICE agents can log in directly to INFACTS to access and download daily commitment reports, which contain information on every individual taken into RIDOC custody that day.

[6] CIS is an internal Department of Homeland Security database that contains records of individuals subject to immigration laws, i.e. those individuals who had encountered federal immigration authorities. ICE individuals use this database to identify       an       individual's       Alien       Number.       *See*

for that person's name.  In this case, Agent Donaghy saw that Ms. Morales was born in Guatemala and the citizenship field in INFACTS was blank so he turned to CIS and NCIC.  Agent Donaghy did not use any of the other information available to him in INFACTS, such as Ms. Morales' social security number, to investigate further.  Neither search yielded any results for "Ada Morales."

However, claiming to believe he had probable cause to do so, Agent Donaghy issued the detainer against Ms. Morales based on her married name and nativity, indicating, "an investigation has been initiated to determine whether [Ada Morales] is subject to removal from the United States."  He faxed it to RIDOC at 8:32 a.m. Monday.  The detainer informed the RIDOC that "federal regulation (8 C.F.R. § 287.7) requires that you detain the alien for a period not to exceed 48 hours ... to provide adequate time for DHS to assume custody of the alien."

RIDOC received the fax and logged the detainer into INFACTS.  Neither state nor federal officials informed Ms. Morales that ICE had issued the detainer. Transported from the ACI by the Rhode Island Sheriff's Department, Ms. Morales appeared in Rhode Island Superior Court around noon that Monday for her initial appearance on the state charges.  The state court withdrew the warrant and released Ms. Morales on $10,000 personal recognizance.  The state court informed Ms. Morales of an "immigration hold," however, mandating that she report to the

---

https://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_uscis_cis.pdf.  (last visited Jan. 12, 2017).

[7] NCIC is a central database maintained by the Federal Bureau of Investigation that contains criminal history information.  *See* https://fas.org/irp/agency/doj/fbi/is/ncic.htm. (last visited Jan. 12, 2017).

Attorney General's office for "routine processing in this matter which will include fingerprinting." Ms. Morales' husband was in court, holding her United States passport, but neither ACI nor ICE officials were in court to witness his display.

Ms. Morales remained in custody based solely on the ICE detainer. The Sheriff's Department then returned Ms. Morales to the ACI sometime during the afternoon of May 4th. Meanwhile, her husband attempted to consult with another attorney and immigration officials to clear up his wife's immigration issue. He was unsuccessful. Ms. Morales was also unsuccessful in convincing RIDOC employees that she was a United States citizen and that her husband could produce the documentation to prove it. She was booked into the ACI, a process that includes a strip search. RIDOC faxed ICE at 8:28 p.m. to inform ICE that Ms. Morales was in custody on the detainer, but RIDOC never heard back from anyone at the ICE office that evening. Apparently, the Rhode Island ICE Office closed at 4:00 p.m. During the time the State held her under the ICE detainer, Ms. Morales testified that RIDOC employees threatened her with deportation, harassed, taunted, and accused her of lying about her immigration status. She spent a night in prison, which she described as "the worst night of [her] life."

The following day, May 5, 2009 at 10:00 a.m., ICE picked up Ms. Morales at the ACI and transported her to its Rhode Island office. Agents interviewed and, after confirming that she was a citizen, released her.[8]

---

[8] Five years before the events leading to this lawsuit, ICE had issued a detainer for Ms. Morales based on unsubstantiated allegations that she was a deportable alien when she was in the custody of the Cranston Police Department.

Ms. Morales filed this lawsuit in 2012. She sued federal defendants Agent Donaghy, Boston Field Office Director (which has responsibility for ICE operations in Rhode Island) Bruce Chadbourne, and the United States. She also sued RIDOC Director A.T. Wall and two correctional officers, Gregory Mercurio and David Riccio. All Defendants filed motions to dismiss on various grounds, with the federal defendants asserting qualified immunity. The Court denied those motions.[9] *Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D.R.I. 2014) ("*Morales I*"). The First Circuit Court of Appeals reviewed several of the grounds and affirmed. *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) ("*Morales II*"). The parties developed the record through discovery and are now all before the Court on cross motions for summary judgment.

## II.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 56 (1st Cir. 2008). Once the moving party has met its burden, the nonmoving party may only defeat the motion by "set[ting] forth specific facts

---

Incredibly, none of Agent Donaghy's searches revealed that Ms. Morales had been imprisoned on an ICE detainer once before despite her citizenship. There was no reference to this previous detention in Ms. Morales' immigration file or on any federal database.

[9] The Court dismissed all claims against Gregory Mercurio on his motion to dismiss. ECF No. 64. Ms. Morales voluntarily dismissed David Riccio. ECF No. 150.

showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, and present evidence sufficient to allow a reasonable jury to find in the nonmoving party's favor. *Soto-Padro v. Pub. Bldgs. Auth.*, 675 F.3d 1, 5 (1st Cir. 2012).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter but [must] determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In determining whether a genuine issue of material fact exists, the trial court must consider the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor as well. *Id.* at 255; *Franceschi v. U.S. Dept. of Veterans Affairs*, 514 F.3d 81, 84 (1st Cir. 2008).  Summary judgment "hinges on the presence or absence of evidence, not on the adequacy of the pleadings." *Garcia-Catalan v. United States*, 734 F.3d 100, 104 (1st Cir. 2013).

When evaluating "'cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party.'" *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund*, 736 F.3d 33, 36 (1st Cir. 2013) (quoting *Roman Catholic Bishop of Springfield v. Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)).

## III.   CLAIMS AGAINST THE FEDERAL DEFENDANTS

Ms. Morales has brought claims individually against Agent Donaghy and ICE Field Office Director Chadbourne for violating her Fourth Amendment rights.  She has also sued the United States of America for negligence and false imprisonment claims under the Federal Tort Claims Act.  Ms. Morales moves for summary

judgment on these claims, arguing that it is undisputed that the federal defendants unreasonably detained her without probable cause.   Director Chadbourne and Agent Donaghy object and cross-move for summary judgment and also reassert a qualified immunity defense to Ms. Morales' claims.  The United States objects and moves for summary judgment as well.  The Court will now consider each Defendant separately.

A.   Agent Edward Donaghy

One of Agent Donaghy's jobs is to issue immigration detainers.  Federal law states that "[a]ny officer or employee of the [Immigration] Service authorized under regulations prescribed by the Attorney General shall have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).  Immigration officers also have authority to arrest without a warrant "any alien ... if he has reason to believe that the alien so arrested is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).  This authority is not a blank check for immigration agents to arrest without a warrant, however.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975).  Seizures of the person must be either based on a warrant or supported by probable cause to believe that the person has committed the violation in question.  *Ker v. California,* 374 U.S. 23, 34–35

(1963). The First Circuit Court of Appeals confirmed that "immigration stops and arrests [are] subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention." *Morales II*, 793 F.3d at 215. Therefore, it is clear as a matter of law that Agent Donaghy needed probable cause to issue the detainer for Ms. Morales because her detention was for more than a brief stop. *Id.* at 216-17 ("it is beyond debate that an immigration officer in 2009 would need probable cause to arrest and detain individuals for the purpose of investigating their immigration status.").

When the First Circuit addressed this legal issue, however, it did not decide whether Agent Donaghy in fact had probable cause to issue the detainer, finding that it lacked jurisdiction at that time to make such a factual determination. *Id.* at 219-20. That is this Court's province, and it is now in the position to do so in light of the undisputed facts in the record.

### 1.    Probable Cause

The main issue for the Court to decide on the Fourth Amendment claim is whether Agent Donaghy had probable cause to issue a detainer for Ms. Morales. "Probable cause exists 'when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators.'" *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004) (quoting *Acosta v. Ames Dept. Stores Inc.*, 386 F.3d 5, 9 (1st Cir. 2004)). "The test is objective in nature . . . and the proof must

be such as to give rise to a reasonable likelihood that the putative arrestee committed the suspected crime." *Cox*, 391 F.3d at 31 (internal citations omitted).

The record shows that Agent Donaghy issued the ICE detainer based on one affirmative piece of information – the notation on the INFACTS database that Ms. Morales was born in Guatemala – and two inferences drawn on the absence of information – the blank citizenship field in INFACTS and his failure to find her name in the CIS and NCIC databases. The Court will consider whether any one or a combination of these clues supported Agent Donaghy's conclusion that he had probable cause to issue the detainer.

### a. Foreign Birth

Of the approximately 40 million foreign born[10] individuals living in the United States as of 2010, 17.6 million or 44% of those individuals are naturalized citizens. *See* https://www.census.gov/prod/2012pubs/acs-19.pdf. This Court has already held that foreign birth cannot alone provide a basis for detention. *Morales I*, 996 F. Supp. 2d at 35; *see also Brignoni-Ponce*, 422 U.S. at 886. Even Agent Donaghy acknowledged in his deposition that "it would be constitutionally improper . . . to issue an immigration detainer simply because the inmate was born outside the U.S." ECF No. 177 at ¶ 94. Therefore, he cannot now argue that Ms. Morales' foreign birth alone was a legitimate basis to establish probable cause upon which he could issue the detainer.

---

[10] The United States Census Bureau defines "foreign born" as anyone who is not a United States citizen at birth, such as a naturalized citizen, a legal permanent resident, a temporary migrant, a humanitarian migrant, or an unauthorized migrant.

### b. Blank Citizenship Field

When Agent Donaghy checked the INFACTS database on the morning of May 4, 2009, the citizenship status field in Ms. Morales' record was blank. He argues that the blank field along with her birth in Guatemala provided an indicia of probable cause to issue the detainer. That field, however, did not provide any information about whether Ms. Morales was a citizen. It was blank and, by virtue of its vacuity, cannot be classified as "apparently trustworthy" evidence upon which Agent Donaghy could conclude that Ms. Morales was not a citizen. *See Cox*, 391 F.3d at 31. Agent Donaghy never contacted RIDOC to inquire about why the citizenship box was empty. Moreover, ICE did not expect the RIDOC to collect citizenship information at intake, noting that it is not part of a local law enforcement officers' job to make citizenship determinations. ECF No. 177 at ¶¶ 64, 71. In fact, Agent Donaghy testified that he did not know if anyone at the RIDOC ever asked Ms. Morales if she was a citizen. *Id.* at ¶ 70. Relying on the blank box for probable cause was unreasonable.

### c. Other Database Checks

Agent Donaghy believes that he would have also queried the CIS and NCIC databases using Ms. Morales' name and date of birth. No record appeared in either database providing another indicia of probable cause to support the detainer. But he testified that he did not know whether the CIS database contained complete immigration benefits information. ECF No. 177 at ¶ 91. The answer to that question bore itself out in discovery, where it was revealed that agents were trained

in 2009 to be aware that CIS is not complete and that "not all aliens will be found in CIS." ECF No. 177 at ¶ 74. The lack of record in an acknowledged incomplete database cannot form the basis for a probable cause determination. Significantly, there is one piece of information that Agent Donaghy could have inputted into CIS to determine whether Ms. Morales was a citizen – her social security number. This number is unique for each individual and not name-dependent. That is perhaps why ICE directed its agents to check an individual's social security number if available because "numbers are the best search mechanisms inside of CIS." *Id.* at ¶ 87. Agent Donaghy failed to search the CIS database using Ms. Morales' social security number despite ICE's directive to do so.

There is also the matter of the name Agent Donaghy used to search the CIS database. He only searched "Ada Morales" even though he knew from the INFACTS database that she was married and that her husband's last name was Morales. *Id.* at ¶ 67. He acknowledged that women often change their last name when they get married. *Id.* at ¶ 80. There is no indication in the record that Agent Donaghy knew what Ms. Morales' maiden name was, but at a minimum, he should have known that searching for a record using only her married name could be under inclusive.

The Court finds that it was not reasonable for Agent Donaghy to infer that Ms. Morales was not a citizen from the absence of information in CIS or NCIC because neither his search criteria nor the CIS database was complete, especially since the other database he searched, INFACTS, did not indicate definitively that

she was not a citizen. The uncontroverted evidence shows that the absence of reliable information, other than foreign birth, demonstrates that Agent Donaghy did not have probable cause to issue the detainer, resulting in a violation of Ms. Morales' rights under the Fourth Amendment of the Constitution.

### d. Proximate Cause

Agent Donaghy next argues that even if he did issue the detainer without probable cause, he was not the cause of Ms. Morales' detention because it was RIDOC, not ICE that held her in custody. Causation under § 1983 is evaluated according to common-law tort principles. *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 50 (1st Cir. 2009). An officer causes a person to be deprived of her constitutional rights if he "'set[s] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989)). Therefore, an officer may be liable for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Gutierrez–Rodriguez*, 882 F.2d at 561 (quoting *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir. 1987)).

In light of these principles, Agent Donaghy's argument that he did not cause the detention is disingenuous at best. Without Agent Donaghy's decision to issue the detainer and direction to RIDOC to abide by such detainer, Ms. Morales would have been free to leave the courthouse after her arraignment Monday afternoon. *Morales II*, 793 F.3d at 218 ("[t]he natural consequence of Donaghy issuing the

detainer was that Morales would be detained for up to 48 hours. Donaghy cannot argue otherwise. The detainer he issued, on its face, instructed ACI officials to 'detain the alien for a period not to exceed 48 hours.'"). Agent Donaghy knew or should have known that RIDOC would detain her because RIDOC had never refused to follow an ICE detainer. Agent Donaghy's actions were a proximate cause of Ms. Morales' unconstitutional detention.

The Court's finding that Agent Donaghy did not have probable cause to issue the detainer and that his actions were a proximate cause of her unconstitutional loss of liberty does not end its inquiry, however. Agent Donaghy has again raised the qualified immunity defense, arguing that his reasonable belief that his actions complied with the law renders him immune from liability for this suit.

### 2.   Qualified Immunity

Agent Donaghy argues that he is immune from Ms. Morales' Fourth Amendment claim against him because it was reasonable for him to rely on the results of the database search he conducted before issuing the detainer. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). "The qualified immunity doctrine is designed to afford officials an added measure of protection against civil liability. To achieve that goal, the doctrine eschews a line that separates the constitutional from the unconstitutional and instead draws a line that separates unconstitutional but objectively reasonable acts from obviously unconstitutional acts." *Cox*, 391 F.3d at

31 (citing *Camilo-Robles v. Zapata*, 175 F.3d 41, 43 (1st Cir. 1999)).   In order to determine whether an officer qualifies for qualified immunity, the Court must determine: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) if so, whether that right was clearly established at the time of the event. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks and citations omitted)).   Regarding the "clearly established" step, the Court must determine "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 32-3 (1st Cir. 2011).   "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (internal citations omitted).

"[O]utrageous conduct will obviously be unconstitutional" without regard to precedent because "the easiest cases don't even arise." *Safford Unified Sch. Dist.*

*No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (brackets and internal quotation marks omitted). The fact that there is not a case precisely on point to provide notice that, in order for an officer's reliance on information in a database to be deemed objectively reasonable, he is obligated to conduct such an electronic search thoroughly, keeping in mind the limitations inherent in such databases does not automatically qualify Agent Donaghy with immunity. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A recent United States Supreme Court decision does not change that axiom. Relying on long-standing authority, the Supreme Court ruled last week that "[o]f course, 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent.'" *White v. Pauly*, No. 16-67, 2017 WL 69170, at *5 (U.S. Jan. 9, 2017).

The Court has already determined that Agent Donaghy did not have probable cause to issue the detainer for Ms. Morales. The evidence upon which he based the detainer was insufficient "to give rise to a reasonable likelihood that the putative arrestee committed the suspected crime." *Cox*, 391 F.3d at 31 (citing *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003)). But in order for qualified immunity to attach, Agent Donaghy must show that the unlawfulness of his conduct "would [not] have been apparent to an objectively reasonable officer standing in [his] shoes." *Cox*, 391 F.3d at 31. Therefore, the Court now must "consider what [Donaghy] knew and when he knew it." *Id.*

Agent Donaghy turns the focus of his argument on the fact that in 2009, there were no published cases holding that an officer did not have probable cause to issue a detainer after a fruitless search of an electronic database for immigration information. Essentially, he argues that he could not have known in 2009 that he should not have relied on the database. In taking this position, he places the blame on the database itself (and, as to INFACTS, on the state law enforcement officers who maintain it) and argues that it was reasonable for him to rely on the information (or lack thereof) contained in the database.

Technology can be a useful tool in law enforcement investigations, but it is only as reliable as its user. An officer can reasonably rely on information in a database as long as that officer knows the database is complete and he inputs reliable and complete information into his search. However, that was not the case here. Agent Donaghy is not entitled to qualified immunity because it was not objectively reasonable for him to assume or to draw an inference from the INFACTS database that Ms. Morales was not a citizen because the citizenship field was blank. As for the second database, Agent Donaghy testified that he knew CIS was incomplete and that he knew it was possible that Ms. Morales could have naturalized under her maiden name. Moreover, it was also not reasonable to assume that his failure to find a match in CIS using her married name meant that she was not a citizen. It is undisputed that ICE expected its agents to search by social security numbers when they are available; Agent Donaghy had her social security number and he did not use it to determine Ms. Morales' status.

As the United States Supreme Court recently affirmed, "[w]hile this Court's case law 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, No. 16-67, 2017 WL 69170, at *4 (U.S. Jan. 9, 2017) (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S.Ct. 305, 308 (2015) (per curiam)). It was most certainly beyond debate in 2009 that an ICE officer should not issue a detainer without probable cause, *see Morales II*, 793 F.3d at 216-17, and should not conduct an investigation that was so obviously deficient. His act in issuing the detainer without probable cause after a clearly sufficient search was obviously unconstitutional.

The cases that Agent Donaghy cites where a court allowed qualified immunity when an officer relied on incorrect, as opposed to incomplete information in a database is not persuasive. *See Parks v. Town of Leicester*, No. 10-30120, 2012 WL 2088926, at *1 (D. Mass. June 7, 2012); *Arizona v. Evans*, 514 U.S. 1, 16 (1995). A database search is only successful and its results are only reliable under a probable cause analysis if the information contained in the database is complete and if the search is thorough and based on available identifiers.

ICE statistics from 2009 show that Agent Donaghy personally issued 77 detainers, 31 of which were later cancelled and only 2 led to an individual being taken into ICE custody. According to Director Chadbourne, a cancelled detainer indicates that the individual subject to the detainer is either a United States citizen or a lawful permanent resident. In other words, almost 50% of the detainers he

issued that year were ultimately erroneous. Agent Donaghy cannot argue that his unlawful behavior would not have been apparent to an objectively reasonable officer. Where an individual's liberty is at stake, a 50/50 success rate is not acceptable. Agent Donaghy's conduct in issuing a detainer on an obviously incomplete investigation was unlawful and that unlawfulness would have been apparent to an objectively reasonably officer. *Cox*, 391 F.3d at 31. He is not entitled to qualified immunity.

Agent Donaghy's Motion for Summary Judgment (ECF No. 157) is DENIED.[11] Ms. Morales' Motion for Summary Judgment as to Defendant Agent Donaghy (ECF No. 173) is GRANTED.

### B. ICE Field Office Director Bruce Chadbourne

Bruce Chadbourne was the Director of ICE's Boston Field Office. He also had supervisory authority over the Rhode Island sub-office. His job as Field Office Director was to oversee enforcement and removal operations, to communicate national policy to his subordinates and sub-offices, including holding training and staff meetings on that policy, and to ensure that they were following that policy.

---

[11] Ms. Morales has included a punitive damages claim against Agent Donaghy, but does not move for summary judgment on it, arguing that a jury should decide whether such extraordinary damages are appropriate. Agent Donaghy, however, does move for summary judgment, arguing that Ms. Morales has not educed enough undisputed evidence of the kind of conduct that justifies a jury's consideration of punitive damages. In light of the fact that the Court has just delivered its liability ruling to the parties and the previous briefing is not guided by that ruling, the Court declines to rule substantively at this time and denies his motion with regard to the portion concerning punitive damages without prejudice. With the Court's ruling in hand, Agent Donaghy is free to file a further motion and briefing if he so chooses.

Procedures for agents to follow in enforcing immigration laws were set forth in a 2008 memo called the "Hayes Memo."[12]  This memo constituted binding ICE policy at the time of this incident.  ECF No. 177 at ¶ 97.  Field Office Directors, like Director Chadbourne, were responsible for communicating this information to agents.  *Id.*  The Hayes Memo dictated that agents needed probable cause to believe that an individual was in violation of immigration laws in order to detain him or her, and insisted that agents were required to investigate fully all claims of citizenship immediately.  *Id.* at ¶ 98.

Having determined that Agent Donaghy violated Ms. Morales' constitutional rights, the Court must now address Director Chadbourne's role in this violation as Agent Donaghy's supervisor.  Ms. Morales moves for summary judgment, arguing that Director Chadbourne violated her Fourth Amendment right by failing to supervise and train his agents to issue detainers properly and failing to implement more effective immigration detainer policies.  Director Chadbourne also moves for summary judgment, arguing that he was not responsible for training agents – that was done at the ICE training academy – or establishing policies for issuing detainers – that happens at ICE Headquarters in Washington, D.C.

### 1.    Supervisory Liability

Because Director Chadbourne did not physically issue the detainer or have a hands-on role in holding Ms. Morales, the Court reviews his conduct under the

---

[12] The Hayes Memo, issued in 2008, named after then-ICE Director James T. Hayes, Jr., defines national ICE policy pertaining to detainer investigation, issuance, or cancellation.  ECF No. 177 at ¶96.

premise of supervisory liability.   "A supervisor may be held liable for the constitutional violations committed by his subordinates where 'an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation.'" *Morales II*, 793 F.3d at 221 (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 275 (1st Cir. 2009) (internal quotation marks omitted)).   "[I]t is beyond debate that a supervisor who either authorized or was deliberately indifferent to his subordinate's issuance of a detainer without probable cause could be held liable for violating the Fourth Amendment." *Morales II*, 793 F.3d at 222 n.5.

The Court begins its analysis, looking for an affirmative link between Agent Donaghy's conduct and Director Chadbourne's actions and inactions.   The undisputed evidence establishes that Director Chadbourne failed to properly train and supervise his subordinates, including Agent Donaghy, concerning the issuance of detainers.   Despite acknowledging his responsibility for communicating ICE policy to agents, Director Chadbourne could not recall discussing the detainer form with his agents or providing any training, guidance, or supervision to them.   ECF No. 177 at ¶ 110, 127.   He could not recall reviewing the Hayes Memo with the agents.   *Id.* at ¶ 103.   Director Chadbourne did not appear to know that probable cause was required to issue a detainer, testifying that "an agent does not have to make a determination that a person is in the country illegally before issuing a detainer."   *Id.* at ¶ 102.   The result of this failure to supervise is that Agent Donaghy issued the detainer against Ms. Morales without probable cause based on

incomplete information without asking a single question before doing so or conducting a further investigation.

Furthermore, Director Chadbourne did not supervise how his employees were issuing detainers through statistical analysis either.  He failed to collect statistics about agent-issued detainers and did not report those statistics to ICE headquarters as was required by a 2007 national ICE policy.  *Id.* at ¶¶ 125, 126. When the weekly statistics on enforcement actions were collected after October 2009, they revealed that agents in the Boston Field Office cancelled roughly two detainers for every three that led to individuals being taken into ICE custody.  *Id.* at ¶ 119.  The only reason Director Chadbourne could think of for cancelling a detainer is if it was determined that the individual was in the United States legally. *Id.* at ¶ 120.  The bottom line is that Director Chadbourne was not aware that there were any problems with the way his Rhode Island Field Office agents issued detainers because he did not pay attention to the process and explicitly failed to supervise agents.

Whether Agent Donaghy's unconstitutional actions were based on Director Chadbourne's inaction in failing to communicate ICE policy, or his failure to review the field offices' detainer statistics for issues, or his failure to ensure through supervision that his agents were not issuing detainers against those asserting citizenship, the Court finds that there was an affirmative link between Agent Donaghy's conduct in issuing an illegal detainer and Director Chadbourne's actions in failing to train and supervise. *Maldonado*, 568 F.3d at 275.  Therefore, Director

Chadbourne is liable for the unconstitutional detainer because his supervision and training of his agents, or the lack thereof, was deliberately indifferent to the possibility that their performance, ignorant of the legal standard for issuing a detainer, could cause a deprivation of civil rights.

### 2.   Qualified Immunity

Director Chadbourne also asserts a defense of qualified immunity. The Court has previously outlined the law, *see supra* Section III.A.2, so will turn directly to Director Chadbourne's factual assertions in support of this defense.  In order to qualify for immunity, Mr. Chadbourne would have to prove that the constitutional right was not clearly established and that, as a reasonable officer, he did not understand that his conduct violated that right.   Where Director Chadbourne's qualified immunity defense fails is in proving the "clearly established" prong.  The evidence shows that it was clearly established in 2009 that Ms. Morales had a constitutional right as a United States citizen not to have her liberty infringed based on a detainer that lacked probable cause, *Morales II,* 793 F.3d at 211, and Director Chadbourne should have understood that his actions violated the Fourth Amendment.  He should have known that agents needed probable cause to issue the detainer, but was deliberately indifferent to the standard under which ICE should issue detainers.  The mandatory directives from the Hayes Memo, which he was responsible for knowing, understanding, and communicating to his agents, said as much.

Moreover, he had the power and authority to supervise these individuals. ICE policy required him to keep statistics on enforcement of immigration detainers, presumably so that any aberration of policy could be detected, but he failed to do so, permitting violations of the constitutional rights of United States citizens like Ms. Morales.  Director Chadbourne's conduct was not objectively reasonable in 2009 and the Court finds that qualified immunity does not shield his deficiencies.

Ms. Morales' Motion for Summary Judgment as to Director Chadbourne (ECF No. 173) is GRANTED.   Director Chadbourne's Motion for Summary Judgment (ECF No. 157) is DENIED.[13]

C.    The United States

Ms. Morales has brought negligence and false imprisonment claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671.  The FTCA acts as a general waiver of sovereign immunity and "permits suits against the government for torts caused by the wrongful acts of any government employee while acting within the scope of his office or employment." *Dominguez v. United States*, 799 F.3d 151, 153 (1st Cir. 2015).  "The FTCA exempts intentional torts from its sovereign immunity waiver but expressly allows actions against the United States for claims of 'assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution' arising out of 'acts or omissions of investigative or law

---

[13] The Court's decision as to Director Chadbourne's motion for summary judgment on the punitive damages claim mirrors its decision on Agent Donaghy's identical motion. *See supra* n.11.  His motion as to punitive damages is denied without prejudice at this time, pending Director Chadbourne's decision whether to file a motion and further briefing his potential liability for punitive damages.

enforcement officers of the United States Government.'" *Abreu-Guzman v. Ford*, 241 F.3d 69, 75 (1st Cir. 2001) (quoting 28 U.S.C. § 2680(h)).

Ms. Morales moves for summary judgment (ECF No. 173), arguing that Agent Donaghy and Director Chadbourne acting within the scope of their employment, committed torts against her for which the United States is liable.[14] The United States cross moves for summary judgment and defends itself by arguing that none of its agents violated Ms. Morales' rights, but that even if they did, it is not liable because the State actors, not the United States, caused her detention.  It argues that, at each stage of Ms. Morales' detention after the state court judge discharged her, individuals other than United States employees were the cause of her false imprisonment.

To prove a false imprisonment claim against the United States under Rhode Island law,[15] Ms. Morales must prove "(1) the defendant intended to confine [her], (2) [she] was conscious of the confinement, (3) [she] did not consent to the confinement, and (4) the confinement was not otherwise privileged.  It is an essential element that [Ms. Morales] show that [] she was detained without legal justification or under a void process." *Moody v. McElroy*, 513 A.2d 5, 7 (R.I. 1986) (internal citations omitted).  To make her negligence claim, Ms. Morales "must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of

---

[14] RIDOC Director Wall has also filed a cross-claim against the United States on the same grounds and similarly moves for summary judgment.  ECF No. 168.

[15] "The FTCA looks to state law to flesh out the elements of particular torts." *Limone v. United States*, 579 F.3d 79, 88 (1st Cir. 2009).  Because the conduct at issue in this case occurred in Rhode Island, the Court applies Rhode Island law.

that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Mills v. State Sales, Inc.*, 824 A.2d 461, 467–68 (R.I. 2003).

The United States first argues that it is not liable under the FTCA because none of its agents violated Ms. Morales' rights. That argument is rejected in light of the Court's determination that Agent Donaghy and Director Chadbourne did violate her constitutional rights. Therefore, the crux of the federal defendants' defense is essentially that they are not liable because Agent Donaghy only issued the detainer because of the information that RIDOC provided (or failed to provide). They raise the fact that no United States employee physically held Ms. Morales after her state court arraignment until RIDOC turned her over to agents the next morning.

This defense does not pass muster. First, the United States cannot argue that RIDOC caused Agent Donaghy to issue the detainer when, at the same time, it concedes that RIDOC has no responsibility or authority over immigration investigations or determinations. ICE cannot blame RIDOC for not doing a thorough job of interviewing Ms. Morales as to her immigration status when it admits that that is not the State's job.[16] While it is true that RIDOC did not obtain

---

[16] The United States also argues that Ms. Morales' detention could have been shortened or avoided all together if RIDOC had informed ICE that it was holding Ms. Morales before the ICE office closed. From the record, it appears that it was late afternoon by the time the Rhode Island Sheriff's Department transported Ms. Morales from court back to the ACI. RIDOC sent a fax to the Rhode Island Field office at 8:28 p.m. that evening, informing ICE that it had Ms. Morales in custody on the detainer and instructed them to pick her up "the next day." The United States asserts that, if its agents had heard from the State before close of business, it would have immediately investigated Ms. Morales and her extra stay in

all of the information from Ms. Morales at intake that ICE needed to determine her citizenship,[17] Agent Donaghy saw the blank citizenship field in INFACTS and assumed that it should say "No" because Ms. Morales was born in Guatemala. This is impermissible. Agent Donaghy did not inquire of RIDOC about this missing field. He checked other databases to see if Ms. Morales was naturalized, but he never checked using her social security number, which would have immediately given him this information. The fact that Agent Donaghy and Director Chadbourne did not physically detain Ms. Morales – they expected the RIDOC to do that – does not alter the fact that "a law enforcement officer is 'responsible for the natural consequences of his actions.'" *Morales II*, 793 F.3d at 217 (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)).

Indeed, "[t]he natural consequence of [Agent] Donaghy issuing the detainer was that [Ms.] Morales would be detained for up to 48 hours. [Agent] Donaghy cannot argue otherwise. The detainer he issued, on its face, instructed ACI officials to 'detain the alien for a period not to exceed 48 hours.'" *Morales II*, 793 F.3d at 218. The United States and its officials cannot induce state agencies to act and then disclaim their responsibility for the desired results. The extensive record makes clear that agents routinely issued investigatory detainers without probable

---

state custody would have been avoided. This is speculative at best, and again, inappropriately puts the onus on the State.

[17] RIDOC internal policy required an officer in the ID Unit to ask about citizenship. Officer Lyons testified that they were required to ask this question not under a specific immigration-based policy at the RIDOC, but under a broader policy focused on collecting demographics about state inmates.

cause and with the full expectation that state correctional facilities would hold the individuals under investigation.   The law is clear that such actions by federal government actors violate the Constitution.

The United States is liable to Ms. Morales under the FTCA; its Motion for Summary Judgment (ECF No. 157) is DENIED.  Ms. Morales' Motion for Summary Judgment (ECF No. 173) is GRANTED.  In light of the Court's decision that the United States, Agent Donaghy, and Director Chadbourne are liable for violating Ms. Morales' constitutional rights, Director Wall's Cross Motion for Summary Judgment against the United States (ECF No. 168) is GRANTED.

## IV.   CLAIMS AGAINST THE STATE DEFENDANT

The Rhode Island Department of Corrections and its Director, A.T. Wall, also played a part in subjecting Ms. Morales to unlawful confinement.  Ms. Morales asserts four counts against the RIDOC Director Wall: Counts IV and V are based on 42 U.S.C. § 1983 and allege: (1) violation of her right to be free from illegal seizures under the Fourth and Fourteenth Amendments to the United States Constitution, and (2) violation of her right to due process under the Fifth and Fourteenth Amendments to the United State Constitution; and Counts VII and VIII are based on state law and assert false imprisonment and negligence.  Director Wall moved to dismiss each count under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  The Court denied the motion.  *Morales I*, 996 F. Supp. 2d at 38-41.   Director Wall now moves for summary judgment (ECF No. 167), arguing that he did not violate her rights and, for the first time, arguing that he is entitled

to qualified immunity in light of the developed record.  Ms. Morales cross-moved for
summary judgment against Director Wall.  ECF No. 175.

A.    Constitutional Violations

This Court had found, in analyzing the State's Motion to Dismiss, that
Ms. Morales set forth a valid constitutional claim of illegal seizure against the State
because it detained her when "faced with a facially invalid request to detain
Ms. Morales pending an investigation of her immigration status lodged solely based
on her country of birth."  *Morales I*, 996 F. Supp. 2d at 39.  As to the allegation of
procedural due process violation, the Court found that "it was incumbent on the
RIDOC at the very minimum to have allowed Ms. Morales to produce her
citizenship documentation.  Instead, the State blindly complied with the detainer,
even in spite of Ms. Morales' protestations that she was a United States citizen, not
subject to an ICE detainer."  *Id.* at 40–41.  Nothing the parties have submitted in
the summary judgment process, after lengthy and extensive discovery, has altered
this Court's conclusion, after it analyzed the pleadings, that the State did indeed
violate Ms. Morales' constitutional rights.[18]  It remains undisputed that the State
detained Ms. Morales based on an invalid detainer and that it did not afford her
appropriate notice and an opportunity to be heard on her further detention,[19] both
in violation of Ms. Morales' constitutional rights.

---

[18] In order to avoid repetitious recitation of the facts, the Court will refrain
from setting forth specific undisputed facts here because it will engage in a more
detailed discussion in the next section on the State's immunity from these claims.

[19] While there is a question in the Court's mind about whether the State was
required in 2009 to provide a formal hearing on her citizenship in light of its limited

B.     Qualified Immunity

Having concluded that Director Wall's acts contributed to Ms. Morales' unconstitutional detention, the Court must now determine if he is entitled to qualified immunity, a defense that he raises for the first time in his motion for summary judgment. The Court has previously set forth the complete standard for finding government actors immune from suit. *See supra* Section III.A.2.; *Maldonado*, 568 F.3d at 269 (violation of a constitutional right and if so, whether the right was clearly established at the time of the violation). The question for the Court in this case now turns on whether the constitutional rights that were violated were "clearly established" such that a reasonable person would have known he violated those rights.

While the Court decides as a matter of law whether Ms. Morales has made out a violation of a constitutional right (which it has above), consideration of the fulfillment of the second inquiry must be fact specific and based on the totality of the circumstances. Determining whether a right is "clearly established" requires the Court to consider "two aspects: (1) 'the clarity of the law at the time of the alleged civil rights violation' and (2) whether, on the facts of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.'" *Estrada v. Rhode Island*, 594 F.3d 56, 63 (1st Cir. 2010) (quoting *Maldonado*, 568 F.3d at 269).

---

role in the immigration process as discovery has borne out, the Court is comfortable concluding here that it was in order to be able to proceed in its analysis on the State's qualified immunity defense.

To compound the complexity of the qualified immunity analysis, the parties disagree about the contours of this right vis-a-vis Director Wall's conduct and how those case-specific particulars should inform this Court's analysis. Ms. Morales advocates for a more general right – that her right to be free from an unconstitutional seizure was clearly established because it was uncontroverted in 2009 that a United States citizen should not be held for an immigration inquiry. That view is certainly hard to disagree with, but the Supreme Court has cautioned courts to take care in painting with too broad a brush in considering the "clearly established" prong in the qualified immunity inquiry. Courts should not "define clearly established law at a high level of generality[,]" but inquire more specifically "whether the violative nature of particular conduct is clearly established." *Ashcroft v. al–Kidd*, 563 U.S. at 742. The examination "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, at ___, 136 S.Ct. at 308; *see also White v. Pauly*, No. 16-67, 2017 WL 69170, at *4 (U.S. Jan 9, 2017).

1.    Fourth Amendment Seizure Claims

The Court first turns to the second prong of this "clearly established" analysis because it finds that it is dispositive of this issue. Director Wall is entitled to qualified immunity if a reasonable corrections director in May 2009 would not have understood that his conduct violated Ms. Morales' constitutional rights. In light of that definition, the Court looks at the law and policy in May 2009 to

determine whether Director Wall would have been on notice that his conduct in honoring the ICE detainer constituted an unlawful seizure.

It is important to note at the outset that even Ms. Morales concedes that RIDOC officials are not equipped or required to make citizenship and/or removability determinations. Her position seems inconsistent with her argument that Director Wall and/or his corrections employees should have independently assessed Ms. Morales' citizenship both when she was processed initially at the ACI on the state charges and when she returned from court, held solely on the ICE detainer, to somehow ensure that the detention was constitutional. And while the law across the circuits is clear today that the RIDOC was not required to detain Ms. Morales pursuant to the ICE investigatory detainer, it was not so clearly established in 2009 such that Director Wall acted unreasonably in honoring the detainer. *See Orellana v. Nobles Cty.*, No. CV 15-3852 ADM/SER, 2017 WL 72397, at *4 (D. Minn. Jan. 6, 2017) (legality of ICE detainers has shifted, citing several 2014 court decisions that held a detainer was a mere request rather than a mandatory requirement); *Galarza v. Szalczyk*, Civil Action No. 10-cv-06815, 2012 WL 1080020 (E.D. Pa. Mar. 30, 2012), vacated and remanded by *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014); *Rios-Quiroz v. Williamson Cty, TN*, No. 3-11-1168, 2012 WL 3945354 (M.D. Tenn. Sept. 10, 2012).

The Court has previously found, and the First Circuit confirmed, that there could be no question in 2009 that immigration detainers had to be issued based on probable cause. *Morales II*, 793 F.3d at 211. Therefore, when the State was

confronted in 2009 with an ICE-issued detainer, it would have been reasonable for it to assume that ICE had probable cause to issue it. Director Wall has consistently maintained and the facts established that he believed that RIDOC's long-standing policy of honoring ICE detainers was legal and not capable of violating any individual's constitutional rights.

Moreover, in 2009 it was reasonable to assume that honoring the ICE detainer was mandatory. This is especially true here where the language of the detainer itself, citing federal law, stated that it was mandatory. *See* 8 C.F.R. § 287.7 (section "requires that you detain the alien for a period not to exceed 48 hours … to provide adequate time for DHS to assume custody of the alien."). Indeed, before 2009, most state and local law enforcement in New England, honored ICE detainers without independently assessing probable cause, and it was ICE's expectation that the states would hold individuals when ICE issued a detainer.[20] Therefore, the Court finds that it was reasonable for Director Wall and RIDOC to conclude in 2009 that the ICE detainer it received was valid, supported by probable cause, and mandatory. His "reasonable, although mistaken, conclusion about the lawfulness of [his] conduct" does not subject him to personal liability. Under these circumstances. *Cookish v. Powell*, 945 F.2d 441, 443 (1st Cir. 1991). In light of the

---

[20] Perhaps in recognition of the fact that ICE was issuing erroneous detainers to them resulting in detention of United States citizens, some state law enforcement agencies began to create policies during the period between 2010 and 2012, governing how those agencies enforce ICE detainers. *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014).

facts and the law, the Court finds that based on the totality of the circumstances and undisputed facts, Director Wall is entitled to qualified immunity on this claim.

### 2.    Procedural Due Process Claim

The Court's consideration of Director Wall's qualified immunity defense to the due process claim follows the pattern of and builds on its analysis above.  Again, the Court first turns to the second prong of the "clearly established" qualified immunity analysis to consider whether Director Wall, as "a reasonable defendant[,] would have understood that his conduct violated the plaintiff's constitutional rights."  *Maldonado*, 568 F.3d at 269.  Based on the facts of this case, the Court finds that he would not have so understood and therefore is entitled to immunity on this claim.

As an initial matter, in its order denying Director Wall's motion to dismiss the due process claim, the Court held that RIDOC should have allowed Ms. Morales, at the very least, to produce her citizenship documentation once state officials determined that she should be held on the ICE detainer.  *Morales I*, 996 F. Supp. 2d at 40-41.  There is no evidence, however, that RIDOC rejected any attempt to do so. Ms. Morales asserts that her husband appeared in court with documentation that would have proved her citizenship, but no one from the RIDOC was in court that day to observe his display.   And, while a RIDOC representative testified that it would take no action if a family member showed up at the ACI with a passport, but would direct that individual to immigration authorities, there is no evidence that

Mr. Morales went to the ACI with that paperwork or called to inquire how he could present such paperwork and was rejected.

ICE faults the RIDOC for not collecting Ms. Morales' citizenship status at intake, but has acknowledged that RIDOC had no role once the detainer issues except to hold the individual. Director Wall did not believe the RIDOC had any role to play in ICE's detainer practices except to notify ICE that the individual subject to the detainer was in custody and to hold her until ICE officials could retrieve the individual for questioning. The State did notify ICE after Ms. Morales was processed into the RIDOC after court; unfortunately that was after the ICE office closed for the day so ICE could not pick her up until the next day. But the Court cannot conclude that, under these circumstances, Director Wall would have understood that his conduct in notifying ICE that Ms. Morales was in custody and holding Ms. Morales for ICE for that period violated her constitutional right to due process. Therefore, Director Wall is entitled to qualified immunity on this claim.

### 3.    State Law Tort Claims

Ms. Morales has alleged two state law tort claims, false imprisonment and negligence, against Director Wall. Ms. Morales argues that her imprisonment was not supported by probable cause so was not legally justified, rendering Director Wall liable in tort. The arguments from both parties are similar on each so the Court will deal with them concurrently.

A brief primer on the elements of these claims is in order. To bring a claim for false imprisonment, there must be an intent to confine, the individual must be conscious of the confinement, it must be without her consent, and the confinement

must be without legal justification. *Moody*, 513 A.2d at 7 (internal citations omitted). To make her negligence claim, Ms. Morales must show a legally cognizable duty, a breach of that duty, that the conduct proximately caused the resulting injury, and damages. *Mills*, 824 A.2d at 467–68.

Because the Court finds that Ms. Morales has not put forth sufficient facts to support the requirement that Director Wall acted without legal justification (*see* analysis above). The false imprisonment and negligence claims against Director Wall are dismissed. Director Wall's Motion for Summary Judgment on Ms. Morales' constitutional and state law tort claims (ECF No. 167) is GRANTED. Ms. Morales' Motion for Summary Judgment (ECF No. 175) is DENIED.

## V.   CONCLUSION

The facts of this case are disturbing on many levels. The fact that a United States citizen was held in prison on an erroneous immigration detainer without probable cause for even one night should concern all Americans. Law enforcement agencies that are charged with enforcing immigration laws need to go above and beyond in crafting and executing constitutional policies and procedures to prevent and avoid the egregious errors that happened in this case. Federal officers need to follow those procedures with an eye toward protecting the constitutional rights of all. It is clear to the Court that the result of this ludicrous series of events is that Ms. Morales was humiliated, kept from her family, and unjustly treated like a criminal.

Plaintiff Ada Morales' Motion for Summary Judgment as to the Federal Defendants Bruce Chadbourne, Edward Donaghy, and the United States of America

(ECF No. 173) is GRANTED.   The Federal Defendants' Motion for Summary Judgment (ECF No. 157) is DENIED.   Defendant Director Ashbel T. Wall's Motion for Summary Judgment against the Plaintiff (ECF No. 167) is GRANTED. Defendant Director Ashbel T. Wall's Motion for Summary Judgment on the cross-claims (ECF No. 168) is GRANTED.   Plaintiff Ada Morales' Motion for Summary Judgment as to Defendant Director Ashbel T. Wall (ECF No. 175) is DENIED.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

January 24, 2017